Robert E. Boone III (California Bar No. 132780)
reboone@bclplaw.com
**BRYAN CAVE LEIGHTON PAISNER LLP**
120 Broadway, Suite 300
Santa Monica, CA 90401-2386
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Kelly W. Cunningham (California Bar No. 186229)
kcunningham@cislo.com
**CISLO AND THOMAS LLP**
12100 Wilshire Boulevard, Suite 1700
Los Angeles, CA 90025
Telephone: (310) 451-0647
Facsimile: (310) 394-4477

Attorneys for Defendant
AMP PLUS, INC. d/b/a Elco Lighting

# UNITED STATED DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DMF, Inc., a California corporation,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>AMP PLUS, INC., d/b/a ELCO LIGHTING, a California corporation; ELCO LIGHTING, INC., a California corporation,<br><br>　　　　Defendants.<br><br>AMP PLUS, INC., d/b/a ELCO LIGHTING, a California corporation;<br><br>　　　　Counterclaimant,<br><br>　　v.<br><br>DMF, Inc., a California corporation,<br><br>　　　　Counter-Defendant. | Case No. 2:18-cv-07090-CAS-GJS<br><br>**DECLARATION OF TIMOTHY S. FISHER IN SUPPORT OF OPPOSITION TO PLAINTIFF DMF, INC.'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: January 7, 2019<br>Time: 10:00 a.m.<br>Location: Courtroom 8D,<br>350 West First Street, Los Angeles, CA |

USA01\12336001.1

DECLARATION OF TIMOTHY S. FISHER

# DECLARATION OF TIMOTHY S. FISHER

1. Contents

Contents ........................................................................................................... 1

Overview of this Declaration .......................................................................... 2

My Professional Qualifications ....................................................................... 2

Legal Standard Used in this Declaration ........................................................ 3

Sources Searched and References Cited ......................................................... 5

Claim Construction for the '266 Patent .......................................................... 6

   Definition of "Person of Ordinary Skill in the Art" .................................... 6

   Construction of "Junction Box" .................................................................. 6

   Construction of "Light Source Module" ..................................................... 6

   Construction of "Driver" ............................................................................. 7

   Construction of "Unified Casting" .............................................................. 7

   Construction of "Reflector" ......................................................................... 7

   Construction of "Lens" ................................................................................ 7

   Construction of "Trim" ................................................................................ 8

Elaboration of Definitions and Additional Issues .......................................... 8

   The Meaning of "Heat Conducting" ........................................................... 8

   The Meaning of "Dissipate Heat" ............................................................... 8

   The Meaning of "Closed Read Face" ......................................................... 8

The '266 Patent Is Invalid ............................................................................. 10

ELCO Products Do Not Infringe The '266 Patent ....................................... 14

1
DECLARATION OF TIMOTHY S. FISHER

Overview of this Declaration

1. I, Professor Timothy S. Fisher, have been retained as a technical expert by Bryan Cave LLP, counsel for AMP Plus, Inc. dba Elco Lighting, to analyze and respond to DMF, Inc.'s Motion for Preliminary Injunction dated December 17, 2018; the Declaration of James R. Benya dated December 17, 2018; and related documents in the litigation entitled, *DMF, Inc. v. AMP Plus, Inc. dba Elco Lighting, et al.*, in the District Court for the Central District of California regarding United States Patent No. 9,964,266 ("the '266 Patent"). Unless otherwise noted, the facts and opinions set forth in this declaration are of my own personal knowledge, and if called to testify I could and would competently testify thereto.

My Professional Qualifications

2. My curriculum vitae is attached as Exhibit 18, and a brief summary of my professional qualifications and background follow. I received the Bachelor of Science degree in mechanical engineering from Cornell University in 1991, and the Doctor of Philosophy degree in mechanical engineering from the same institution in 1998. I worked as a design engineer at Motorola's Automotive and Industrial Electronics Group from 1991 to 1993 before beginning my graduate studies.

3. I joined UCLA's Mechanical and Aerospace Engineering faculty in 2017 after 15 years at Purdue's School of Mechanical Engineering and several previous years at Vanderbilt University. In 2018 I was named Chair of the Mechanical and Aerospace Engineering Department and received the John P. and Claudia H. Schauerman Endowed Chair in Engineering at UCLA, as well as the Heat Transfer Memorial Award from the American Society of Mechanical Engineers. I am also an Adjunct Professor in the International Centre for Materials Science at the Jawaharlal Nehru Centre for Advanced Scientific Research (JNCASR) and co-direct the JNCASR-Purdue Joint Networked Centre on Nanomaterials for Energy. From 2009 to 2012, I served as a Research Scientist at

the U.S. Air Force Research Laboratory's newly formed Thermal Sciences and Materials Branch of the Materials and Manufacturing Directorate. I am active in service to the American Society of Mechanical Engineers through a variety of technical and leadership responsibilities, a former Co-Editor of the journal Energy Conversion & Management and currently Specialty Chief Editor for Thermal and Mass Transport of the journal Frontiers in Mechanical Engineering. Throughout my academic faculty career of 20 continuous years I have conducted teaching and research on mechanical engineering subjects ranging from engineering design to heat transfer to fluid mechanics. I have published extensively, authoring or co-authoring more than 300 peer-reviewed technical papers and two books.

4. I am being compensated for my time consulting in this matter at the rate of $350 per hour. My salary is not dependent on the outcome of the case, and I have no personal interest or financial stake in this litigation or its outcome.

The Legal Standards I Am Using in this Declaration

5. I am not an attorney. For the purposes of this declaration, I have been informed about certain aspects of the law that are relevant to my analysis and opinion. In formulating my opinions, I have taken into account the following principles of the law regarding patent infringement, which I understand to be accurate statements of the law.

6. I understand that infringement involves a two-step analysis and that the first step involves determining the proper construction of the asserted claims.

7. I have been instructed that ultimately claims are construed by the judge in light of how one of ordinary skill in the art would understand the claims. It is my understanding that what is to be considered includes the language of the claims, the patent specification, the drawings, and the prosecution history, including any prior art listed by the Examiner or the applicant. It is my understanding that information external to the patent, including inventor and expert testimony and unlisted prior art,

3
DECLARATION OF TIMOTHY S. FISHER

are to be considered only if ambiguities remain. However, expert testimony may be useful in helping to explain the technology. I further understand that technical dictionaries, encyclopedias, and treatises may be used in claim construction, as long as these definitions do not contradict any definition found in or ascertained by a reading of the patent documents.

8. I understand that in arriving at the proper construction of the language of the claims of a patent, it is generally improper to bring requirements or limitations recited in the specification or drawings into the meaning of the claim terms. However, I understand that there are certain situations in which a patent may define a claim term in the specification and/or reference a particular aspect of the invention as being important or critical to the invention, and in such cases, it may be proper to construe a claim term in a more limited manner than its plain, ordinary meaning in the claim itself. I further understand that a patent file history may contain references that specifically limit the scope of a term used in the claims.

9. I understand that patent claims may be written in a format known as "means plus function" language in which particular claim language may be described in functional terms, such as a means for accomplishing a task, and that under this particular claiming format, the structure(s) that accomplishes the recited means or function would typically be recited elsewhere in the claims or in the patent specification.

10. I understand that the second step of the infringement analysis involves determining whether the accused products contain all of the elements of the asserted claims. A product is covered by and, thus, infringes a patent claim if the product meets or embodies each and every limitation of the patent claim, either literally or under the doctrine of equivalents. A method claim is infringed when each of the recited steps are performed.

11. I understand that an accused product literally infringes on a patent claim if it contains every limitation of the claim. I further understand that a prior art reference without express reference to a claim limitation may nonetheless anticipate under the doctrine of inherency, provided the prior art necessarily functions in accordance with, or includes, the claims limitations, it anticipates.

12. I understand that an accused product that does not literally infringe a claim may nonetheless infringe the claim under the doctrine of equivalents. It is my understanding that to establish infringement under the doctrine of equivalents, the accused product must be shown to include an equivalent for each claim limitation that is literally absent.

13. It is my understanding that infringement under the doctrine of equivalents may be established by showing that the elements of the accused product perform substantially the same function, in substantially the same way, to achieve substantially the same result as the corresponding elements of the patented invention. I further understand that DMF is not asserting infringement under the doctrine of equivalence at this time.

<ins>Sources Searched and References Cited</ins>

14. As part of this work, I conducted literature searches with respect to methodologies and techniques identified in the '266 Patent, Benya Declaration, and related documents. The '266 Patent is reproduced in Exhibit 19 of this Declaration. DMF's Motion for Preliminary Injunction, the Benya Declaration, and the '266 Patent prosecution history are hereby incorporated by reference. The libraries, archives, and repositories that I searched during my analysis include the Web of Science, Google Scholar, the IEEE Xplore digital library, and the U.S. Patent and Trademark Office (USPTO) patent database. As a result of these searches, I retrieved and examined journal articles, conference papers, books, manuals, product specifications, and patents spanning more than two decades.

DECLARATION OF TIMOTHY S. FISHER

15. All references cited in this declaration were published in the open scholarly literature either in conference proceedings, in professional journals of wide distribution, and/or the internet. I reference various websites, all of which are accessible to anyone through the internet, as well as patents issued by the USPTO, all of which are part of the public record and freely accessible.

Claim Construction for the '266 Patent

16. As discussed above, infringement analysis involves a two-step process, the first of which involves determining the proper construction of the asserted claims in light of how a person of ordinary skill in the art would understand the claims and their plain, ordinary meaning.

Definition of "Person of Ordinary Skill in the Art"

17. I understand that with respect to the '266 Patent, the person of ordinary skill in the art should be a person with a degree in Mechanical or Electrical Engineering or closely related field, and several years of experience in designing recessed lighting devices and/or components.

Construction of "Junction Box"

18. The Benya Declaration and the '266 Patent construe a "junction box" as "a structure that separates the inner components of the recessed lighting system 1, including electrical wires/cables, from the items inside a ceiling or crawl space (e.g., insulation) in which the junction box 2 has been installed" [Benya Declaration, page 7, paragraph 17]. For the purpose of this Declaration, I will use this definition of "junction box".

Construction of "Light Source Module"

19. The Benya Declaration and the '266 Patent construe a "light source module" as "the light source module 3 receives electricity from the driver 4 … such that the light source module 3 may emit a controlled beam of light into a room or

surrounding area" [Benya Declaration, page 13, paragraph 26]. For the purpose of this Declaration, I will use this definition of "light source module".

### Construction of "Driver"

20. The Benya Declaration and the '266 Patent construe a "driver" as "an electronic device that supplies and/or regulates electrical energy to the light source module 3 and thus powers the light source module 3 to emit light" [Benya Declaration, page 13, paragraph 27]. For the purpose of this Declaration, I will use this definition of "driver".

### Construction of "Unified Casting"

21. The Benya Declaration and the '266 Patent applicant construe a "unified casting" as "a one-piece housing for the driver, the light source module and the reflector, while also acting as a heat sink thereby eliminating the need for any additional heat sink piece" [Benya Declaration, page 17, paragraph 36]. For the purpose of this Declaration, I will use this definition of "unified casting".

### Construction of "Reflector"

22. The Benya Declaration and the '266 Patent construe a "reflector" as an object that "may surround the light source module 3 … to adjust the way light emitted by the light source is focused inside a room or surrounding area" [Benya Declaration, page 18, paragraph 39]. For the purpose of this Declaration, I will use this definition of "reflector".

### Construction of "Lens"

23. The Benya Declaration and the '266 Patent construe a "lens" as "a protective barrier for the light source module 3 … and may also assist in the diffusion of light and increase the uniformity of light over the surface of the recessed lighting system" [Benya Declaration, page 18, paragraph 40]. For the purpose of this Declaration, I will use this definition of "lens".

Construction of "Trim"

24. The Benya Declaration and the '266 Patent construe a "trim" as an object that "serves the primary purpose of covering the exposed edge of the ceiling or wall where a hole is formed in which the recessed lighting system 1 resides while still allowing light from the light source module 3 to be emitted into a room through an aperture 22" [Benya Declaration, page 18, paragraph 41]. For the purpose of this Declaration, I will use this definition of "trim".

1. Elaboration of Definitions and Additional Issues

25. This section elaborates on the definitions, meanings, and implications of several terms and phrases used in the '266 Patent.

The Meaning of "Heat Conducting"

26. The term 'heat conduction' refers to the transport of thermal energy, also known as heat, through a material that is nominally stagnant.[1] Heat conduction occurs by the thermally agitated motion of a variety of microscopic mechanisms in different substances: molecules in fluids, electrons in metals, atomic vibrations in nonmetals. By itself, heat conduction does not imply efficacy of cooling.

The Meaning of "Dissipate Heat"

27. The term 'to dissipate' means, according to Merriam-Webster, "to cause to spread thin or scatter and gradually vanish."[2] The technical meaning in the context of the transfer of heat is consistent with this general definition, namely that to "dissipate heat" implies a spreading of heat such that it vanishes into the broader surroundings, typically by heat convection or radiation from a surface. If heat is continually supplied, then the process of heat dissipation will persist if a heat flow path to the surroundings exists.

---

[1] T. Bergman et al., *Fundamentals of Heat and Mass Transfer, 7th Ed.*, Wiley, pp. 3-12, 2011.
[2] Merriam-Webster Dictionary. https://www.merriam-webster.com/dictionary/dissipate

8
DECLARATION OF TIMOTHY S. FISHER

### The Meaning of "Closed Rear Face"

28. Contrary to the Benya Declaration, the '266 Patent construes the term "closed rear face" as the exterior surface of the casting. Both Figures 1 and 2 of the '266 patent clearly identify that the closed rear face **14** as well as the open front face **15** of the casting as the exterior surfaces:



(Figure 1 of the '266 Patent).

29. Additionally, the claims of the '266 Patent use the term "closed rear face" in a manner that would cause a person of ordinary skill to interpret the term as meaning the exterior surface of the rear wall.

30. First, only the exterior surface can "significantly dissipate heat generated by the light source module during operation" as recited at the end of both independent claims 1 and 17.

31. Second, to determine whether the "dimension between the heat conducting closed rear face and the open front face" is "less than 2 inches," one would measure the distance between the two exterior surfaces. Indeed, DMF argued during prosecution that the claimed invention is distinguished over the prior art by being small enough to fit within a standard-sized junction box. I attach as Exhibit 17 a true and correct copy of DMF's February 6, 2018 Supplemental Amendment. At pp. 18-19 of this supplement amendment, DMF argued that "the claimed heat

9
DECLARATION OF TIMOTHY S. FISHER

conducting unified casting ... has a particular configuration and dimensions to facilitate recessing the unified casting substantially inside a standard-sized junction box...." It is the dimension between the **exterior** surfaces that determines that the patented configuration can fit recessed inside a standard-sized junction box.

32. Third, to determine whether "the light source module is closer to the closed rear face of the unified casting than the open front face of the unified casting," one would compare the distances between the light source and the *exterior* surfaces of the front and back faces. One reason for this is consistency. The open front face has no internal surface to speak of because it is open. It has only an exterior surface (identified as reference numeral **15** in Figure 1 above).

The '266 Patent Is Invalid

The '266 Patent Is Invalid on Anticipation Grounds

33. I attach hereto as Exhibit 1 a true and correct copy of U.S. Patent No. 9,222,661 to Jim Wook Kim et al. ("Kim"). The prior art Kim patent states a priority date of February 6, 2013 and discloses the structure recited in the independent claims of the '266 patent. Even if the Kim patent does not expressly disclose a plurality of elements positioned proximate to the open front face so as to align with corresponding tabs of a standard junction box, I understand that a prior art reference without express reference to a claim limitation may nonetheless anticipate under the doctrine of inherency.

34. Here, forming elements proximate to the open front face so as to align with a standard junction box is inherent in that normal use would require one to align and mount the device disclosed in the Kim reference. I therefore attach hereto as Exhibit 2 a claim chart (the "Kim Claim Chart") showing how Kim anticipates representative claim 1 of DMF's U.S. Patent No. 9,964,266 ("the '266 patent"), the patent-at-issue in the present action.

10
DECLARATION OF TIMOTHY S. FISHER

35.     I attach hereto as Exhibit 3 a true and correct copy of relevant pages from a June 17, 2012 Imtra catalog ("Imtra").  The prior art Imtra product and product description was published at least by June 17, 2012.  The Imtra catalog discloses the structure recited in the independent claims of the '266 patent.  I therefore attach hereto as Exhibit 4 a claim chart (the "Imtra Claim Chart") showing how the Imtra product and product description anticipates representative claim 1 of the '266 patent.

The '266 Patent Is Invalid on Obviousness Grounds

36.     The Kim patent and Imtra product also render obvious the independent claims of the '266 patent.

37.     Regardless of whether the Kim patent expressly discloses anything akin to "a plurality of elements positioned proximate to the open front face so as to align with corresponding tabs of a standard junction box," the addition of such alignment features to Kim would have been obvious to a person of ordinary skill in the art.

38.     Similarly, regardless of whether the side loops of Imtra product and product description are sufficiently akin to "a plurality of elements positioned proximate to the open front face so as to align with corresponding tabs of a standard junction box," the addition of such alignment features to the Imtra product would have been obvious to a person of ordinary skill in the art.

39.     Furthermore, I attach hereto as Exhibit 5 a true and correct copy of China Patent Publication No. CN202733693U to Foshan Huaquan Electrical Lighting Co. ("Foshan").  The prior art Foshan patent reference was published on February 13, 2013 and discloses a recessed lighting device that has a plurality of elements positioned proximate to the open front face so as to align with corresponding tabs of a standard junction box.

40.     Additionally, by the priority date of the '266 Patent, numerous adaptor plates were available on the market for mounting such recessed electrical and

11
DECLARATION OF TIMOTHY S. FISHER

electronics component to or inside a standard-sized junction box, such as the Blackman reference. I attach hereto as Exhibit 6 a true and correct copy of U.S. Patent No. 7,347,580 to Stephen Blackman ("Blackman").

41. The Kim patent, in combination with either the alignment features of Foshan or the adaptor plate of Blackman, renders obvious the independent claims of the '266 Patent since the combined teachings of these references disclose all the structure recited in the '266 Patent claims.

42. I therefore attach hereto as Exhibit 7 a claim chart (the "Kim/Foshan/Blackman Claim Chart") showing how Kim, in combination with either the alignment features of Foshan or the adaptor plate of Blackman for aligning and mounting such a device to or inside a standard-sized junction box, renders obvious representative claim 1 of the '266 Patent.

43. I attach hereto as Exhibit 8 a claim chart showing how Imtra, in combination with either the alignment features of Foshan or the adaptor plate of Blackman for aligning and mounting such a device to or inside a standard-sized junction box, renders obvious representative claim 1 of the '266 Patent.

44. I attach hereto as Exhibit 9 a true and correct copy of Japanese Patent Publication No. JP2007265961A to Goto Yoshiro et al. ("Yoshiro"). Yoshiro was published on October 11, 2007 and likewise renders obvious the independent claims of the '266 Patent because it, combined with the alignment features of Foshan or Blackman, discloses the structure recited in the claims. I attach hereto as Exhibit 10 a claim chart (the "Yoshiro/Foshan/Blackman Claim Chart") showing how Yoshiro, in combination with either Foshan or Blackman, renders obvious representative claim 1 of the '266 Patent.

45. I attach hereto as Exhibit 11 a true and correct copy of U.S. Patent No. 7,566,154 to Jennifer L. Gloisten et al. ("Gloisten"). Gloisten was published on March 27, 2008 and likewise renders obvious the independent claims of the '266

12
DECLARATION OF TIMOTHY S. FISHER

patent. Gloisten, together with the alignment features of either Foshan or Blackman, discloses the structure recited in the claims of the '266 patent. I attach hereto as Exhibit 12 a claim chart (the "Gloisten/Foshan/Blackman Claim Chart") showing how Gloisten, in combination with either Foshan or Blackman, render obvious representative claim 1 of the '266 Patent.

46. I attach hereto as Exhibit 13 a true and correct copy of U.S. Patent No. 7,488,097 to William Reisenauer et al. ("Reisenauer"). Reisenauer was published on August 23, 2007 and likewise renders obvious the independent claims of the '266 Patent because it, combined with the alignment features of either Foshan or Blackman, discloses the structure recited in the claims. I attach hereto as Exhibit 14 a claim chart (the "Reisenauer/Foshan/Blackman Claim Chart") showing how Reisenauer, in combination with either Foshan or Blackman, render obvious representative claim 1 of the '266 Patent.

47. I attach hereto as Exhibit 15 a true and correct copy of a September 9, 2012 web page from Mouser Electronics advertising the Cree LMH2 product recorded and maintained by archive.org. The LMH2 online product description, combined with the alignment features of either Foshan or Blackman, discloses the structure recited in the independent claims of the '266 Patent.

48. I understand that DMF may have previously taken the position that the LMH2 is not relevant because it discloses an external driver, not enclosed under the reflector as required by the claims of the '266 Patent. The '266 Patent claims, however, recite the driver as including an electronic device to either supply or regulate the electrical energy to the light source module:

> the driver including an electronic device to at least one of supply
> and regulate electrical energy to the light source module

(The '266 Patent, at claim 1, col, 8, lines 5-7).

13
DECLARATION OF TIMOTHY S. FISHER

49. As a result, it would not matter if the LMH2 device uses an external driver to supply the electrical energy to the light module. Whether or not the LMH2 device uses an external driver to supply the electrical energy to the light module, the LMH2 appears to house an internal driver that includes an electronic device for at least ***regulating*** the electrical energy to the light source module, and this driver is indeed internal and enclosed under the reflector as shown in Exhibit 15. I attach hereto as Exhibit 16 a claim chart, therefore, (the "LMH2/Foshan/Blackman Claim Chart") showing how the LMH2 product and product description, in combination with either Foshan or Blackman, render obvious representative claim 1 of the '266 Patent.

50. Thus, the claims of DMF's '266 Patent are a merely obvious combination of already known elements. The concept of having a compact recessed lighting system that can fit inside a standard junction box and be mechanically secured to it is not new, as demonstrated by the foregoing prior art references and the associated claim charts.

<u>Elco's Modified Light Module Does Not Infringe The '266 Patent</u>

51. I here include the figure showing pictures of various assembled and disassembled Elco ELL light modules from Mr. Benya [Benya Decl., page 21, paragraph 48]. In each photograph, the modified Elco light module, referred to as "ELL1130 version 2" by Mr. Benya, is on the left side. The red circles added in the present Declaration highlight the "hat" and "cylindrical piece of aluminum" as described by Mr. Benya.




52.     Mr. Benya further states that "there is probably little or no apparent functional advantage gained by adding the cylindrical piece and hat to the rear-end of the casting of the LED Module." Here, I assume that the function at issue is to "significantly dissipate heat generated by the light source module during operation" as recited at the end of both claims 1 and 17.  As such, the modified Elco light module fundamentally alters the function of the rear casting wall such that the latter does ***not*** dissipate, but instead, at least partially ***constricts*** the flow of heat such that heat conducts into the "cylindrical piece of aluminum."  This constricting the flow is functionally the opposite of "significantly dissipating heat."  [*See*, above, at p. 8, paragraph 27].

53.     Moreover, the Benya Declaration and the '266 Patent applicant construe a "unified casting" as "a one-piece housing for the driver, the light source module and the reflector, while also acting as a heat sink thereby eliminating the need for any additional heat sink piece" [Benya Declaration, page 17, paragraph 36]. The "cylindrical piece of aluminum" is obviously a good thermal conductor with substantial mass to act as an "additional heat sink piece" to absorb heat from the contacted casting and to conduct it for subsequent dissipation to the "hat." Mr. Benya's statement that "there is probably little or no apparent functional advantage gained by adding the cylindrical piece and hat to the rear-end of the casting of the LED Module" speaks to the relative functional performance of the Elco module with and without modification, but not to the clear distinction in function introduced by the "additional heat sink piece".

54.     Moreover, it is only the exterior surfaces of the sidewalls and the closed rear face, what Mr. Benya calls a "hat," that can "significantly dissipate heat generated by the light source module during operation" as recited at the end of both independent claims 1 and 17.  According to the principles of heat transfer, heat generated by the light source module during operation does not "significantly

15
DECLARATION OF TIMOTHY S. FISHER

dissipate" to the surroundings from any interior constituents or intermediate surfaces. The essential and unique role of these external surfaces can be understood by imagining that all such surfaces were physically covered with thermal insulation. In such a case, heat would be completely confined to the constituents of the device and any internal gases (such as air), and under the action of a continual heat source such as an LED light, the constituent temperatures would monotonically increase in time until thermal failure of the light source would occur, thus eliminating the source of heat. This thought experiment demonstrates that an internal element or intermediate surface that does not possess an external surface cannot itself "significantly dissipate" heat.

55.  I attach hereto as Exhibit 17 a true and correct copy of DMF's Supplemental Amendment filed February 6, 2018 during prosecution of the '266 patent. I inspected one of Elco's modified ELL light modules and measured the distance between "the closed rear face and the open front face of the casting". I note that, given the alteration in function for heat dissipation discussed above for Elco's modified ELL light module, the measurement was made between the open front face and the tallest point of the "hat" as representative of the "closed rear face" and is not "less than 2 inches".

56.  Furthermore, I am assured that nowhere and by no reasonable measure is the light source module of Elco's modified ELL light module closer to the closed rear face than the open from face.

57.  If called to testify, I expect that my opinions would comport with the opinions I provide above. I reserve my rights, however, to continue to evaluate the evidence in this case and to revise and/or update my opinions and conclusions as such further evaluations warrant.

I declare under penalty of perjury under the laws of the United States and of the State of California that the foregoing is a true and correct statement of my

16
DECLARATION OF TIMOTHY S. FISHER

opinions based on my experience and my review and analysis of the materials referenced above.

Executed December 3, 2018 at Los Angeles, California.

_____
Timothy S. Fisher, Ph.D.