UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL    'O'

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|---|---|---|---|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**     **[REDACTED]** PLAINTIFF DMF'S MOTION FOR PRELIMINARY INJUNCTION (Dkt. 28, filed **Under Seal** November 15, 2018)

## I.  INTRODUCTION

On August 15, 2018, plaintiff DMF, Inc. filed a complaint against defendants AMP Plus, Inc. d/b/a ELCO Lighting, and ELCO Lighting, Inc. (collectively "ELCO"), alleging claims for patent infringement of U.S. Patent No. 9,964,266 ("the '266 Patent"), trademark infringement, and unfair competition.  Dkt. 1 ("Compl.").  On October 18, 2018, ELCO filed an answer and counterclaims for declaratory relief.  Dkt. 18.  On October 31, 2018, DMF filed an answer to ELCO's counterclaims.  Dkt. 22.

On November 14, 2018, DMF filed the instant motion for a preliminary injunction. Dkt. 26 ("Mot.").  ELCO filed an opposition on December 3, 2018.  Dkt. 55 ("Opp'n"). DMF filed a reply on December 17, 2018.  Dkt. 62 ("Reply").  The Court held a hearing on January 7, 2019.  Dkt. 96.  The Court requested further briefing on January 14, 2019. Dkt. 100.  DMF and ELCO filed their respective supplemental briefs on January 22, 2019, dkts. 103, 110, and their respective oppositions on January 29, 2019, dkts. 130, 127.  The Court requested one further brief from DMF on January 31, 2019, dkt. 138, which DMF filed on February 12, 2019, dkt. 140.  ELCO filed an *ex parte* application for leave to file a brief response to DMF's additional supplemental brief on February 13, 2019, dkt. 141, which the Court granted, dkt. 143.  The Court provided DMF with leave to file a response, which DMF filed on February 15, 2019.  Dkt. 144.

The following constitutes the Court's findings of facts and conclusions of law.

**CIVIL MINUTES – GENERAL**   **'O'**

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|----------|------------------------|------|---------------|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

## II.   BACKGROUND

### A.   DMF's LED Lighting System and the '266 Patent

Recessed lighting systems are designed, in part, to manage the heat generated by the light source, meet fire resistance codes, and connect to a building's electrical system. Compl. ¶¶ 11–14. Conventional recessed lighting systems are typically installed within a hole cut into and extending above a ceiling, id. ¶ 14, and may also include a "can" for housing the lighting portion of the fixture and a separate junction box for connecting wires from the lighting fixture to the building's electrical system, id. ¶ 13. Conventional systems manage temperature using a heat sink (highlighted red) stacked on top of housing that contains the light source and other components:

 

Id. ¶ 12 (showing a heat sink 198 stacked on top of a housing 195 from U.S. Patent Application Publication No. 2013/0010476). Fire resistance codes may require building a firebox to enclose the lighting system, which requires significant installation time and labor and materials costs. Id. ¶ 14. The image below illustrates a conventional firebox using wooden framing and drywall around the lighting fixture:



Id. ¶ 14.

Michael Danesh, the son of DMF's founder and DMF's vice president of vendor relations, designed a modular LED lighting system that includes a compact LED module with a low-profile heat conducting casting that houses the LED components and significantly dissipates heat from the LED light source without the need for a conventional heat sink.  Id. ¶ 16; Dkt. 28-27 ¶ 2.  The LED module fits into traditional "cans" or other lighting fixtures, but is also small enough to fit into standard junction boxes without using a separate firebox, can, or lighting fixture.  Id.  The LED lighting system includes a twist-and-lock connection so that trims of different sizes and designs can be attached by hand without tools.  Id. ¶ 18.



Id. ¶ 17.  DMF claims that this LED system, as a whole, combines features and benefits not found in prior LED lighting systems and allows for a flexible, modular lighting system that can be used in the many different circumstances encountered when installing LED lighting systems in existing or new buildings.  Id. ¶ 19.  Danesh's lighting system received industry awards for innovation based on features that enable simplified installation in ceilings and walls of varying depths while meeting applicable codes.  Id. ¶¶ 34–39.

On July 5, 2013, a provisional application was filed disclosing Danesh's LED lighting system, and on May 8, 2018, the Patent Office granted and published the '266 Patent, which names Danesh as the inventor.  Id. ¶¶ 23; Compl. Ex. 1 ("Patent").  Danesh subsequently assigned ownership of the '266 Patent to DMF.  Compl. ¶ 26.  DMF's DRD2 LED Module products practice the '266 Patented invention.  Id. ¶ 28.

**CIVIL MINUTES – GENERAL**   **'O'**

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|---|---|---|---|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

### B. ELCO's Lighting System

According to DMF, ELCO sold traditional lighting systems and was in danger of obsolescence if it did not obtain a strong presence in the LED light fixture market.  Id. ¶ 40.  To avoid obsolescence, ELCO allegedly developed a scheme to increase its LED market presence by directly copying DMF's DRD2 LED Module lighting system, and started selling its infringing products—ELCO's ELL LED Modules— two years after DMF publicly introduced its LED lighting system.  Id. ¶¶ 47, 58.  The following image compares the '266 Patent, DMF's DRD2 LED Module, and ELCO's ELL LED Module:



**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|----------|------------------------|------|---------------|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

<u>Id.</u> ¶ 60.  ELCO's ELL LED Module also has similar dimensions to DMF's lighting system, as shown below:



'266 Patent FIG. 2
LED Module

casting – dark grey
junction box – light grey
trim- white

DMF DRD2
LED Module

ELCO ELL
LED Module

<u>Id.</u> ¶ 61.

After the complaint was filed, ELCO started to sell a second version of its LED module, which allegedly consists of the same LED module with a conical metal piece attached to the back of the module by a single screw. Mot. at 8. ELCO also plans to sell a third version of its product which extends the first version's casting into the same shape as the conical metal piece featured in the second version. Reply at 2. The image below shows the first, second, and third versions of ELCO's ELL Module in that order:

[REDACTED]

<u>Id.</u>

DMF contends that the second and third versions are unsuccessful attempts by ELCO to avoid infringing the '266 patent. Mot. at 8; Reply at 2–3.

C.    **The Instant Motion**

On August 3, 2018, DMF's counsel sent a cease-and-desist letter to ELCO informing ELCO of its infringement of the '266 Patent. <u>Id.</u> ¶ 54; Dkt. 1-10. Sales information provided to DMF by ELCO indicates that ELCO has sold its ELL LED Modules at a rate of about [REDACTED] per month, and that ELCO has about [REDACTED] unsold ELL LED Modules in inventory. Mot. at 9. DMF seeks a preliminary injunction prohibiting ELCO from making, selling, offering to sell, importing into the United States, or supplying from the United States all three versions of ELCO's infringing LED modules, as well as prohibiting ELCO and those acting in concert with ELCO from inducing others to perform the aforementioned activities. Dkt. 26-18. DMF further seeks a recall of all ELCO's infringing LED modules that have not been installed in a building. <u>Id.</u> In support of its motion, DMF attaches:

• Declaration of James Benya. Dkt. 26-2 ("Benya Decl.").

- Declaration of Chip Israel.  Dkt. 26-1 ("Israel Decl.").
- Declaration of Peter Maciel.  Dkt. 27 ("Maciel Decl.").
- Declaration of Michel Danesh.  Dkt. 28-27 ("Danesh Decl.").
- Declaration of Benjamin Chen.  Dkt. 28-3 ("Chen Decl.").
- Declaration of Ben Davidson.  Dkt. 28-4 ("Davidson Decl.").

In support of its opposition, ELCO attaches:

- Declaration of Timothy Fisher.  Dkt. 55-7 ("Fisher Decl.").
- Declaration of Joseph O'Neill.  Dkt. 55-27 ("O'Neill Decl.").
- Declaration of Steve Cohen.  Dkt. 55-32 ("Cohen Decl.").
- Declaration of Benjamin Ardestani.  Dkt. 55-44 ("Ardestani Decl.").
- Declaration of Louise Gardner.  Dkt. 55-61 ("Gardner Decl.").

ELCO also filed numerous evidentiary objections to the declarations filed in support of DMF's motion, dkts. 55-1, 55-2, 55-3, 55-4, 55-5, 55-6, to which DMF responded, dkt. 70.  In support of its Reply, DMF attaches:

- Declaration of Bijan Armandpour.  Dkt. 64 ("Armandpour Decl.")
- Declaration of James Benya.  Dkt. 65 ("Reply Benya Decl.").
- Declaration of Chip Israel.  Dkt. 67 ("Reply Israel Decl.").
- Declaration of Peter Maciel.  Dkt. 68 ("Reply Maciel Decl.").
- Declaration of Michel Danesh.  Dkt. 66 ("Reply Danesh Decl.").
- Declaration of Benjamin Chen.  Dkt. 64 ("Reply Chen Decl.").
- Declaration of Ben Davidson.  Dkt. 69 ("Reply Davidson Decl.").

## III.    LEGAL STANDARDS

A preliminary injunction is an "extraordinary remedy."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  The Ninth Circuit summarized the Supreme Court's clarification of the standard for granting preliminary injunctions in Winter as follows: "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Am. Trucking Ass'n, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009); see also Cal Pharms. Ass'n v. Maxwell-Jolly, 563 F.3d 847, 849

(9th Cir. 2009). Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply towards the plaintiff can support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 622 F.3d 1045, 1053 (9th Cir. 2010). A "serious question" is one on which the movant "has a fair chance of success on the merits." Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir. 1984).


IV.    DISCUSSION

A.    ELCO's Evidentiary Objections

ELCO lodged hundreds of evidentiary objections to the declarations filed in support of DMF's motion for preliminary injunction. Dkts. 55-1, 55-2. 55-4, 55-4, 55-5, 55-6, 82–86. The Court observes that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). Thus, a district court may give inadmissible evidence, including hearsay, weight in deciding a preliminary injunction. See, e.g., Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009); Republic of the Philippines v. Marcos, 862 F.3d 1355, 1363 (9th Cir. 1988) (en banc); Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949 (3d ed. 2018) ("The federal rules do not explicitly require [the standard set forth in Federal Rule of Civil Procedure 56(c)(4) that applies to affidavits on a motion for summary judgment] to be applied to preliminary-injunction affidavits . . ."). Although evidentiary issues are still relevant to this proceeding, such issues properly go to weight rather than admissibility. Garcia v. Green Fleet Systems, LLC, No. CV 14-6220 PSG (JEMx), 2014 WL 5343814, at *5 (C.D. Cal. Oct. 10, 2014).

The Court has reviewed ELCO's objections and DMF's responses and finds that ELCO's objections are largely "boilerplate recitations of evidentiary principles or blanket objections without analysis." American Hotel & Lodging Ass'n v. City of Los Angeles, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015) (quoting Capitol Records, LLC v. BlueBeat, Inc., 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010)). The majority of ELCO's objections are meritless and many border on frivolous. See, e.g., Dkt. 55-1 at 1 (objecting to Danesh's statement that DMF was founded by his father and managed by his mother for lack of foundation and personal knowledge). It is thus "unnecessary and

impractical for the Court to methodically scrutinize each objection and give a full analysis of each argument raised." American Hotel, 119 F. Supp. 3d at 1185 (internal quotation marks omitted). It is also unnecessary for the Court to scrutinize each of ELCO's objections in light of the relaxed evidentiary standard for preliminary injunction proceedings.

Accordingly, the Court has considered ELCO's objections when deciding how to weigh DMF's evidence and where the Court has expressly relied on evidence that is subject to an evidentiary objection, the Court has **OVERRULED** the objection.

## B.     Likelihood of Success

The first preliminary injunction factor requires DMF to "prove that success in establishing infringement is more likely than not." Trebro Mfg., Inc. v. Firefly Equipment, LLC, 748 F.3d 1159, 1166 (Fed. Cir. 2014) (internal quotation marks and citation omitted). And to defeat an injunction based on invalidity or enforceability defenses, ELCO bears the burden of establishing a substantial question of invalidity or unenforceability. See Abott Laboratories v. Andrx Pharmaceuticals, Inc., 473 F.3d 1196, 1201 (Fed. Cir. 2007).

### i.     Infringement of the '266 Patent

A product literally infringes a patent when the product "contain[s] each and every limitation of the asserted claim(s)." Trebro, 748 F.3d at 1166. DMF contends that ELCO's ELL LED Module literally infringes Claim 1 and its dependent Claims 2, 5, 7, 13, and 15, and that ELCO induces those who purchase its ELL LED Modules to infringe Claim 16. Mot. at 11. DMF provides a declaration prepared by its technical lighting expert, Mr. James Benya, explaining how each of the limitations in the aforementioned claims is present in ELCO's ELL LED Modules. Benya Decl. ¶¶ 56–90. The Court finds Benya's infringement analysis to be persuasive and thorough.

ELCO does not challenge DMF's infringement analysis with respect to the first version of ELCO's ELL LED Module, but instead argues that DMF's patent infringement claim with respect to this version of the ELL LED Module is "moot for purposes of this Motion because ELCO no longer sells that version of the product." Opp'n at 2. "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the

case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." Id. ELCO merely states that it received its last shipment of the original ELL design in early September 2018. Opp'n at 2. ELCO does not represent that it no longer engages, or threatens to engage, in other accused infringing acts including making, using or importing the original ELL LED Module. ELCO has not met its formidable burden of showing that it no longer engages in the allegedly wrongful behavior, nor has it challenged DMF's patent infringement analysis with respect to the original version of the ELL LED Module.

With respect to the second and third versions, ELCO argues that the modified version of the ELL LED Module does not infringe the '266 Patent due to the altered shape of the rear of the module. Opp'n at 12. The Court finds ELCO's arguments to be unavailing.

The relevant limitation in Claim 1 of the '266 Patent is emphasized in bold text below:

> A compact recessed lighting system, comprising . . . a unified casting with a heat conducting closed rear face, a heat conducting sidewall and an open front face wherein the heat conducting sidewall is joined to the heat conducting closed rear face at one end and defines the open front face of the unified casting at another end, wherein the heat conducting sidewall has a first dimension between the heat conducting closed rear face and the open front face of less than 2 inches and extends 360 degrees around a center axis of the unified casting to define a first cavity that extends forward from the heat conducting closed rear face to the open front face of the unified casting and outward to the heat conducting sidewall, **wherein the light source module and the driver are positioned inside the first cavity while being coupled to the heat conducting closed rear face of the unified casting such that the light source module is closer to the closed rear face of the unified casting than the open front face of the unified casting**, and wherein the unified casting includes a plurality of elements positioned proximate to the open front face so as to align with corresponding tabs of a standard junction box and thereby facilitate holding the unified casting up against the standard junction box when the unified casting is installed in the standard junction box . . .

Patent at 8 (emphasis added). ELCO contends that the claim term "closed rear face" should be construed as the exterior surface of the rear wall of the casting, and that, when

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|----------|------------------------|------|---------------|
| Title    | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

using ELCO's construction of the term "closed rear face," the second and third versions of ELCO's ELL LED Modules would not meet each limitation of Claim 1 because the light source in those modules is closer to the open front face of the unified casting than the exterior of the rear wall of the casting. Opp'n at 12–15; Fisher Decl. ¶ 28. According to ELCO, "it would be unreasonable" to use the interior surface of the closed rear face to determine the distance between the light source module and the closed rear face because "the light source is physically attached to the interior surface of the rear closed side of the casting." Opp'n at 13. Using the interior surface as the point of reference would thus render this limitation "superfluous" because the light source would *always* be closer to the interior surface of the closed rear face than the open front face. Id.

DMF disputes ELCO's construction of the term "closed rear face" and contends that the term "closed rear face" as used throughout the patent specification encompasses an internal surface, an external surface, and portions in between, and that the term as used in the relevant portion of Claim 1 refers to the interior surface of the closed rear face of the unified casting. Mot. at 14; Reply at 3. Benya explains that the distance between the light source and the interior surface of the closed rear face would not always be zero because the patent specification provides that the light module can be mounted to the closed rear face using a variety of connecting mechanisms, including "resins, clips, screws, bolts, [and] clamps[.]" Dkt. 140-1, ¶ 6. These connecting mechanisms, which vary in height, are not part of the closed rear face and may lie *between* the closed rear face and the light source module. Dkt. 140-1, ¶ 8; Dkt. 144, at ¶ 3.

The "words of a claim 'are generally given their ordinary and customary meaning.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" Id. at 1313. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Id. at 1315 (quoting Vitronics, 90 F.3d at 1582).

ELCO's construction of the term "closed rear face" to refer exclusively to the exterior surface of the rear of the casting is plainly inconsistent with how the term "closed rear face" is used throughout the specification. Rather, as Benya explains, the

**CIVIL MINUTES – GENERAL**       **'O'**

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|----------|------------------------|------|---------------|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

terms "closed rear face" or "rear face" are used to refer to the interior, exterior, and entirety of the rear of the casting.  For example, the specification uses the term "closed rear face" to refer to the entirety of the rear of the module: "In one embodiment, the casting 5 may include a closed rear face 14 and an open front face 15a."  Patent at 3.  In the next line, the specification clearly refers to the interior surface of the closed rear face when describing how the light module is attached to the casting: "The closed rear face 14 allows the light source module 3 and the driver 4 to be securely mounted to the casting 5 . . ."  Id. at 3.  Alternatively, when describing the total height of the module, the specification language refers to the exterior surface of the closed rear face: "The unitary structure of the housing and the coplanar location of the trim interlocking flanges allow a reduction in total height of the compact light as measured between lens 7 and rear wall 14.  Such reduced height in turn facilitates installation of the light in a standard but relatively small junction box . . ."  Id. at 7.

ELCO's construction of the term "closed rear face" is also inconsistent with how the term is used in the relevant limitation of Claim 1, which plainly refers to the interior surface of the closed rear face because that is where the light module is attached:

> wherein the light source module and the driver are positioned inside the first cavity **while being coupled to the heat conducting closed rear face** of the unified casting such that the light source module is closer to the closed rear face of the unified casting than the open front face of the unified casting

Patent at 8 (emphasis added).  The Court finds that DMF's construction of the term "closed rear face," as it is used in the relevant limitation, to refer to the interior surface of the rear of the casting, to be sound.  Benya has also persuasively explained that this construction does not render the limitation superfluous because the various connecting mechanisms that may be used can cause the distance between the light module and the closed rear face to vary.[1]

---

[1]      ELCO disputes this point by pointing to specification language indicating that the light source is to be coupled inside the cavity *on* the rear face of the casting.  See Dkt. 141 at 7.  According to ELCO, "on" means direct contact with that surface, and therefore the light source module must be in direct contact with the rear wall.  The Court is not persuaded by this argument because this specification language merely indicates that the connecting mechanism, which couples the light module to the rear face, must be in direct contact with the rear wall.  The language cited by ELCO does not indicate that the light

Accordingly, it appears the second and third versions of ELCO's ELL LED Module also infringe the Patent because the light source module in those versions is closer to the interior surface of the closed rear face than the open front face. The Court thus finds that DMF has shown that it is more likely than not that it will prevail on infringement with respect to both the original version and the modified versions of ELCO's ELL LED Modules.

### ii.     Validity and Enforceability of the '266 Patent

ELCO contends that the '266 Patent is invalid because: (1) Claim 1 of the '266 Patent is anticipated by the Kim Patent, U.S. Patent No. 9,222,661 ("Kim Patent") and the Imtra product; (2) DMF's asserted claims are rendered obvious by a combination of other patents and products; and (3) DMF's asserted claims are impermissibly indefinite. Opp'n at 5–9. In support of its opposition, ELCO provides the declaration of its technical expert, Timothy Fisher.

### a.     ELCO's Assertion that the '266 Patent is Anticipated by the Kim and Intra References

A patent claim is invalid if the "claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102(a). "A single prior art reference that discloses, either expressly or inherently, each limitation of a claim invalidates that claim by anticipation." <u>Perricone v. Medicis Pharmaceutical Corp.</u>, 432 F.3d 1368, 1375 (Fed. Cir. 2005).

ELCO first asserts that the Kim Patent anticipates Claim 1 of the '266 Patent. In support of this assertion, ELCO provides a claim chart prepared by Fisher. Fisher's claim chart, however, provides no analysis as to how the '266 Patent is anticipated by the Kim Patent, but rather relies almost exclusively on conclusory comparisons between Claim 1 of the '266 Patent and images from the Kim Patent. One such example is provided below:

---

module itself must be in direct contact with the rear wall, only that it is to be coupled to the rear wall through the use of some connecting mechanism.



See Fisher Decl., Ex. 2.

In his reply declaration, Benya provides a detailed and persuasive rebuttal to Fisher's conclusion that the '266 Patent is anticipated by the Kim Patent. First, Benya notes that the Kim reference is nearly identical to the Woo reference which was discussed in the '266 Patent file history. Benya Reply Decl. ¶ 114; Benya Decl. Ex. 19. The Patent Officer Examiners found that Woo did not invalidate Claim 1 of the '266 Patent because "Woo's housing is **not** heat conducting and cannot significantly dissipate heat generated by light sources during operation" and that "**a heat conducting unified casting that significantly dissipates heat generated by an LED module during operation** is a feature that distinguishes over both Woo and Benesohn." Benya Reply Decl. ¶ 115 (quoting the '255 Patent File History at FH266PAT 1054) (emphasis in original). Benya explains that, like Woo, the Kim reference couples a non-heat conducting housing with a heat-conducting heat sink, while the '266 Patent discloses a heat-conducting **unified** casting that "significantly dissipate[s] heat generated by the light source module during operation of the light source module." Benya Reply Decl. ¶ 117 (emphasis added). Benya provides the image below which highlights the non-heat conducting "housing 100" of the Kim reference in orange and the heat-conducting "heat sink 600" in red:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | | |
|---|---|---|---|
| **CIVIL MINUTES – GENERAL** | | | **'O'** |
| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |



Benya Reply Decl. ¶ 115.  Benya observes that Fisher's claims chart merely encircled both the housing and heat sink of the Kim reference and misquoted the Kim reference as to suggest that both the housing and the heat sink are heat conducting:



"The heat sink may be formed of a metallic material or
a resin material, each of which has excellent heat
radiation efficiency."

Id. at ¶ 118 (copying an image from Fisher Decl., Ex. 2).  Fisher's analysis appears to be flawed in this respect as the Kim reference does not disclose a **heat conducting unified casting** that significantly dissipates heat, but rather discloses a non-heat conducting housing paired with a heat-conducting heat sink.

Benya's declaration also indicates several other flaws with Fisher's analysis of the Kim reference, but the Court need not reach the other issues raised by Benya because it is persuaded that ELCO has failed to meet its burden of raising a substantial question of invalidity based on the assertion that the '266 Patent is anticipated by the Kim reference.

ELCO's assertion that Claim 1 of the '266 Patent is anticipated by the prior art Imtra reference also fails for similar reasons.  Without any meaningful analysis, Fisher

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|---|---|---|---|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

merely asserts that the June 16, 2012 Imtra catalog discloses the structure recited in the '266 Patent, and provides another conclusory claim chart. Fisher Decl., Ex. 4. Benya persuasively rebuts Fisher's conclusion that the '266 Patent is anticipated by the Imtra reference. Benya first explains that while Fisher's claims chart is based on the Imtra Ventura product, Fisher mistakenly referenced several different products offered in the Imtra catalog in his analysis. Benya Decl. ¶¶ 126–28. Benya further explains that the Imtra product is not meant for residential or commercial recessed lighting but is rather a low voltage device mounted into a hole cut into a boat "headliner or other mounting service" and held in place by "mounting springs" on the side and near the rear of the device:



Benya Reply Decl. ¶ 127. Benya then explains that the Imtra "spring clips" near the rear end of the device do not meet the Claim 1 limitation of a "plurality of elements positioned proximate to the open front face so as to align with corresponding tabs of a standard junction box . . ." Id. ¶ 133. Rather, the Imtra product's spring clips are fastened **to the rear** of the device and do not align with the tabs of a standard junction box. Id. ¶ 134 (emphasis added). Such alignment would be unnecessary since the Imtra product is designed to receive low-voltage, direct current from a boat, and is not designed to be connected to the higher, main voltage of a residential or commercial building. Id. It appears that Fisher's analysis fails to demonstrate that the Imtra product discloses "plurality of elements" limitation in Claim 1 of the '266 Patent.

   As with the Kim reference, Benya's declaration also indicates several other flaws with Fisher's analysis of the Imtra reference, but the Court need not reach the other issues raised by Benya because it is persuaded that ELCO has failed to meet its burden of raising a substantial question of invalidity based on the assertion that the '266 Patent is anticipated by the Imtra reference.

### b. ELCO's Assertion of Invalidity due to Obviousness

   A patent claim is invalid "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|----------|------------------------|------|---------------|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. The underlying factual inquiries of an obviousness analysis include: (1) scope and content of prior art, (2) the level of ordinary skill in the field; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness. See Graham v. John Deere Co., 383 U.S. 1, 17–18 (1966). "A party seeking to invalidate a patent on obviousness grounds must demonstrate by clear and convincing evidence that a person of ordinary skill would have selected and combined and modified the subject matter of the references in the manner of the claimed invention, with a reasonable expectation of success." Orexo AB v. Actavis Elizabeth LLC, 903 F.3d 1265, 1271 (Fed. Cir. 2018). "A reason for combining disparate prior art references is a critical component of an obviousness analysis" and "this analysis should be made explicit." In Touch Technologies, Inc. v. VGO Communications, 751 F.3d 1327, 1351 (Fed. Cir. 2014) (quoting KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 418 (2007)).

A finding of obviousness cannot be based on hindsight. As such, "[i]t is inappropriate to use the template provided by the inventor, to render the inventor's contribution obvious." Orexo, 903 F.3d at 1271. Objective indicia of nonobviousness "play a critical role in the obviousness analysis" and assist the court in "avoiding the trap of hindsight when reviewing, what otherwise seems like, a combination of known elements." Leo Pharmaceutical Products, Ltd. v. Rea, 726 F.3d 1346, 1358 (Fed. Cir. 2013) (citation omitted).

ELCO asserts that Claim 1 of the '266 Patent is rendered obvious by the Kim patent, the Imtra product, and a combination of the following prior art references: the Yoshira Patent, Japan patent No. JP2007265961A; the Gloisten Patent, U.S. Patent No. 7,566,154; the Reisenauer Patent, U.S. Patent No. 7,488,097; the LMH2 Product and Product Description; the Foshan Patent, China Patent Publication No. CN202733693U; and the Blackman Patent, U.S. Patent No. 7,347,580. Opp'n at 7–9.

ELCO's assertion of obviousness fails for multiple reasons. First, although ELCO provides Fisher's testimony in support of its assertion of obviousness, Fisher is not an expert of ordinary skill in the art. Fisher himself states that, with respect to the '266 Patent, a person of ordinary skill in the art "should be a person with a degree in Mechanical or Electrical engineering or closely related field, and several years of experience in designing recessed lighting devices and/or components." Fisher Decl. ¶ 17. Although Fisher holds a PhD in mechanical engineering, he does not appear to have any experience in designing recessed lighting devices or its components. See id ¶¶ 2–3; id.

ex. 18 (Fisher's curriculum vitae). Accordingly, the Court gives Fisher's testimony little weight as he appears to be unqualified to opine on the obviousness of the '266 Patent.

Second, Fisher's entire obviousness analysis, which ELCO relies on in its opposition, appears to be flawed. Fisher's analysis consists of conclusory statements such as the following:

> I attach hereto as Exhibit 13 a true and correct copy of U.S. Patent No. 7,488, 097 to William Reisenauer et al. ("Reisenauer"). Reisenauer was published on August 23, 2007, and likewise renders obvious the independent claims of the '266 Patent because it, combined with the alignment features of either Foshan or Blackman, discloses the structure recited in the claims. I attach hereto . . . a claim chart . . . showing how Reisenauer, in combination with either Foshan or Blackman, render obvious representative claim 1 of the '266 Patent.

Fisher Decl. ¶ 46. Fisher's claim charts are similarly unhelpful and conclusory as they, for the most part, merely list the asserted claim in one column and images of the elements of the prior art in the other column. Fisher fails to provide any substantive analysis of the prior art, to provide any reasons why a person of ordinary skill would have combined the prior art references, or to address the objective indicia of nonobviousness that DMF asserted in its motion, including industry praise. Rather, Fisher's analysis appears to impermissibly use the '266 Patent as a template to combine elements of prior art references.

DMF's expert, Benya, who does possess ordinary skill in the art,[2] provides a persuasive and thorough analysis of the reasons that the '266 Patent is not obvious. First, Benya provides evidence of objective indicia of nonobviousness in the form of industry praise for the DRD2 LED Module. Benya Reply Decl. ¶¶ 147–154. Benya then explains the many flaws with Fisher's analysis, including that Fisher's prior art references do not meet the "plurality of elements positioned proximate to the open front face so as to align with corresponding tabs of a standard junction box" limitation of Claim 1 of the '266 Patent. Id. ¶ 155. Although Fisher asserts, without explanation, that the Foshan or

---

[2]     Benya is the principal illuminating engineer and lighting designer for Design Services, Inc. and has 45 years of practical experience as a professional engineer and lighting designer. Benya Decl. ¶ 4.

**CIVIL MINUTES – GENERAL**      **'O'**

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|----------|------------------------|------|---------------|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

Blackman references could be combined with the other references to meet that limitation, Benya explains that neither the Foshan or Blackman references meet the "plurality of elements" limitation or otherwise render Claim 1 obvious.

    With respect to the Foshan reference, Fisher provides the following cropped image from the Foshan patent in an attempt to show that Foshan reference meets the plurality of elements limitation:



and wherein the unified casting includes a plurality of elements positioned proximate to the open front face so as to align with corresponding tabs of a standard junction box and thereby facilitate holding the unified casting up against the standard junction box when the unified casting is installed in the standard junction box; and

[From Foshan]

Fisher Decl. ¶ 39, Ex. 16. In response, Benya includes the entirety of the Foshan image and adds orange arrows to show that the four tabs in Fisher's image do not align with the junction box but are rather used to fasten shell 6 to front shell 5:



Benya Reply Decl. ¶¶ 159–160. As for the Blackman reference, Fisher states that "the adaptor plate of Blackman" can be used to align and mount a lighting device to a standard-sized junction box and provides the following image:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**   **'O'**

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|---|---|---|---|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

| and wherein the unified casting includes a plurality of elements positioned proximate to the open front face so as to align with corresponding tabs of a standard junction box and thereby facilitate holding the unified casting up against the standard junction box when the unified casting is installed in the standard junction box; and |  |
|---|---|

Fisher Decl. ¶ 42, Exs. 7–8. Benya explains that the Blackman reference is a mounting tool "for enabling one person to install a bulky "conventional fluorescent light fixture" to a ceiling-mounted electrical box, which otherwise "requires two persons." Benya Decl. ¶ 163–64. In other words, the Blackman patent describes a device that is used to temporarily attach a long and bulky fluorescent light fixture to the ceiling so that one person can install it rather than two. Benya explains in extensive detail why a person skilled in the art would not use the device described by the Blackman patent for recessed lighting and why the Blackman device could not successfully attach recessed lights to a junction box. Id. ¶¶ 169–74. Thus, it appears that Fisher has failed to demonstrate that any combination of the prior art references would have met each of the limitations in Claim 1.

Accordingly, the Court finds ELCO has not carried its burden of establishing a substantial question as to invalidity of the '266 Patent due to obviousness.

### c. ELCO's Assertion of Invalidity due to Indefiniteness

ELCO contends that Claim 1 of the '266 Patent is invalid on the grounds of indefiniteness because it impermissibly includes a method step in what is otherwise an apparatus claim:

A compact recessed lighting system, comprising: a light source module for emitting light; a driver for powering the light source module to emit light, the driver including an electronic device to at least one supply and regulate electrical energy to the light source module; . . . wherein the heat conducting closed rear face and the heat conducting sidewall of the unified casting **significantly dissipate** heat generated by the light source module **during operation** of the light source module.

Opp'n at 11 (quoting the '266 Patent) (emphasis added). According to ELCO, "it is unclear whether a 'compact recess lighting system' having all of the foregoing *apparatus* elements would, by itself, infringe claim 1 or whether it would infringe only if its rear face and sidewalls later, 'during operation,' in fact 'significantly dissipate heat generated by the light source module during operation of the light source.'" Id. (emphasis in original). ELCO's argument relies on IPXL Holdings, L.L.C. v. Amazon.com, Inc., 430 F.3d 1377 (Fed. Cir. 2005). In IPXL, the apparatus claim included a method claim requiring activities of the user, and the Federal Circuit held that it was unclear whether infringement occurred when the system was created, or when the user used the system. Id. at 1384. The IPXL holding, however, does not apply to limitations that indicate a function of the claimed structure that does not require any user activity. See UltimatePointer, LLC v. Nintendo Co. Ltd., 816 F.3d 816, 827–28 (Fed. Cir. 2016) (distinguishing from IPXL when a claim involves an apparatus with particular capabilities). ELCO's argument fails because the "significantly dissipate heat" limitation indicates a function of the closed rear face and sidewall structure that does not require any user activity.

Accordingly, the Court finds ELCO has not carried its burden of establishing a substantial question as to invalidity of the '266 Patent due to indefiniteness.

### C.    Irreparable Harm

DMF bears the burden of demonstrating that "irreparable injury is *likely* in the absence of an injunction." Winter, 555 U.S. at 22. Irreparable harm is found where potential losses cannot be adequately compensated by monetary damages. See Reebok Int'l Ltd. v. Baker Inc., 32 F.3d 1552, 1557 (Fed. Cir. 1994). But "[b]ecause the principal value of a patent is a statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." Id. "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." Celsis in Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012).

DMF presents evidence of likely irreparable harm through decreased market share and lost customer relationships, price erosion, lost reputation as an innovator of premium specification-grade lighting, jeopardized relationships with sales representatives, and a jeopardized ability to recoup their investment in developing the DRD2 LED Module. Mot. at 18–23. ELCO challenges the sufficiency of DMF's evidence and contends that, in any event, such harms can be rectified with monetary damages. Opp'n at 16–24.

CIVIL MINUTES – GENERAL      'O'

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|----------|------------------------|------|---------------|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

### i.    Market Share and Customer Relationships

DMF represents that ELCO is currently targeting DMF's market share and customer relationship by offering its copy of the DRD2 LED Module at discount prices. Mot. at 18.  DMF provides an e-mail showing that, in response to DMF's cease and desist letters, ELCO's President urged ELCO sales representatives to increase their sales efforts and "dominate the market." Danesh Decl., Ex. 25.  Danesh attests that ELCO has already approached a number of DMF's key distributors with offers to provide ELCO's ELL LED Modules at a lower price than DMF's product, and that ELCO has offered its product to developers to replace DMF's products that were otherwise required in building specifications.[3]  Mot. at 18–19; Danesh Decl. ¶¶ 59–60, 65, 67, 73–74, 79, Exs. 19, 21, 24.  In its supplemental brief, DMF submitted statements by owners of distributors indicating that sales of ELCO ELL modules have had a negative impact on sales of the DMF DRD2 LED module.  See Dkt. 107 at 2; Dkt. 108 ¶ 2; Dkt. 106 at 1.  For example, [REDACTED], attests that he recently sold ELCO ELL Modules to a contractor who showed him a specification sheet for the product and noted that ELCO's product costs, on average, [REDACTED] less than DMF's product. Dkt. 108 ¶ 2.  He further states that he would have sold him the DMF DRD2 LED module if the ELCO ELL Modules were not available.  Id.  DMF also provides an email sent from an ELCO distributor to one of the largest developers in California which attached ELCO's brochure for the ELL LED Module and suggested that ELCO's product could replace DMF's product.  Danesh Decl. ¶ 60, Ex. 21.

DMF further argues that when ELCO takes away a DMF customer by replacing the DRD2 LED Module with ELCO's cheaper copy, DMF loses not only the sales of its LED Module, but also sales of trims and housings specifically built to work with those modules, and that ELCO benefits by obtaining a critical foothold on customer relationships that would otherwise benefit DMF.  Mot. at 19.

DMF also submits the declaration of Chip Israel, a lighting designer with over 33 years of experience in the field of lighting and lighting design.  Israel Decl. ¶ 1.  Israel also explains that the DMF DRD2 LED Module is meeting the needs of the residential housing industry during a historic building boom, providing DMF with a limited opportunity to open doors and build customer relationships that can lead to future sales of the DRD2 LED Module.  Mot. at 19–20; Israel Decl. ¶ 26.  According to Israel, due to

---

[3]    Danesh attests that ELCO's LED Module is sold at a price below DMF's wholesale price.  Danesh Decl. ¶ 65, Ex. 24.

the similarities in the DMF and ELCO products, it would be very easy for a distributor to persuade a contractor on a project where the DRD2 LED Module has been specified to purchase the cheaper ELCO unit instead by representing that they are the same product. Israel Decl. ¶ 22.  This substitution of sales would not only mean lost sales to DMF with respect to that specific project, but would also result in lost future sales as that contractor would likely continue to bid on future projects based on the DMF specification but then purchase the cheaper ELCO units to save money.  Id. ¶ 23.

ELCO contends that DMF cannot show ELCO's sales have diminished DMF's sales because the DRD2 and ELL Modules compete against numerous other recessed products and that the parties do not operate in a two-player, two-product market.  Opp'n at 20.  ELCO further contends that DMF must demonstrate that it has *already* lost market share to demonstrate a likelihood of irreparable harm.  Opp'n at 17.  To support this argument, ELCO relies on Automated Merchandising Systems, Inc. v. Crane Co., 357 Fed. Appx. 297 (Fed. Cir. 2009), wherein the Federal Circuit stated in an unpublished opinion that "[l]ost market share must be proven (or at least substantiated with some evidence) in order for it to support entry of a preliminary injunction, because granting preliminary injunctions on the basis of speculative loss of market share would result in granting preliminary injunctions 'in every patent case where the patentee practices the invention.'"  Id. at 301 (quoting Nutrition 21, 930 F.2d at 871).

The Court need not resolve whether the Federal Circuit in Automated Merchandising intended to require a plaintiff to establish that it has already lost market share in order to obtain a preliminary injunction because DMF has provided some evidence that it has, indeed, lost market share and customers to ELCO.  DMF has also shown that ELCO is actively seeking to directly displace DMF's product with its allegedly infringing and cheaper product.  DMF has sufficiently demonstrated that these losses cannot be addressed by money damages alone because of the various "ecosystem" effects caused by ELCO's infringement, including that customers are likely to keep doing business with ELCO for future projects and to tell other developers and contractors to use the ELCO brand.  Dkt. 109 ¶ 5; See Metalcraft of Mayville v. Toro Co., 848 F.3d 1358, 1368 (Fed. Cir. 2017) ("[T]he loss . . . of customers may have far-reaching, long-term impact on [ ] future revenues, and the sales lost . . . are difficult to quantify due to "'ecosystem' effects, where one company's customers will continue to buy that company's products and recommend them to others.") (quoting Apple Inc. v. Samsung Elecs. Co., 809 F.3d 633, 641 (Fed. Cir. 2015)).  Accordingly, the Court finds that DMF's evidence demonstrating that it is likely to, and already has, experienced losses of

market share and customer relationships supports a finding of likely irreparable harm in the absence of a preliminary injunction.

### ii.     Relationships with Sales Representatives

Sales representatives are independent companies that choose a portfolio of products from several different manufacturers to promote and sell. Specifiers are professionals who, at the initial stage of a building construction project, "specify" lighting products to be used in the building. DMF relies on independent sales representatives to promote DMF's products to specifiers. Danesh Decl. ¶ 57; Israel Decl. ¶ 1. Although a specific product may have been specified at the initial stage of a project, a contractor may be convinced at a later point to replace the specified product with a cheaper, comparable product. Danesh Decl. ¶¶ 57–58; Israel Decl. ¶ 22. For this reason, DMF explains that a sales representative may decline to promote DMF's module to a specifier if there is a chance that the sale may not be consummated because a contractor has decided to substitute DMF's module with ELCO's product during the construction phase. Danesh Decl. ¶ 63; Israel Decl. ¶ 24. The sales representative would not only lose that particular sale, but also risks criticism for suggesting the higher priced product in the first place. Danesh Decl. ¶ 64. Consistent with this theory, Steve Cosci, an independent lighting sales representative, attests that sales representatives are losing incentives to promote DMF's DRD2 product due to the presence of ELCO's lower-priced, comparable product. Dkt. 113-2 at 1. According to Cosci, it is "dangerous" to be beat on price because if a contractor decides that a specified DMF product is overpriced, he is likely to reject a sales representative's entire proposed package of lights for a project. Id. Moreover, because "contractors are creatures of habit," once they are "happy" using ELCO's ELL Module, they will continue to buy other products from ELCO instead of DMF. Id.

The Court finds that the threat that ELCO's infringement poses to DMF's relationship with its sales representatives also supports a finding of likely irreparable harm. See Conceptus, Inc. v. Hologic, Inc., No. C 09-02280 WHA, 2012 WL 44064, at *2 (N.D. Cal. Jan. 9, 2012) ("[L]oss of access to potential customers . . . is indicative of irreparable harm.").

### iii.     Price Erosion

DMF explains that it has a policy against discounting its DRD2 LED Module below a certain level, but ELCO's infringement is causing DMF to face the choice of either breaking its no-discount policy or losing customers to ELCO's product. Mot. at

20. Danesh attests that DMF has been asked by a number of distributors to reduce its prices to meet or come close to ELCO's prices. In support, Danesh includes an email from one of DMF's distributors asking for reduced pricing on DMF's DRD2 LED Modules because a customer had learned of the "elco version of the drd modules" from a competing distributor. Danesh Decl. ¶¶ 70–71, Ex. 26. Due to ELCO's sales, DMF has had to lower its prices with at least two distributors. Id. ¶¶ 71–72. Israel warns of the implications of such price erosion: "once participants in the construction industry learn of a cheaper alternative, they will push the alternative to increase profitability of the project. And once the prices are lowered, typically they never recover." Israel Decl. ¶ 30.

A likelihood of irreparable harm can be demonstrated through a showing that the plaintiff "had a general no-discount policy to maintain its premium product pricing that it was forced to break in order to compete with [the infringing product]." Celsis in Vitro, 664 F.3d at 930. DMF has proffered expert testimony on the likely damage to its premium pricing model, as well as evidence that it has already had to lower its prices. Accordingly, the Court finds that DMF's evidence of price erosion supports a finding of likely irreparable harm in the absence of a preliminary injunction.

### iv.    Reputational Harm

According to Israel, the lighting marketplace has different tiers of manufacturers and products, and DMF is recognized as a high grade or "specification grade manufacturer." Mot. at 21, Israel Decl. ¶ 9. Consistent with this reputation, DMF's products have garnered many awards for innovation. Id. Danesh explains that the DRD2 LED Module is largely responsible for DMF's reputation as an innovative lighting company. Danesh Decl. ¶ 54. ELCO, by contrast, is known among professional lighting designers as the lowest grade, or a "light commercial grade" vendor that sells commodity products. Mot. at 21; Israel Decl. ¶ 9. Due to ELCO's reputation as a light commercial grade vendor, ELCO's infringement creates the impression that DMF and ELCO are both purchasing the same product from the same factory, thus harming reputation of DMF's product as a "design level product" and destroying the "value proposition" that DMF earned in creating and promoting its patented technology as a design-level product.[4]

---

[4]    DMF also contends that ELCO's product presents safety hazards and is otherwise of poor quality, which further threatens to erode DMF's reputation. ELCO strongly disputes this contention and asserts that its product has been certified by Underwriters Laboratories, Inc. ("UL"). Opp'n at 22–24; Arestandi Decl. ¶¶ 19–20; O'Neill Decl. ¶¶ 15–16. Ultimately, the Court need not resolve this issue because it does not rely on

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL     'O'

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|----------|------------------------|------|----------------|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

Mot. at 21–22; Israel Decl. ¶¶ 17, 33. ELCO characterizes Israel as a "hired gun" and contends that his methodology is unscientific, unsound, and unreliable. Opp'n at 22. However, ELCO does not contest its reputation as a light commercial grade vendor, nor does it provide any persuasive evidence rebutting DMF's evidence that the DRD2 LED Module is a premium grade product.

"In cases where a patentee seeks to establish a reputation for expertise and advanced products, '[m]oney damages alone cannot restore the technological lead-time that the Plaintiff would have enjoyed but for the infringement of the Defendant.'" Advanced Transit Dynamics, Inc. v. Ridge Corp., No. CV 15-1877 BRO (MANx), 2015 WL 12516692, at *24 (C.D. Cal. 2015) (quoting EyeTicket Corp. v. Unisys Corp., 155 F. Supp. 2d 527, 548 (E.D. Va. 2001)). Here, plaintiff has demonstrated that the reputation of DMF's DRD2 LED Module as a "design level" product has already experienced, and is likely to continue experience, harm due to ELCO's infringement. Money damages will be unable to restore DMF's reputation with its customers, some of whom have already indicated that they assumed both DMF and ELCO's products came from the same factory. Accordingly, the Court finds that DMF's evidence of reputational harm also indicates that DMF is likely to suffer irreparable harm in the absence of a preliminary injunction.

### v.     DMF's Ability to Recoup its Investment in Developing and Promoting its New Technology

DMF asserts that it invested well over $1 million in designing, developing, engineering, quality-testing, marketing, and promoting the DRD2 LED Module. Danesh Decl. ¶ 74. DMF also hired a professional sales force to educate customers about the new product and to support its sales, as well as organized and paid for industry events to educate architects and lighting designers about the DRD2 LED Module. Id. DMF argues that these investments may not be recouped if ELCO's infringement continues. Although this may very well constitute harm, it appears that this harm is quantifiable and can be addressed through money damages. Accordingly, DMF's evidence about its jeopardized ability to recoup its investments does not support a finding that it is likely to suffer irreparable harm.

---

DMF's contention that ELCO's product is unsafe in finding that DMF has demonstrated a likelihood of irreparable harm.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|----------|------------------------|------|---------------|
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

In conclusion, DMF has shown evidence of a loss of customers and market share, some evidence indicating price erosion, and some evidence indicating reputational harm as a result of ELCO's alleged infringement.  This evidence supports a finding that the harm is irreparable.  The nature of the relationship between sales representatives, distributors, specifiers, and contractors; the interchangeable nature of DMF and ELCO's products; and evidence that ELCO has targeted DMF's customers, all establish a causal nexus between ELCO's infringement and the harm DMF already has, and is likely to, suffer.  Accordingly, the Court finds that DMF has demonstrated a likelihood of irreparable harm in the absence of injunctive relief.

## D.     Balance of Hardships

The Court finds that the balance of the hardships tips in favor of DMF.  Although ELCO argues that a preliminary injunction would be a "harsh consequence" for ELCO, Opp'n at 24, the preliminary record indicates that ELCO intentionally copied DMF's product.  The Federal Circuit has held that "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."  Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).  DMF, on the other hand, will likely suffer irreparable harm as described above absent a preliminary injunction.

## E.     Public Interest

Public policy favors the enforcement of patent rights.  See PPG Indus. v. Guardian Indus., Corp., 75 F.3d 1558, 1567 (Fed. Cir. 1996).  As DMF has established a likelihood of success on the merits, the Court finds that the public interest weighs in DMF's favor.  ELCO does not rebut the public interest weighing in favor of the enforcement of patent rights, but rather bases its argument on its assertion that DMF has fraudulently marketed its DRD2 LED Module.  This argument is misplaced as it bears no relevance to ELCO's alleged infringement of the '266 Patent.

DMF has established all four factors for an injunction.  Accordingly, the Court **GRANTS** DMF's motion for preliminary injunction.

## F.     Appropriate Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
|----------|------------------------|------|---------------|
| Title    | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.* The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003) (quotation marks omitted) (emphasis in original).

ELCO contends that its estimated costs and damages in the event it is wrongfully enjoined in this matter total $3,468,621 and consists of the following: (1) lost profits of [REDACTED] from the sale of ELCO ELL modules over the next 12 months, including 2019 sales commitments; (2) lost profits of $[REDACTED] from the sale of associated products; (3) $[REDACTED] in projected costs to relaunch the ELL product after the injunction is lifted; and (4) $[REDACTED] in costs incurred to comply with the injunction. Dkt. 104-1 at 11. DMF contends that ELCO has provided insufficient evidence to support its proposed bond amount. Dkt. 132-1 at 2. DMF proposes that the Court either set a nominal bond of $10,000, or set a bond that is twice the amount of profits that ELCO reported for its 2018 ELL Module sales. Id.

ELCO's president, Steve Cohen, filed a declaration attesting that ELCO sold [REDACTED] ELL Modules in 2018. Dkt. 104-7, at ¶ 8. Based on the figures that Cohen provided, it appears that ELCO's profits in 2018 for ELL Module sales did not exceed $[REDACTED]. See id. ¶ 10–11. Cohen provides no supporting evidence to support his assertion that ELCO expects to earn $2.3 million in profits in from the sale of ELCO ELL LED Modules in 2019. Instead, he merely provides bare assertions that customers have committed to buy [REDACTED] version 3 units, and that one customer has indicated he intends to purchase $[REDACTED] worth of ELL modules in 2019. Id. ¶¶ 15–16. Cohen also fails to provide any evidence supporting his calculations with respect to his estimated losses relating to losses from the sale of associated products, projected costs to relaunch the ELL product, and costs incurred in complying with the injunction. See id. ¶¶ 19–21.

The Court finds that the bond should be set to reflect the hypothetical profit that ELCO would earn from the sales of the ELL Modules between now and the trial date, which the parties propose will take place in December 2019, approximately 10 months from now. In light of ELCO's failure to substantiate its estimated profits of $2.5 million for 2019, or any of its other estimated losses, the Court finds it appropriate to substantially reduce ELCO's requested bond amount. Accordingly, the Court sets bond at $500,000.

| CIVIL MINUTES – GENERAL | | 'O' | |
|---|---|---|---|
| Case No. | 2:18-cv-07090-CAS-GJSx | Date | March 7, 2019 |
| Title | DMF, INC. v. AMP PLUS, INC. ET AL. | | |

## V.    CONCLUSION

In accordance with the foregoing, the Court **GRANTS** DMF's motion for preliminary injunction.

To the extent necessary, each of the foregoing findings of fact may be deemed a conclusion of law, and each of the foregoing conclusions of law may be deemed a finding of fact.

Upon DMF's posting of a bond in the amount of $500,000, defendant ELCO and its agents, principals, servants, employees and all those acting in concert with them, shall be preliminarily enjoined from engaging in the manufacture, use, sale, or offer for sale within the United States, or importation into the United States, of any and all products that infringe U.S. Patent No. 9,964,266.[5]

Upon the posting of bond, ELCO shall (1) immediately cease all manufacture, use, sales, offers for sale or importation of all three versions of the ELL LED Module or any other products that infringe the Patent; and (2) file with the Court, and serve on DMF, within ten days of the posting of the bond, a report in writing and under penalty of perjury setting forth in detail the manner and form in which ELCO has complied with the preliminary injunction.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |

---

[5]    Plaintiff also requested a recall of all ELCO ELL Modules that have not yet been installed in a building.  The Court declines to grant this particular relief because it would disturb, rather than preserve, the status quo.