1 Robert E. Boone III (California Bar No. 132780)
2 reboone@bclplaw.com
 **BRYAN CAVE LEIGHTON PAISNER LLP**
3 120 Broadway, Suite 300
 Santa Monica, CA 90401
4 Telephone: (310) 576-2100
 Facsimile: (310) 576-2200
5

6 Daniel A. Crowe (*Pro Hac Vice*)
 dacrowe@bclplaw.com
7 **BRYAN CAVE LEIGHTON PAISNER LLP**
 One Metropolitan Square
8 211 N. Broadway, Suite 3600
 St. Louis, MO 63102
9 Telephone: (314) 259-2000
 Facsimile: (314) 259-2020
10

11 Erin A. Kelly (*Pro Hac Vice*)
 erin.kelly@bclplaw.com
12 **BRYAN CAVE LEIGHTON PAISNER LLP**
 1700 Lincoln Street, Suite 4100
13 Denver, CO 80203
 Telephone: (303) 861-7000
14 Facsimile: (303) 866-0200
15

 **UNITED STATES DISTRICT COURT**
16
 **CENTRAL DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| 18 DMF, Inc., a California corporation, | Case No. 2:18-cv-07090-CAS-GJS |
| 19           Plaintiff, | Hon. Christina A. Snyder |
| 20     vs. | **DEFENDANT AMP PLUS, INC.'S OPPOSITION TO DMF'S MOTION FOR SUMMARY JUDGMENT** |
| 21 AMP Plus, Inc. d/b/a ELCO Lighting, a | |
| 22 California corporation; and, | [Filed with Statement of Genuine Disputes of Material Fact; Evidentiary Objections; and Declarations of Eric Bretschneider, Benjamin Ardesetani and Robert E. Boone III and Exhibits] |
| 23 ELCO Lighting Inc., a California corporation, | |
| 24 | |
| 25           Defendants. | Date:        March 2, 2020<br>Time:      10:00 a.m.<br>Courtroom:  8D |
| 26 AND RELATED COUNTER- | |
| 27 ACTIONS. | **REDACTED** |
| 28 | |

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

**Table of Contents**

Page

I.    INTRODUCTION ..........................................................................................1

II.   STATEMENT OF FACTS..........................................................................1

III.  APPLICABLE LEGAL STANDARDS .........................................................1

    A.    Summary Judgment....................................................................1

    B.    Non-Infringement.......................................................................2

    C.    Invalidity ...................................................................................3

IV.  THE ACCUSED PRODUCTS DO NOT INFRINGE.......................................4

    A.    The ELL Modules Do Not Infringe the Asserted Claims.......................4

    B.    There Are Triable Issues of Fact Regarding Whether the ELL Modules Meet the Reflector Limitation....................................................5

    C.    There Are Triable Issues Regarding Whether the ELL's Light Source Module and the Driver are Coupled to the Rear Face.................7

    D.    There are Triable Issues Regarding Whether ELL Version 3 Meets the Sidewall and Closed Rear Face Relationship Limitation. .................8

    E.    ELLs Do Not Meet the Significantly Dissipates Heat Limitation...........9

V.   DMF FAILS TO ESTABLISH THAT IT WILL PREVAIL ON ELCO'S INVALIDITY CHALLENGES. ....................................................................11

    A.    Any Presumption of Validity Has Little Weight Because of the PTAB's Institution Decision...................................................11

    B.    The Imtra Products and References are Sufficient to Raise Factual Issues Compelling Denial of DMF's Motion. .......................................12

        1.    The Imtra 2011 Brochure and Hatteras Product Anticipate Claims 1-2, 4-11, 13, 15-17, 19, 21 and 26 ..............12

        2.    The Imtra-Based Combinations Render Claims 1-2, 4-11, 13-17, 19, 21-22, 25-26 and 28-30 Obvious ..............................15

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

i

1   C. The Kim Reference and Combinations are Sufficient to Raise

2     Factual Issues Compelling Denial of DMF's Motion............................16

3   D. The LMH2 Alone, or in Combination with Gifford and/or Imtra,

4     Raises Factual Issues Compelling Denial of DMF's Motion. ...............17

5   E. DMF's Evidence of Secondary Considerations is Insufficient to

6     Overcome the Strong Case of Obviousness..........................................18

7 VI. TRIABLE ISSUES EXIST REGARDING DMF'S UNCLEAN HANDS ..... 21

8 VII. CONCLUSION ............................................................................... 25

9

10

11

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

4

**Cases**

5

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ............................................................................. 1

6

7

*Becton Dickinson & Co. v. C.R. Bard, Inc.,*
   922 F.2d 792 (Fed. Cir. 1990) ............................................................... 3

8

9

*Beyene v. Coleman Sec. Servs., Inc.,*
   854 F.2d 1179 (9th Cir. 1988) ............................................................... 1

10

11

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 106 S. Ct. 2548 (1986) .................................................... 1

12

13

*Chamberlain Group, Inc. v. Techtronic Industries Co. Ltd,*
   935 F.3d 1341 (Fed. Cir. 2019) ........................................................... 13

14

15

*Cheng v. AIM Sports, Inc.,*
   2012 WL 12952729 (C.D. Cal. May 11, 2012) (Gutierrez, J.) ............................ 3

16

17

*DatCard Sys., Inc. v. PacsGear, Inc.,*
   2013 WL 12134056 (C.D. Cal. Mar. 12, 2013) (Pfaelzer, J.) .............................. 3

18

19

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,*
   851 F.2d 1387 (Fed. Cir. 1988) ....................................................... 18, 20

20

*Fox Factory, Inc. v. SRAM, LLC,*
   944 F.3d 1366 (Fed. Cir. 2019) ....................................................... 18, 20

21

22

*Friskit, Inc. v. Real Networks, Inc.,*
   306 F. App'x 610 (Fed. Cir. 2009) ................................................. 18, 19, 20

23

24

*Glaukos Corp. v. Ivantis, Inc.,*
   2019 WL 1950297 (C.D. Cal. Mar. 19, 2019) (Selna, J.) .................................. 3

25

26

*Graham v. John Deere Co.,*
   383 U.S. 1 (1966) ............................................................................. 4

27

28

*Hitkansut LLC v. United States,*
   127 Fed. Cl. 101 (2016) .................................................................... 20

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEFENDANT AMP PLUS, INC.'S OPPOSITION TO DMF'S MOTION FOR SUMMARY JUDGMENT

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
   780 F.3d 1376 (Fed. Cir. 2015) ........................................................................... 13

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ............................................................................................. 4

*Lambert Corp. v. LBJC Inc.*,
   2014 WL 2737913 (C.D. Cal. June 16, 2014) (Snyder, J.) .................................. 1

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
   485 F.3d 1157 (Fed. Cir. 2007) .......................................................................... 18

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) ................................................................................ 2

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .............................................................................................. 2

*McCormick v. Cohn*,
   No. CV 90-0323 H, 1992 WL 687291 (S.D. Cal. July 31,
   1992), *aff'd*, 17 F.3d 395 (9th Cir. 1994) .......................................................... 24

*Meridian Mfg., Inc. v. C & B Mfg., Inc.*,
   340 F. Supp. 3d 808 (N.D. Iowa 2018) .............................................................. 20

*Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*,
   527 F.3d 1330 (Fed. Cir. 2008) ............................................................................ 5

*Miranda v. City of Cornelius*,
   429 F.3d 858 (9th Cir. 2005) ................................................................................ 1

*In re Mouttet*,
   686 F.3d 1322 (Fed. Circ. 2012) ........................................................................ 15

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
   545 F.3d 1359 (Fed Cir. 2008) ........................................................................... 13

*Newell Cos., Inc. v. Kenney Mfg. Co.*,
   864 F.2d 757 (Fed. Cir. 1988) ............................................................................ 18

*Pollar v. Columbia Broadcasting Sys., Inc.*,
   368 U.S. 464 (1962) .............................................................................................. 2

*POM Wonderful LLC v. Coca Cola Co.*,
   166 F. Supp. 3d 1085 (C.D. Cal. 2016) .............................................................. 24

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

*Pregis Corp. v. Kappos,*
700 F.3d 1348 (Fed. Cir. 2012) ............................................................................ 18

*Reeves v. Sanderson Plumbing Prod., Inc.,*
530 U.S. 133 (2000) ............................................................................................... 2

*Republic Molding Corp. v. B.W. Photo,*
319 F.2d 347 (9th Cir. 1963) ............................................................................... 24

*Responsive Innovations, LLC v. Holtzbrinck Publishers, LLC,*
No. 4:08CV1184, 2014 WL 1271199 (N.D. Ohio Mar. 26, 2014) .................... 20

*Streamfeeder, LLC v. Sure-Feed Sys., Inc.,*
175 F.3d 974 (Fed. Cir. 1999) ............................................................................... 3

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n,*
809 F.2d 626 (9th Cir. 1987) ................................................................................. 2

*Takeda Chem. Indus. v. Alphapharm Pty., Ltd.,*
492 F.3d 1350 (Fed. Cir. 2007) ........................................................................ 3, 4

*Tokai Corp. v. Easton Enters., Inc.,*
632 F.3d 1358 (Fed. Cir. 2011) ........................................................................... 18

*Trintec Indus., Inc. v. Top-U.S.A. Corp.,*
295 F.3d 1292 (Fed. Cir. 2002) ............................................................................. 3

*United States v. One Residential Prop. Located at 8110 E. Mohave Rd., Paradise Valley, AZ,*
229 F. Supp. 2d 1046 (S.D. Cal. 2002) ................................................................. 1

*Vasudevan Software v. Microstrategy,*
782 F.3d 671 (Fed. Cir. 2015) ............................................................................... 5

*Victaulic Company v. Iancu,*
753 F. App'x 895 (Fed. Cir. 2018) ...................................................................... 13

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC,*
683 F.3d 1356 (Fed. Cir. 2012) ........................................................................... 18

*Worden & Co. v. California Fig Syrup Co.,*
187 U.S. 516 (1903) ............................................................................................. 24

*Wyers v. Master Lock Co.,*
616 F.3d 1231 (Fed. Cir. 2010) ....................................................................... 3, 18

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1

**Statutes**

35 U.S.C. § 102 ..................................................................................................... 11

35 U.S.C. § 102(b) ................................................................................................... 3

35 U.S.C. § 103 ................................................................................................. 3, 11

35 U.S.C. § 271(a) ................................................................................................... 2

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................... 1

Fed. R. Civ. P. 56(c) ............................................................................................... 1

**Other Authorities**

Report of James R. Benya ("Benya 11/15/19 Report"), ¶ 147 ................................ 10

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEFENDANT AMP PLUS, INC.'S OPPOSITION TO DMF'S MOTION FOR SUMMARY JUDGMENT

I.    **INTRODUCTION**

DMF's Motion must be denied.  Triable issues of material fact abound.

II.   **STATEMENT OF FACTS**

Defendants incorporate their Statement of Genuine Disputes of Material Fact (individual facts are referred to as "Fact(s)" or "F__").

III.  **APPLICABLE LEGAL STANDARDS**

A.    **Summary Judgment**

DMF bears the heavy burden of establishing that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005). The party seeking summary adjudication "bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment." *Lambert Corp. v. LBJC Inc.*, 2014 WL 2737913, *2 (C.D. Cal. June 16, 2014) (Snyder, J.); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). A party must also submit admissible evidence to meet its burden. *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988); Fed. R. Civ. P. 56(c).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party fails to submit sufficient admissible evidence to satisfy its burden, the non-moving party does not have to submit evidence in opposition. *United States v. One Residential Prop. Located at 8110 E. Mohave Rd., Paradise Valley, AZ*, 229 F. Supp. 2d 1046, 1048 (S.D. Cal. 2002) (if the moving party fails to meet its burden, "the Court need not consider the non-moving party's evidence"). In judging evidence at the summary judgment stage, however, courts do not make credibility determinations or weigh conflicting evidence at the summary judgment

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEFENDANT AMP PLUS, INC.'S OPPOSITION TO DMF'S MOTION FOR SUMMARY JUDGMENT

1  stage, and must view all evidence and draw all inferences in the light most

2  favorable to the non-moving party.  *See T.W. Elec. Serv., Inc., v. Pac. Elec.*

3  *Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing *Matsushita Elec.*

4  *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).  "'Credibility

5  determinations, the weighing of the evidence, and the drawing of legitimate

6  inferences from the facts are jury functions, not those of a judge.'  Thus, although

7  the court should review the record as a whole, it must disregard all evidence

8  favorable to the moving party that the jury is not required to believe.  That is, the

9  court should give credence to the evidence favoring the nonmovant as well as that

10  'evidence supporting the moving party that is uncontradicted and unimpeached, at

11  least to the extent that that evidence comes from disinterested witnesses.'"  *Reeves*

12  *v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150–51 (2000).

13     In addition, the Supreme Court has cautioned that "summary procedures

14  should be used sparingly . . . where motive and intent play lead roles . . . It is only

15  when witnesses are present and subject to cross-examination that their credibility

16  and the weight to be given their testimony can be appraised.  Trial by affidavit is no

17  substitute for trial by jury which so long has been the hallmark of 'even handed

18  justice.'"  *Pollar v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473 (1962).

19     **B.    Non-Infringement**

20     A patent is infringed when a person "without authority makes, uses, offers to

21  sell, or sells any patented invention, within the United States or imports into the

22  United States any patented invention." 35 U.S.C. § 271(a).  Assessing whether

23  such a device infringes requires two-steps:  "determining the meaning and scope of

24  the patent claims asserted to be infringed," and "comparing the properly construed

25  claims to the device accused of infringing."  *Markman v. Westview Instruments,*

26  *Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).  While claim construction is a question of

27  law, the second step of comparing the construed claims with the accused product is

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

2

1  a question of fact.  *Glaukos Corp. v. Ivantis, Inc.*, 2019 WL 1950297, at *4 (C.D.
2  Cal. Mar. 19, 2019) (Selna, J.).

3  To establish patent infringement, "every limitation set forth in a claim must
4  be found in an accused product or process exactly or by a substantial equivalent."
5  *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed. Cir. 1990).  If
6  non-infringement is found as to an independent claim, all claims that depend
7  therefrom are likewise not infringed.  *Streamfeeder, LLC v. Sure-Feed Sys., Inc.*,
8  175 F.3d 974, 984 (Fed. Cir. 1999).  The burden of proving infringement is on the
9  patent owner.  *Glaukos*, 2019 WL 1950297, at *4.  DMF thus carries the burden to
10  show that ELCO "makes, uses, sells, offers to sell, or imports [devices] that have all
11  of the elements of" the asserted claims.

12  **C.    Invalidity**

13  "A patent may be invalidated for anticipation, if the invention patented was
14  disclosed in a printed publication or offered for sale to the public more than one
15  year prior to the date of the application for the patent."  *Cheng v. AIM Sports, Inc.*,
16  2012 WL 12952729, at *1 (C.D. Cal. May 11, 2012) (Gutierrez, J.) (citing 35
17  U.S.C. § 102(b)).  "Each limitation must be expressly or inherently described in a
18  single prior art reference for that reference to be anticipating."  *DatCard Sys., Inc. v.*
19  *PacsGear, Inc.*, 2013 WL 12134056, at *1 (C.D. Cal. Mar. 12, 2013) (Pfaelzer, J.)
20  (citing *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir.
21  2002)).  Anticipation is an issue of fact.  *Cheng*, 2012 WL 12952729, at *1.

22  Claims of a patent may also be invalidated under 35 U.S.C. §103 if, at the
23  time of the invention, the claimed subject matter as a whole would have been
24  obvious to a person of ordinary skill in the art. *See Wyers v. Master Lock Co.*, 616
25  F.3d 1231, 1237 (Fed. Cir. 2010); 35 U.S.C. §103. "Whether an invention would
26  have been obvious under 35 U.S.C. §103 is a question of law… based upon
27  underlying factual questions." *Takeda Chem. Indus. v. Alphapharm Pty., Ltd.*, 492

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

3

1  F.3d 1350, 1355 (Fed. Cir. 2007) (internal quotation marks and citation omitted). In

2  assessing obviousness, a court considers (1) the scope and content of the prior art;

3  (2) the differences between the prior art and the asserted claims; (3) the level of

4  ordinary skill in the art; and (4) any relevant secondary considerations. *Id*. (citing

5  *Graham v. John Deere Co*., 383 U.S. 1, 17–18 (1966); *See also KSR Int'l Co. v.*

6  *Teleflex Inc.*, 550 U.S. 398, 406 (2007)).  Since the Supreme Court's decision in

7  *KSR*, the rationale to support a conclusion that the claim would have been obvious

8  has been well settled in case law, in that all claimed elements were known in the

9  prior art and one skilled in the art could have combined the elements as claimed by

10  known methods with no change in their respective functions, and the combination

11  yields nothing more than predictable results. *KSR*, 550 U.S. at 416.

12  **IV.   THE ACCUSED PRODUCTS DO NOT INFRINGE.**

13       **A.   The ELL Modules Do Not Infringe the Asserted Claims.**

14       DMF's flawed infringement theory is based on two premises:  (1) the DRD2

15  practices the '266 Patent; and (2) the ELL design is the same as the DRD2 design.

16  DMF fails to prove either premise.  DMF's evidence does not show that the DRD2

17  actually practices the patent.  Indeed, Mr. Benya does not explain how the DRD2

18  design satisfies the various claim limitations of the patent.  F 310.

19       More importantly, the fact witnesses and technical experts disagree about the

20  ELL's design, structure and operation with respect to at least four claim limitations.

21  DMF blatantly ignores these and other significant differences between the

22  respective DRD2 and ELL designs, was well as substantial design advantages of the

23  ELL, based on which the jury may find non-infringement.

24       First, the ELL's reflector not enclose the driver because the driver is already

25  enclosed by potting material and a driver housing.  The DRD2 module does not pot

26  its driver nor use a driver housing in the shape and structure of the ELL modules.

27       Second, neither the ELL's LED light source module nor the ELL's driver is

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

4

coupled to the closed rear face.  Rather, because ELCO's design incorporates the driver housing, screws passing through the reflector and the driver housing enter the inside face of the casting without passing through the LED module or the driver. The LED light source module is securely retained to the underneath of the driver housing by a leaf spring system.  The DRD2 does not make use of a leaf spring system nor a driver housing similar to the ELL.

Third, the rear wall and sidewall of the version 3 ELL casting are not joined together, like the DRD2.  Rather, an angled wall lies between the two components.

Fourth, under DMF's own definition of "dissipates" – to transfer heat away from an object – the ELL's casting does not dissipate heat generated by the light source module.  ELCO's modules incorporate a silicone-based thermal grease, which is a heat conducting material, between the light source module and the interior surface of the casting.  This thermal grease, not the casting, transfers, the heat generated by the light source module away from the light source module.

Each of these four reasons, explained in greater detail below, is supported by facts, admissions, and opinions in the record and provides an independent basis for the jury to find non-infringement.  DMF may disagree with Dr. Bretschneider's opinions, but those disputes present triable issues that may not be resolved at the summary judgment stage.  "As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case." *Vasudevan Software v. Microstrategy*, 782 F.3d 671, 683 (Fed. Cir. 2015); *see also, Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*, 527 F.3d 1330, 1339 (Fed. Cir. 2008) (resolving credibility disputes between experts "is not appropriate on summary judgment").

**B.      There Are Triable Issues of Fact Regarding Whether the ELL Modules Meet the Reflector Limitation.**

Independent claims 1, 17 and 22 require the reflector to "enclose[] the driver from exposure to the area surrounding the compact recessed lighting system."

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

5

Independent claim 26 requires the reflector to "cover the driver."  The specification explains that "the reflector 6 surrounds the light source module 3 and separates the light source module 3 from the driver 4.  This separation allows light from the light source module 3 to be emitted into a room or surrounding area while further shielding the driver 4 from being exposed to the room or surrounding area."  '266 Patent, 5:65-6:3.

The DRD2 does not have a structural component between the reflector and the driver and, thus, the reflector separates the driver from the light source module.  F262-263.  By contrast, the ELL's LED light source module and driver are already separated by two components.  First, the driver is enclosed in a potting material, separating the driver from other components.  Second, the ELL LED light source module and the driver sit on opposite sides of the inner wall forming the small cavity of the driver housing.  F264.  Because the ELL's LED light source module and the driver are already independently separated by two other separate components, the reflector cannot further separate the two.

Further, driver housings of versions 1 and 2 ELL modules included a cap having an annular opening, wherein the cap enclosed the driver completely within the driver housing.  F270-274. This driver housing completely surrounds the driver and encloses the driver from exposure to the area surrounding the compact lighting system.  F272. Even DMF's expert refers to this component as the "black driver **enclosure**."  Benya Decl. ¶¶ 193, 205 (emphasis added).  Thus, the ELL reflector cannot enclose the driver because the driver is already enclosed by (1) the potting material and (2) the driver housing.  The DRD2 driver is not potted, nor does the DRD2 driver housing have a cap to fully enclose the driver.  As a result, the DRD2 needs its reflector to perform the separation and enclosing (or covering) functions.  While this limitation may read on the DRD2 module, because of the structural differences between the ELL and the DRD2 (and the requirements of the claims),

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEFENDANT AMP PLUS, INC.'S OPPOSITION TO DMF'S MOTION FOR SUMMARY JUDGMENT

1 | ELL modules that incorporate the driver housing do not infringe any claim of the
2 | patent. F274.

3 |     Construed in the light most favorable to Defendants, this evidence, at a
4 | minimum, creates triable issues of fact regarding this claim limitation.

5 | **C.**    **There Are Triable Issues Regarding Whether the ELL's Light**
6 |        **Source Module and the Driver are Coupled to the Rear Face.**

7 |     Claim 1 of the patent includes the limitation "wherein the light source
8 | module and the driver are positioned inside the first cavity while being coupled to
9 | the heat conducting closed rear face of the unified casting."  The patent describes
10 | several types of mechanisms to *securely* couple the light source module and the
11 | driver to the inside of the rear face, including resins.  '266 Patent, 3:37-42.  The
12 | DRD2 uses a thermally conductive epoxy adhesive from ▮▮ having high adhesive
13 | strength to secure the light source module to the interior surface of the rear face of
14 | the casting.  F298-299.  DMF uses this epoxy adhesive to securely couple the light
15 | source module to the inside of the rear face of its casting.

16 |     By contrast, in the ELL, there is a layer of silicone-based thermal grease
17 | designed for thermal conductivity, which does not harden with time, between the
18 | LED light source module and the inside surface of the casting.  F287-288.  The
19 | thermal grease provides a conductive thermal path between the light source module
20 | and the interior surface of the housing, but does not securely couple the light source
21 | module to the housing.  F288-292, 300-309.

22 |     Rather, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  F301-305. The driver housing is
24 | then attached to the inside rear face of the aluminum housing using screws that pass
25 | through the reflector and the driver housing, into openings in the inside rear face of
26 | the housing, without passing through the LED light source module or the driver.
27 | F307-308. Thus, the ELL does not meet the limitation that both the light source

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

28

1   module and the driver are coupled to the closed rear face of the unified casting.
2   F309.

3       DMF makes little effort to explain its position regarding this limitation,
4   relying on a single paragraph in Mr. Benya's declaration.  Mr. Benya opines that the
5   LED is coupled to the closed rear face because there is a layer of thermal grease
6   between the LED light source module and the post of the housing.  Benya Decl. ¶
7   193.  He ignores the composition of this thermal grease, including the fact that it
8   has a low coefficient of adhesion and is not a resin.  He also ignores the fact that the
9   ELL's LED light source module is coupled to and securely attached to the
10  underside of the shelf of the driver housing. F305. Mr. Benya further opines that by
11  having screws pass through the shelf of the driver housing, in an area completely
12  outside of the driver, and into the rear face, which allegedly "sandwiches" the driver
13  housing and the LED between the reflector and the rear face, the ELL somehow
14  meets the coupling limitation.  Mr. Benya again ignores the function of ▮▮▮▮▮
15  ▮▮▮▮▮ and the function and material composition of the thermal grease.

16      Here, there clearly are disputes of fact that must go to the jury, including
17  whether DMF's "sandwich" theory is equivalent to coupling,[1/] particularly where:
18  (i) the ELL LED light source module only has an indirect thermal connection to the
19  housing; (ii) the light source module easily separates from that thermal connection
20  because the grease is not an adhesive;  and (iii) the reflector screws do not contact
21  the driver or the LED light source module.  F300-309.

    **D.   There are Triable Issues Regarding Whether ELL Version 3 Meets the Sidewall and Closed Rear Face Relationship Limitation.**

23      Independent claims 1, 17 and 22 of the '266 Patent include the limitation that
24  the sidewall of the casting is joined to the closed rear face of the casting.

25      The version 3 ELL casting is drastically different from the DRD2 module.

27  [1/] DMF does not move for summary judgment under the doctrine of equivalents, nor
28  does Benya render any opinions based on this theory.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

F279-281. The DRD2 casting incorporates two major components: a circular sidewall and a flat rear face.  The sidewall is joined to the rear face.  By contrast, the version 3 ELL casting incorporates three major structural components:  a sidewall, an angled wall, and a rear wall.  The lower end of the angled wall is joined to the sidewall; separately, the upper end of the angled wall is joined to the rear wall.  F279-281.  In other words, the angled wall lies between the closed rear face and the sidewall.  The transitions between the sidewall and the lower end of the intermediate angled wall, and the intermediate angled wall and the rear face, are not smooth, but occur at sharp angles.  *Id*.  As such, the version 3 ELL sidewall is not joined to the rear face.  F282.

Once again, DMF makes little attempt to show that the geometry of the version 3 ELL casting meets this joining limitation. Mr. Benya describes the rear face and the intervening face as "a conical closed rear face." Benya Decl. ¶ 187. But a conical object is shaped like a cone, *i.e*., a three-dimensional geometric shape that tapers smoothly from a flat base to a point called the apex or vertex. A face is planar or, at best, smoothly curved.  Bretschneider Decl. ¶ 452.  Whether the combination of the rear face and the angled intermediate wall of the ELL casting is "conical" and meets this limitation is a factual issue for the jury.

**E.    ELLs Do Not Meet the Significantly Dissipates Heat Limitation.**

Independent claims 1, 17 and 26 require the closed rear face and the sidewall of the unified casting (or just the unified casting for claims 17 and 26) to "significantly dissipate heat generated by the light source module."

In its Claim Construction Order, the Court rejected ELCO's assertion that the term "significantly dissipates" is hopelessly indefinite and also ELCO's proposed alternative construction that "significantly dissipates" means "transfers or disperses into the outside environment at a measurably great rate."  Dkt. 266 at 20-23.  The Court construed "significantly dissipates" to mean "dissipates sufficient heat

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

9

generated by the light source module during operation of the light source module
such that an additional heat sink is not required." *Id*. at 23.  This construction
defines the adverb/verb combination of "significantly dissipates" but does not
change which object must perform the dissipation – the unified casting.

According to DMF, this limitation does "not concern where the heat is
transferred **to**, but where the heat is transferred **from** – i.e., the LED. . . . a
fundamental design issue for LED lighting is heat transfer away **from** the LED..."
11/15/19 Report of James R. Benya ("Benya 11/15/19 Report"), ¶ 147 (Exh. QQ to
Bretschneider Decl.) (original emphasisl); *see also* Benya Decl., ¶ 95 ("Dissipating
heat" from an object (e.g., from 'the light source module') means that the heat is
transferred away **from** the object.").  Mr. Benya also testified that general
dictionary definitions "indicate a general view that the term *dissipate* generally
concerns being transferred away **from** something, not **to** something else . . . ."
Benya 11/15/19 Report at ¶ 149 (original emphasis).  He also testified that heat
dissipation from an object can occur through three modes, including "*heat
conduction* (e.g., heat flows away from the object through a heat conducting
material in thermal contact with that object) . . . ." *Id*. at ¶ 126 (original emphasis).

DMF and Mr. Benya now ignore their prior positions and merely assert that
the ELL housing dissipates the heat generated by the LED light source module
because the ELCO modules work and, in DMF's view, do not have a second heat
sink.  Again, this position ignores the disputed facts the parties have regarding the
structure and operation of the ELL modules.

As described above, the ELL incorporates a silicone-based thermal grease,
which is a heat conducting material, between the light source module and the
interior surface of the housing.  F287-288. The light source module is not in direct
contact with the aluminum housing.  F291.

Based on Mr. Benya's definition of "dissipates" – that is, "to transfer heat

Bryan Cave LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386

1   away from" – the thermal grease, not the casting, dissipates the heat generated by

2   the light source module away from the light source module.  F292. The casting

3   dissipates the heat away from the thermal grease.  In fact, Mr. Benya admitted this:

4       Q.    Heat transfers from the orange circle of LEDs to the white

5       square-shaped board on which the LEDs sit?

    A.    Correct.

6       *    *    *

7       Q.    Well, doesn't the heat conduct from the LEDs to that square

    white board, then through the thermal paste, then to the casting?  Isn't

8       that the order --

9       A.    That is exactly the order.

10  Benya Depo. at 48:20-22, 49:11-14.

11      At a minimum, there is a triable issue whether it is the aluminum housing or

12  the thermal grease that "significantly dissipates" the heat generated by the LED.

13  **V.**     **DMF FAILS TO ESTABLISH THAT IT WILL PREVAIL ON ELCO'S**

14      **INVALIDITY CHALLENGES.**

15      **A.**     **Any Presumption of Validity Has Little Weight Because of the**

16      **PTAB's Institution Decision.**

17      As this Court knows, in November 2019 the Patent Trial and Appeal Board

18  ("PTAB") instituted *Inter Partes* Review of the '266 Patent, which means that the

19  prosecution of the patent is <u>open</u>.  The PTAB determined that ELCO is likely to

20  prevail on its invalidity challenges under 35 U.S.C. §§ 102 and 103 against the

21  same claims DMF asserts in this Motion.  Inst. Dec. (Exh. PP to Bretschneider

22  Decl.) at 34.  As this Court also knows, the PTAB strongly disagrees with this

23  Court's construction of the terms "driver" and "standard junction box."  In opposing

24  Defendants' request to stay this action pending IPR, DMF misled this Court by

25  asserting that the PTAB's findings on the proper construction of these terms were

26  premised solely on: (i) the doctrine of claim differentiation; (ii) viewing expert

27  testimony in the light most favorable to ELCO; and (iii) giving no weight to the

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEFENDANT AMP PLUS, INC.'S OPPOSITION TO DMF'S MOTION FOR SUMMARY JUDGMENT

1 prosecution history.  [Dkt. 326]  DMF completely disregarded the PTAB's principal

2 reason for its ruling – the patent's specification.  Inst. Dec. at 9.  DMF then filed a

3 petition for rehearing, but the PTAB emphatically rejected those arguments just

4 days ago, reiterating the PTAB's conviction to its construction of those terms, and

5 demonstrating that the PTAB's analysis is soundly based on the two best sources –

6 the claims themselves and the specification.  Decision Denying Patent Owner's

7 Request for Rehearing ("Reh'g Dec.") (Exh. 1216).

8      Under the PTAB's claim construction, DMF loses ELCO's invalidity

9 challenge based on the nearly identical recessed lighting products Imtra sold <u>years</u>

10 before DMF allegedly invented its device.  The institution decision presents a

11 significant cloud regarding the Court's construction of driver and standard junction

12 box and removes any presumption that the patent claims are valid.[2/]

13 **B.    The Imtra Products and References are Sufficient to Raise Factual**

14 **Issues Compelling Denial of DMF's Motion.**

15      1.    The Imtra 2011 Brochure and Hatteras Product Anticipate

16           Claims 1-2, 4-11, 13, 15-17, 19, 21 and 26

17      DMF claims ELCO has not identified a single prior art reference that meets

18 all claim limitations.  This is false.  The evidence, construed in the light most

19 favorable to ELCO, shows otherwise.  ELCO has demonstrated that Imtra's 2011

20 brochure, as the PTAB has already signaled, and the Imtra Hatteras physical

21 product, which was sold for years before the alleged invention, anticipate a number

22 of claims of the '266 Patent. In any event, the competing technical experts'

23 disagreements regarding Imtra prevent the entry of summary judgment.

24      DMF also contends ELCO does not identify a single product in the Imtra

25 2011 catalog that meets every claim limitation and instead mixes features from

26 different products.  F116.  This argument is not supported by the law; in fact, the

27 

28 [2/] The Court should *sua sponte* reconsider staying the case pending IPR.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEFENDANT AMP PLUS, INC.'S OPPOSITION TO DMF'S MOTION FOR SUMMARY JUDGMENT

1  PTAB shot down this exact argument by DMF on its petition for rehearing:

> Anticipation requires that "all limitations of the claimed invention are described in a single reference, rather than a single example in the reference." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 n. 5 (Fed Cir. 2008). We must look at the reference "as a whole" and determine whether it discloses all elements of the claimed invention as arranged in the claim *Id.* "[A] reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015).

Reh'g Dec. at 11. *See also, Victaulic Company v. Iancu*, 753 F. App'x 895 (Fed. Cir. 2018). "[W]hen a reference discloses elements in different locations in the disclosure, the relevant question is whether the reference is sufficiently clear in disclosing the combinability of those elements such that a skilled artisan would 'at once envisage' the claimed combination." *Chamberlain Group, Inc. v. Techtronic Industries Co. Ltd*, 935 F.3d 1341, 1350 (Fed. Cir. 2019).

DMF argues the Imtra references lack the "driver" and "plurality of elements" limitations. DMF claims the Imtra materials fail to disclose the driver because the Imtra products do not connect to "building mains voltage." The Court did not construe the term "driver" but noted that a POSITA "would understand that a driver in the context of the '266 Patent is intended to serve the function of supplying and regulating electrical energy from building main power to the light source module." Claim Construction Order [Dkt. 266] at 29.[3]

---

[3] The PTAB ruled that "neither the Specification nor the prosecution history restricts the recessed lighting system to being only within a building, and 'structure' is undefined. Dec. 18 We identified nothing in the Specification (or prosecution history to the extent identified to us) that restricts the claimed system to be powered by only 'building main power.' Dec. 19. We noted that the Specification discloses that the driver may be any type of power supply that delivers AC *or DC* voltage to the light source module." Reh'g Dec. at 8 (emphasis in original).

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

13

"Building main power" includes DC because DC may be the main power source of a building or structure. F336. Dr. Bretschneider acknowledged the Court's analysis of the parties' competing positions on the construction of driver and opined that the driver shown in the Imtra references provides this function because boats and yachts have both AC and DC sources of main power.  F339-341.  Yachts have living quarters with multiple bedrooms, kitchens, living spaces and are considered residences. F342. Thus, there is ample evidence in the record that the Imtra brochure and the Hatteras product disclose the driver limitation.  DMF may disagree, but that is a triable issue of fact.

DMF asserts that the Imtra products lack the "plurality of elements" limitation because they were allegedly not designed to mate with a junction box and that ELCO has not identified a junction box that aligns with the holes in the flange of the Imtra products.  This argument fails because no claim of the patent requires "the presence of a 'standard junction box.' F330. Moreover, the Imtra 2011 brochure and Hatteras product clearly disclose that the lighting devices include mounting holes on the housing that are adapted to receive mounting screws to fasten the lighting device to a surface, such as a recessed area in the ceiling. F331-332. These mounting holes may be aligned with the tabs of a standard junction box. F320-328, 331-334, 368-373.

DMF attempts to support its argument by including a photograph of the Hatteras product within a junction box.  Motion at 11.  This is simply a red herring. DMF misconstrues the purpose of the photograph, which demonstrates that the product meets the limitation of claim 26 requiring the unified casting to have dimensions such that it fits inside a standard junction box.  F333.

Facts 94-118, 319-336, 339-344, 346-352, 357-360 demonstrate that there are triable issues of fact as to whether claims 1, 2, 4-11, 13, 15-17, 19, 21, and 26 are anticipated by Imtra 2011 and Imtra Hatteras.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

14

2. The Imtra-Based Combinations Render Claims 1-2, 4-11, 13-17,
19, 21-22, 25-26 and 28-30 Obvious

With respect to the combination of Imtra 2011 or Hatteras and Gifford, DMF provides a detailed explanation of the operation of the device described in Gifford, including the adapter apparatus 100 providing a safety protection barrier.  F127-142.  DMF claims that a POSITA would not be motivated to put the internal components of Imtra into Gifford's adaptor apparatus.  F142.  DMF completely misunderstands the obvious combination of Imtra and Gifford, or it is attempting to obfuscate the issue to confuse the Court.  DMF tried to do the same with the PTAB, but the PTAB soundly rejected DMF's unfounded position:

> Here, the prior art invention being modified is Imtra's LED devices, not Gifford's apparatus.  The proposed combination adds Gifford's junction box, not the entirety of Gifford, to Imtra's devices.  *See* Pet. 64-67.  As discussed in the Decision [instituting a PTAB trial], the features of Gifford need not be physically incorporated into Imtra 2011 and Imtra 2007.  Dec. 32.  We did not misapprehend or overlook Gifford's disclosures.  We do not find that modifying Imtra's devices with Gifford's junction box would render Imtra's devices unsatisfactory for their intended use. (Reh'g Dec. at 13-14.)

"It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements."  *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Circ. 2012).

Dr. Bretschneider explains the obvious combination of Imtra and Gifford:

> "It would look like Imtra with a wider flange that allowed mounting to the tabs of the standard junction box.  You're actually going about it the wrong way because Imtra has the majority of the features except for the tabs to mount to a standard junction box.  So it would be more correct to say you're modifying Imtra.  You're adding the features of Gifford than the other way around.  It's a shorter process.  You'll get to the same place."

> "Again, what I've said is combining the features. And you are ignoring what I've said. One option would be to take Imtra, which we

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1

2

3

already discussed earlier today, that it would be easy for a person of ordinary skill in the art to extend that flange, that base around it, so that it would extend and cover a standard junction box.  And you would be able to put in screw holes so it would mount to a standard junction box." F371-372.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

DMF falsely claims that Dr. Bretschneider did not adequately explain the combination of Imtra and Gifford. But Dr. Bretschneider fully explained in his report and deposition the teachings of Imtra and Gifford from the perspective of a POSITA and why a POSITA would be motivated to combine the references, what the result of the combination would be, and how that combination meets all the limitations of the claims.  Bretschneider Decl. ¶¶ 138-139, 142-143, 245; F371-373. He testified that combining the Imtra brochures (or the Hatteras physical product) with the teachings of Gifford's lighting device (having a flange with holes that line up with the holes in the junction box shown in Gifford) would result in extending the flange of Imtra to mate with holes of a standard junction box.  He also detailed this combination to DMF in his IPR declaration in May 2019.  Bretschneider IPR Decl. (Exh. 1215), ¶¶ 109-121, 178.  "[W]e credited Dr. Bretschneider's testimony regarding what a person of ordinary skill in the art would have been motivated to do in view of Gifford and Imtra, which we found to be <u>substantial evidence</u> based on the record at the time of the Decision."   Reh'g Dec. at 12 (emphasis added).  Thus, there is a triable issue of whether the combination of Imtra and Gifford render claims of the '266 Patent obvious.

21

22

23

24

Facts 94-152, 319-336, 339-345, 346-352, 359-362, 368-374 demonstrate that there are triable issues of fact as to whether the remaining combinations of Imtra 2011 and/or the Hatteras product with Imtra 2007 and/or the Gifford reference render claims of the '266 Patent obvious.

25

26

**C.    The Kim Reference and Combinations are Sufficient to Raise Factual Issues Compelling Denial of DMF's Motion.**

27

28

DMF repeats its oft-cited mantra that the Kim Reference is the same as the

Bryan Cave LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386

16

1  Woo Reference and that the Examiners agreed that Woo would not invalidate claim
2  1 because Woo's housing is not heat conducting.  F147.  DMF and Benya have
3  repeatedly made this statement to the Court throughout this case.  But Benya
4  admitted in deposition that this statement is, and has always been, *false* – that is,
5  Woo does <u>not</u> disclose a non-heat conducting housing.  Benya Depo. at 64:23-25;
6  73:21-74:2; 78:6-10.  Shockingly, after making this startling admission in his
7  deposition, Mr. Benya signed yet another declaration, no less in support of this
8  Motion, repeating this falsehood.  Benya Decl. ¶ 331.  This creates a triable issue.

9         Dr. Bretschneider testified that Kim discloses a heat-conducting unified
10  casting and, in combination with Gifford, discloses the "plurality of elements"
11  limitation.  Bretschneider Decl. ¶ 327. This testimony, and Facts 94-158, 319-337,
12  339-353, 355,  357-364, 368-374 demonstrate that there are triable issues of fact as
13  to whether the Kim reference, combined with Gifford and/or Chang or with Imtra
14  2011 or Hatteras render claims of the '266 Patent obvious.

15         **D.      The LMH2 Alone, or in Combination with Gifford and/or Imtra,**
16         **Raises Factual Issues Compelling Denial of DMF's Motion.**

17         DMF asserts that the LMH2 product does not meet the driver, unified casting,
18  or plurality of elements limitations.  But, Dr. Bretschneider carefully examined the
19  LMH2 and testified that it includes a driver, a unified casting, and that it has screw
20  holes located in its flange.  Bretschneider Decl. ¶¶ 394-397, 405-407. He concludes
21  that the LMH2 alone, or in combination with Gifford or Imtra (2011 or Hatteras)
22  discloses every limitation of asserted claims.  *Id.* ¶¶ 393-432.  Facts 94-167, 319-
23  336, 338-352, 354, 356-367, 374, demonstrate that there are triable issues of fact as
24  to whether LMH2 anticipates, or whether LMH2 in combination with Gifford and/or
25  Imtra render the claims of the '266 Patent obvious.

26
27
28

Bryan Cave LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386

17

1
2

**E.     DMF's Evidence of Secondary Considerations is Insufficient to Overcome the Strong Case of Obviousness.**

3   Secondary considerations do not control the obviousness conclusion. *See*

4   *Newell Cos., Inc. v. Kenney Mfg. Co*., 864 F.2d 757, 768 (Fed. Cir. 1988).  Where,

5   as here, a strong prima *facie case* of obviousness exists, even relevant secondary

6   considerations supported by substantial evidence may not dislodge the final

7   conclusion of obviousness.  *See, e.g., Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,

8   485 F.3d 1157, 1162 (Fed. Cir. 2007).  Secondary considerations evidence can only

9   be accorded substantial weight if the patent owner meets its burden to prove a nexus

10  between that evidence and the merits of the claimed invention.  *Fox Factory, Inc. v.*

11  *SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019); *Wyers v. Master Lock Co*., 616

12  F.3d 1231, 1246 (Fed. Cir. 2010); *Demaco Corp. v. F. Von Langsdorff Licensing*

13  *Ltd*., 851 F.2d 1387, 1392 (Fed. Cir. 1988) ("The burden of proof as to this

14  connection or nexus resides with the patentee.").  Not just any nexus will do.  There

15  must be a nexus between the evidence of secondary considerations and the claimed

16  invention.  That is, the secondary consideration must actually result from novel

17  features of the claim.  There is no nexus when the secondary consideration results

18  from something other than what is both claimed and novel. *Tokai Corp. v. Easton*

19  *Enters., Inc*., 632 F.3d 1358, 1369 (Fed. Cir. 2011). *See also, Pregis Corp. v.*

20  *Kappos*, 700 F.3d 1348, 1356 (Fed. Cir. 2012) ("The lack of nexus between the

21  claimed subject matter and the commercial success or purportedly copied features of

22  the EZ I machine renders Free–Flow's proffered objective evidence uninformative

23  to the obviousness determination.").  *See also, Wm. Wrigley Jr. Co. v. Cadbury*

24  *Adams USA LLC*, 683 F.3d 1356, 1364 (Fed. Cir. 2012) ("a nexus between the

25  copying and the novel aspects of the claimed invention must exist for evidence of

26  copying to be given significant weight in an obviousness analysis."); *Friskit, Inc. v.*

27  *Real Networks, Inc.*, 306 F. App'x 610, 617 (Fed. Cir. 2009) ("Copying by the

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

accused infringer, however, has limited probative value in the absence of evidence of failed development efforts by the infringer . . . .").

DMF asserts that the ELL modules are a copy of the DRD2 allegedly the subject of the '266 Patent. Not only is ELCO's module not a copy of the DRD2, but DMF fails to prove that its own product is covered by the patent claims.

DMF also fails to establish the requisite nexus between any alleged copying of any novel aspects of the patent. DMF misconstrues a number of emails between ELCO and potential vendors in Asia about potential pricing, before ELCO started the design process. DMF takes these emails out of context, and Mr. Benya fails to account for ELCO witnesses' testimony explaining the emails. F388-390; *see also* F171-197. Indeed, neither DMF nor Mr. Benya even attempt to explain how these emails evidence copying by ELCO of any novel design feature of the patent. Thus, the Court should not infer copying from this evidence, particularly when construed in the light most favorable to ELCO.

DMF also asserts that its invention has received "industry praise." However, all of the alleged "industry praise" relates to features outside of the alleged invention, namely to DMF's marketing claims of meeting certain fire-rating standards, based on a junction box that was subsequently withdrawn from the market. F376-387. Further, DMF failed to adduce competent testimony from any witness actually involved in the award decisions establishing precisely why the awards were given, including whether the awards were actually directed to the claimed invention. Without a competent witness so testifying, these documents cannot be authenticated, are irrelevant, and amount to inadmissible hearsay.

A careful review of these awards demonstrates that they were given <u>not</u> for the patented LED light module, but to DMF's larger, overall modular lighting system called the "OneFrame" which refers to an entire lighting kit that includes a junction box, mounting brackets, a light engine, and a trim. *Id.* Rather than focus on

Bryan Cave LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386

19

features of the claimed invention, the awards focus on non-patented components and features of the overall OneFrame system. *Id.* The awards specifically refer to a "fire-rated" downlight and do not mention any components of the claimed invention such as a heat dissipating unified casting, a light source module well recessed in the unified casting, an internal driver, or a reflector. *Id.* The reference to fire rating is directed to the junction box itself, not the DRD2 light module, and, of course, none of the asserted claims of the patent requires a junction box. Inst. Dec. at 8.

"When the thing that is commercially successful is not coextensive with the patented invention – for example, if the patented invention is only a component of a commercially successful machine or process, the patentee is not entitled to a presumption of nexus." *Fox Factory,* 944 F.3d at 1373 (citing *Demaco*, 851 F.2d at 1392). Because DMF's awards are directed to non-patented features, namely the junction box and hanger bars, DMF cannot rely on the awards to demonstrate commercial success of the patented invention.

DMF also claims Dr. Bretschneider's opinions on obviousness should be discounted because he allegedly did not consider DMF's evidence of secondary considerations. DMF cites to no case law holding that a technical expert offering opinions about the teachings of the prior art must also consider evidence of secondary considerations. In fact, the case law is to the opposite. *Hitkansut LLC v. United States*, 127 Fed. Cl. 101, 113-114 (2016) (secondary considerations are not part of defendant's burden in proving obviousness and, as such, need not be addressed in defense expert report); *Meridian Mfg., Inc. v. C & B Mfg., Inc*., 340 F. Supp. 3d 808, 832 (N.D. Iowa 2018) (expert reports on prior art or obviousness need not include secondary considerations); *Responsive Innovations, LLC v. Holtzbrinck Publishers, LLC*, No. 4:08CV1184, 2014 WL 1271199 at *6 (N.D. Ohio Mar. 26, 2014)(secondary considerations are for a patentee to raise in rebutting a prima facie showing of obviousness).

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEFENDANT AMP PLUS, INC.'S OPPOSITION TO DMF'S MOTION FOR SUMMARY JUDGMENT

In any event, Dr. Bretschneider did consider this evidence.  In his Rebuttal Report, Dr. Bretschneider reviews the materials cited by Mr. Benya (in his initial expert report) related to industry praise for the DMF products and opined that the claim of industry praise is not related to the features in the asserted claims.  F387.

Dr. Bretschneider also considered whether the ELCO module was a copy of the DMF module when he disassembled both modules.  Bretschneider Decl. ¶¶ 441-442.  After viewing the DRD2 module, Dr. Bretschneider observed several critical distinctions between the DRD2 and the ELL, which form the basis of his opinions on why the ELL does not infringe the '266 Patent.  There is substantial evidence in the record that the ELL module is not a copy of the DRD2.  Ardestani Decl. ¶ 20.

By contrast, Mr. Benya simply chose to ignore substantial evidence demonstrating the significant differences between the ELL and the DRD2.  This will be an important factor in how the jury will weigh his testimony at trial.  Thus, there are significant issues of fact in dispute regarding DMF's allegations of secondary considerations and whether such evidence is sufficiently strong to overcome the substantial *prima facie* case of obviousness put forth by ELCO.

## VI.  TRIABLE ISSUES EXIST REGARDING DMF'S UNCLEAN HANDS

Defendants' unclean hands defense is based on DMF's deceptive marketing scheme for its trademarked "OneFrame" system.  This deceptive scheme enabled DMF to establish an ill-gotten (alleged) good reputation in the industry, including purported industry awards.  *See* Complaint, ¶¶ 34-39 and Exhs. 6-9.  As mentioned, these awards focus on the OneFrame system's purported 2-hour fire rating.  DMF alleges that Defendants' purported patent and trademark infringement, as well as their purported unfair competition, tarnished DMF's reputation, including the critical acclaim it received for the DRD2 and OneFrame system.  Complaint, ¶ 98.

Construed in the light most favorable to Defendants, the evidence shows that DMF intentionally misled and fooled the marketplace about its OneFrame system

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

and patented DRD2 product by falsely claiming that its junction boxes are recessed lights, and the junction boxes and the DRD2 itself were properly certified for 2-hour fire-ratings, when in fact they were not. The evidence further shows, contrary to what DMF asserts, that DMF made numerous deceptive statements in its various marketing materials; and the false statements were not limited solely to the one sentence contained in DMF's DRDHNJ specification sheet, which is the only statement addressed by DMF's Motion. DMF deceptively marketed its DRD2 product by claiming that its DRD2-compatible junction box is a recessed luminaire with a 2-hour fire-rating under UL 514A. Elco's head of engineering explains DMF's deceptive marketing scheme in detail in his declaration filed in opposition to DMF's preliminary injunction motion. Declaration of Benjamin Ardestani in Opposition to Motion for Preliminary Injunction (ECF No. 54), ¶¶ 25-49.

DMF acknowledges the deceptive nature of its marketing. One of DMF's engineers responsible for product labeling suggested to Mr. Danesh using the following, less deceptive language: "This product is a listed junction box under UL 514A standard and may be used in floor ceiling and roof ceiling assemblies with the fire rating not exceeding two hours." But DMF opted not to use that language in its marketing literature and, instead, used misleading marketing language. F400.

Moreover, the one phrase DMF does address in its Motion was not in compliance with UL requirements or guidance through at least mid-2016, when UL, after investigating an anonymous complaint against DMF, determined that DMF's marketing language regarding a fire-rating could mislead others into believing the DRD2 was fire-rated, when it is not. Danesh Decl., ¶ 13 and Exh. 277 to Davidson Decl. By that time, DMF had already fooled the market about its OneFrame systems and DRD2 product and obtained some awards.

DMF marketed this deceptive fire-rating theme so heavily that its head of sales admitted in deposition that, when he joined DMF in 2017, DMF was known as

22

1  "the fire-rated guys," and he wanted to change that marketing scheme. F 402

2  (DMF's Head of Sales testified, "I will say, though, at that time, for better or for

3  worse, our marketing department had, you know, done a nice job. We -- but we felt

4  that we were becoming known as the fire-rated guys…"). The awards DMF touts in

5  its Complaint were given based on its deceptive 2-hour fire-rating ad campaign, not

6  because of the features of the patent.

7  In 2018, before UL made any changes to its guidance,

8  

9  F 402-407. Indeed,

10  F 406.

11  

12  

13  

14  (emphasis added) F 405. UL further told DMF,

15  

16  *Id.* Contrary to DMF's assertions,

17  

18  

19  F408.



20  DMF then retired its deceptively marketed junction box. F409.

21  Numerous triable issues exist regarding DMF's unclean hands, such as (1)

22  whether DMF's representations were deceptive; (2) whether UL determined they

23  were deceptive; (3) whether DMF's deception was intentional; (4) whether DMF's

24  reputation was obtained through deceptive marketing; (5) whether UL actually

25  approved the language of DMF's marketing materials; and (6) whether DMF's

26  misconduct justifies barring a recovery against Defendants.

27  DMF's argument that it cannot be guilty of unclean hands because ELCO also

28  

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1  used <u>one</u> of the deceptive phrases DMF used fails.  DMF cites no authority for the
2  proposition that ELCO's use bars its unclean hands defense as a matter of law.
3  Rather, DMF's position merely raises a triable issue of fact for the jury to decide.

4      DMF also argues there is no nexus between the alleged acts and the '266
5  Patent.  This is false.  There is evidence that DMF deceived the PTO in getting the
6  patent issued.  To overcome the PTO's final rejections and get the '266 patent
7  issued, DMF told the PTO that DRD2 had won innovation awards.  Indeed, Mr.
8  Danesh told the PTO about those awards in his interview with the examiners in
9  January 2018, leading up to his final amendment of claims that overcame the PTO's
10  final rejection of his application, to get the patent issued.  Exh. 291 at p. 65
11  (FH266PAT 1053) ("Inventor Danesh then demonstrated his award-winning lighting
12  products embodied by the claims…").  But those awards were for DMF's
13  deceptively marketed OneFrame system and specifically acknowledged its
14  purported fire-rating, and were not solely for the claimed invention itself.  Thus,
15  there is a triable issue whether DMF deceived the PTO about these awards to get the
16  patent issued.

17      Defendants' unclean hands defense also is sufficiently related to the subject
18  matter of DMF's unfair competition and trademark claims. *POM Wonderful LLC v.*
19  *Coca Cola Co.*, 166 F. Supp. 3d 1085, 1095 (C.D. Cal. 2016). *See also Republic*
20  *Molding Corp. v. B.W. Photo,* 319 F.2d 347 (9th Cir. 1963) (unclean hands defense
21  applies to unfair competition/trademark claims); *Worden & Co. v. California Fig*
22  *Syrup Co.,* 187 U.S. 516, 528 (1903); *McCormick v. Cohn*, No. CV 90-0323 H,
23  1992 WL 687291, at *4 (S.D. Cal. July 31, 1992), *aff'd,* 17 F.3d 395 (9th Cir. 1994).
24  DMF fooled the marketplace by deceptively marketing the same products upon
25  which DMF bases its claims against Defendants. Complaint, ¶¶ 98, 140-144, 156-
26  157, 168-169.  DMF's unclean hands in falsely marketing its trademarked
27  OneFrame system and patented LED module to create the alleged good reputation
28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

and goodwill it seeks to preserve with an injunction has a clear relevant nexus to DMF's patent and trademark, and its patent and trademark infringement claims.

There also exists a triable issue whether Mr. Danesh is the true, sole inventor. DMF produced no documentary evidence proving Mr. Danesh is the inventor. F424. ███████████████████████████████████████████████████████ F426-440.  This evidence shows that DMF deceived the PTO about inventership.

## VII.   CONCLUSION

For the foregoing reasons, the Court should deny DMF's Motion.

Dated:  February 10, 2020          BRYAN CAVE LEIGHTON PAISNER LLP


By: */s/ Robert E. Boone III*
          Robert E. Boone III

Attorneys for Defendants
AMP Plus, Inc. d/b/a ELCO Lighting and Elco Lighting, Inc.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEFENDANT AMP PLUS, INC.'S OPPOSITION TO DMF'S MOTION FOR SUMMARY JUDGMENT