1  Ben M. Davidson (State Bar No. 181464)
   ben@dlgla.com
2  DAVIDSON LAW GROUP, ALC
   4500 Park Granada Blvd, Suite 202
3  Calabasas, California  91302
   Office: (818) 918-4622
4  Fax: (310) 473-2941

5  David W. Long (admitted *pro hac vice*)
   longdw@ergoniq.comERGONIQ LLC
6  8200 Greensboro Dr. Suite 900
   McLean, VA  22102
7  Office: (202) 847-6853

8  *Attorneys for Plaintiff DMF, Inc.*

9

10              **IN THE UNITED STATES DISTRICT COURT**

11          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12  DMF, Inc., a California corporation,    Case No.   2:18-CV-07090 CAS (GJSx)

13              Plaintiff,                  **REDACTED JOINT STATUS
                                            REPORT**
14       v.

15  AMP Plus, Inc. d/b/a ELCO Lighting,     Ctrm:  350 W. First. Street, Room 8D
    a California corporation; and
16                                          Hon. Christina A. Snyder
    ELCO Lighting Inc., a California
17  corporation,

18              Defendants.

19                                          **CONFIDENTIAL PURSUANT TO
                                            PROTECTIVE ORDER**
20

21

22

23

24

25

26

27

28

1  Plaintiff DMF, Inc. ("DMF") and Defendants AMP Plus, Inc., d/b/a ELCO
2  Lighting and Elco Lighting, Inc. ("Defendants") submit this Joint Status Report
3  following the Pretrial Conference on March 23, 2020 and pursuant to the Court's
4  Minute Order dated March 24, 2020 (dkt. 501).  Further, the Court requested during
5  the Pretrial Conference that the parties suggest dates about two weeks from this
6  submission for a follow-up status conference that is not on a Monday.  The parties
7  jointly suggest a hearing any time at the Court's convenience between Tuesday,
8  April 21 to Friday, April 24.
9     At the Pretrial Conference, the Court asked the parties to state whether the
10  Court's March 19, 2020 Order granting in part and denying in part DMF's motion
11  for partial summary judgment (SJ Order) and its March 20, 2020 Order issuing
12  rulings on the parties' motions *in limine* (MIL Order) require modification to the
13  parties' Proposed Pretrial Conference Order ("PTCO") before the PTCO is signed by
14  the Court.  The parties identify the remaining claims and defenses raised in the
15  PTCO in **Section I** of this report.
16     The Court also indicated that the parties should state in their report what
17  aspects of the Court's summary judgment Order ("SJ Order" Dkt. 499) and motion
18  *in limine* Order ("MIL Order" Dkt. 500) each side intends to seek reconsideration of,
19  along with the length of briefing the parties propose filing.  The parties address these
20  issues below in **Section II** of this report.  Neither side responds to the other's
21  statements regarding the anticipated motions, but instead will respond in oppositions
22  to such motions or as the Court otherwise directs.  The parties propose briefing page
23  limits as follows:
24     **DMF's Proposed Page Limits**: DMF proposes that each side file one motion
25  for reconsideration each to addresses in each single motion both the SJ Order (Dkt.
26  499) and MIL Order (Dkt. 500).  To further ease the burden on the Court, and
27  because this is a reconsideration motion, neither party may submit new declarations
28  or exhibits except that, as discussed in DMF's Rule 37(c) section below, the March

1, 2019 Infringement Contentions may be filed from which ELCO's counsel read excerpts during the summary judgment hearing for a new argument not in ELCO's briefing and without providing a copy to DMF or the Court.  Briefing pages limits for each motion are: <u>20 page</u> limit on opening and opposition briefs and <u>10 page</u> limit on reply briefs.

**Defendants' Proposed Page Limits**:  Defendants do not object to DMF's briefing proposal insofar as it pertains to DMF's anticipated motion for reconsideration.  However, Defendants wish to file separate motions for reconsideration of, respectively, the SJ Order and the MIL Order.  Defendants suggest that the briefing on the motion for reconsideration of the SJ Order can be shortened to 18 pages for the motion and opposition, and 7 pages for a reply.  Defendants suggest that the briefing on the motion for reconsideration of the MIL Order can be shortened to 10 pages for the motion and opposition, and 5 pages for a reply.  Defendants also intend to file a motion to bifurcate trial of DMF's allegations of alleged willful infringement and suggest that the briefing on this motion can be shortened to 10 pages for the motion and opposition, and 5 pages for a reply.

**I.     Claims And Defenses Remaining In The PTCO**

The following claims and defenses remain in the case following the Court's March 19, 2020 Order granting in part and denying in part DMF's motion (dkt. 345) for partial summary judgment:

**A.     Status of DMF's Claims That Remain To Be Tried**
**1.     '266 Patent Infringement – Asserted Claims**

DMF asserts that ELCO's Version 1, Version 2 and Version 3 ELL products infringe the following eighteen claims of U.S. Patent No. 9,964,266 ("the '266 Patent"), where all claims are accused of direct infringement under 35 U.S.C. § 271(a) <u>except</u> Claims 16 and 30 that are alleged to infringe indirectly under § 271(b) (induced infringement) or § 271(c) (contributory infringement):

- Independent Claim 1 and its dependent Claims 2, 4-8, 13-16

- Claims 19 and 21 that depend from Independent Claim 17 (but not Claim 17 itself).
- Claim 25 that depends from Independent Claim 22 (but not Claim 22 itself).
- Independent Claim 26 and its dependent Claims 28-30.

DMF is not asserting infringement by independent Claims 17 and 22, but DMF is asserting Claims 19, 21 and 25 that depend from them.  The parties agree that summary judgment of infringement as to claims 17 and 22 should be vacated because those two claims are not asserted as infringed.  The parties disagree, however, on whether ELCO can maintain a declaratory judgment action against Claims 17 and 22.  The parties' respective positions are presented below.

**DMF's Position on Unasserted Claims 17 and 19**:  ELCO seeks to maintain three of its validity grounds in this case based on unasserted Claims 17 and 22: Ground 1 Anticipation by Imtra Hatteras, Ground 2 Anticipation by Imtra 2011, and Ground 8 Anticipation by Kim.  Because there is no "case or controversy" as to unasserted patent claims, the Court lacks declaratory judgment jurisdiction as to unasserted claims 17 and 22.  *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1308-09 (Fed. Cir. 2012).  Even if jurisdiction exists, whether to maintain some or all of a declaratory judgment action is within the Court's discretion.  In these particular current times, litigating the validity of two unasserted claims is not the best use of Court resources.  DMF respectfully asserts that no motion is warranted and the Court should exercise its discretion not to proceed with unasserted Claims 17 and 22.

DMF's Complaint (Dkt. 1) states that ELCO infringes "at least" certain identified claims without listing all claims ultimately to be asserted (Claims 17 and 22 were not listed).  On February 19, 2019, DMF served a preliminary Identification of Asserted claims that did identify Claims 17 and 22.  However, about two weeks later, on March 1, DMF served its Infringement Contentions showing that DMF was asserting claims that depend from Claims 17 and 22 , but not Claims 17 and 22 themselves:

DMF asserts that ELCO infringes, literally and under the Doctrine of Equivalents, the following Claims of the '266 Patent:

○ Claim 1 and its dependent Claims 2, 4-11, 13-16

○ Claims 19 and 21 that depend from Claim 17

○ Claim 25 that depends from Claim 22

○ Claim 26 and its dependent Claims 28-30

Over four months later, on July 1, 2019, ELCO filed its operative pleading, Third Amended Answer and Counterclaim (Dkt. 235) .

DMF's summary judgement motion itself (Dkt. 345) did inartfully identify Claims 17 and 22.  But in that same filing, DMF's Opening Brief (Dkt. at 3) stated (as above) that DMF was asserting "Claims 19 and 21 that depend from Claim 17" and "Claim 25 that depends from Claim 22."  And all of DMF's briefing papers were consistent with that—*i.e.*, DMF did not include ELCO's invalidity Ground 8 because it was directed to only Claims 17 and 22 that are not at issue in this case.

ELCO's assertion that is has expended resources to challenge Claims 17 and 22 <u>as asserted claims</u> is, at most, illusory.  The parties had to consider whether Claims 17 and 22 limitations were met by the accused products or prior art because DMF was asserting claims that depend from them:.*e.g.*, to show Claim 25 that depends from Claim 22 reads on an accused product or prior art, one must show that all Claim 22 limitations are also met.

**ELCO's Position on Claims 17 and 22**:  Defendants' position is that a case or controversy continues to exist as to Claims 17 and 22.  DMF asserted Claims 17 and 22 in its Identification of Asserted Claims, served on February 19, 2019.  This identification was not, as DMF contends above, preliminary.  DMF confirmed this assertion by moving for summary judgment of infringement of Claims 17 and 22 [*see* Dkt. 345].  For more than one year, Defendants have expended legal fees defending against alleged infringement of Claims 17 and 22, including taking

1    discovery, providing expert analysis, reports and testimony, addressing Claims 17

2    and 22 in ELCO's Petition for *Inter Partes* Review, and in opposing DMF's motion

3    for summary judgment.  DMF has not dismissed the case as to Claims 17 and 22

4    with prejudice.  Defendants' counterclaims pertain to Claims 17 and 22.  If the Court

5    dismisses those counterclaims for lack of subject matter jurisdiction, as DMF

6    suggests, DMF can later sue Defendants regarding Claims 17 or 22.  If DMF

7    believes that the Court lacks subject matter jurisdiction over Claims 17 and 22, DMF

8    should file a motion to dismiss Defendants' counterclaims for invalidity with respect

9    to Claims 17 and 22.

10          Finally, as discussed further below, the Court should vacate its finding that

11   Claims 17 and 26 are not anticipated under 35 U.S.C. §102 on the basis of  the Imtra

12   Hatteras product (Ground 1), and on the basis of the Imtra 2011 brochure, because

13   Claims 17 and 26 lack the "plurality of elements" limitation relied upon by the Court

14   for finding no anticipation with respect to Claim 1.

15          Accordingly, Defendants assert that the following invalidity grounds with

16   respect to Claims 17 and/or 22 should be tried:

17          Ground 1     Anticipation by Imtra Hatteras (claims 17 and 26)

18          Ground 2     Anticipation by Imtra 2011 (claims 17 and 26)

19          Ground 8     Anticipation by Kim (claims 17 and 22)

20

21          **2.     Direct Infringement of the '266 Patent (PTCO at 5:27, 10:3-7**

22   **Patent Claims Determined Infringed:**  The Court has granted summary

23   judgment of infringement "as to Claims 17, 19, 21, 22, 26, 28-30 of the '266 Patent .

24   . . ." (SJ Order at at 17).  The Court indicated in the summary judgment order that it

25   is not clear whether DMF asserts infringement of "Claims 17 and 22, from which

26   other asserted claims depend" (SJ Order at 2 n.1).

27

28

**Patent Claims Remaining For Trial.** As to Claims 1, 2, 4-8, and 13-16, the Court granted-in-part DMF's motion for summary judgment of infringement.  (SJ Order at 17).  The only issue that remains as to infringement of these Claims is whether the ELCO accused products meet the requirement that "the light source module and the driver are positioned inside the first cavity while being **coupled to** the heat conducting closed rear face."  (SJ Order at 14).

DMF also is asserting Claim 25.  In its summary judgment Order, the Court did not address Claim 25 given uncertainty if it was part of the motion.  DMF intends to seek reconsideration for that claim

### 3.   DMF's Claims for Induced and Contributory Infringement of the '266 Patent (PTCO at 6:1-2, 10:8-16)

DMF's indirect infringement claims for induced and contributory infringement against Defendants remain in the case.

### 4.   DMF's Claims for Trademark Infringement, Unfair Competition, Violation of California Business & Professions Code § 17200 and Common Law Unfair Competition (PTCO at 6:3-8; 14:8-20:19)

DMF's trademark and unfair competition claims remain in the case.  As indicated during the Pretrial Conference, to streamline the case, and particularly in light of current circumstances, DMF has offered to dismiss these claims if ELCO discontinues use of the UNO mark.  DMF had previously made this offer in light of ELCO's apparent phasing-in of a new mark.  Defendants have stated that they are considering DMF's offer.

### 5.   Remedies

The remedies sought by DMF for patent infringement remain: damages, a determination of willfulness, enhancement based on willful infringement, attorneys' fees based on 35 U.S.C. § 285 (exceptional case), and permanent injunctive relief.

The remedies sought by DMF for trademark infringement and unfair competition remain:  damages and permanent injunctive relief.

**B.      Status of Defendants' Defenses/Counterclaims That Remain To Be Tried**

           **1.      Patent Defenses/Counterclaims**

The Court granted summary judgment as to Defendants' anticipation and unclean hands defenses to patent infringement, as to prior art defenses based on LMH2, and also as to Defendants' defenses of improper inventorship and inequitable conduct (which DMF notes were unpled).  SJ Order at 20-21, 29-33.

DMF asserts that the defenses to patent infringement identified in the PTCO that remain to be tried are Defendants' defenses based on Imtra and Kim, as identified below:

| | |
|---|---|
| Ground 3 | Obviousness Based on Imtra Hatteras and Imtra 2007 (SDF ¶¶ 119-123); |
| Ground 4 | Obviousness Based on Imtra 2011 and Imtra 2007 (SDF ¶¶ 124-126); |
| Ground 5 | Obviousness Based on Imtra 2011, Imtra 2007, and Gifford (SDF ¶¶ 127-143); |
| Ground 6 | Obviousness Based on Imtra 2011, Imtra 2007, Imtra Hatteras, and Gifford (SDF ¶¶ 144); and |
| Ground 7 | Obviousness Based on Kim and Gifford (SDF ¶¶ 145-152); |
| Ground 9 | Obviousness Based on Kim, Gifford, and Chang (SDF ¶ 153). |
| Ground 10 | Obviousness Based on Imtra 2011, Imtra Hatteras, and Kim (SDF ¶¶ 154-158). |

Defendants agree that, following the Courts summary judgment ruling, the defenses identified above remain to be tried  In addition, Defendants assert that the following defenses should remain in the case based on the reasons stated below and in Section III.A.4:

Ground 1  - Anticipation by Imtra Hatteras (claims 17 and 26) (as such claims do not include the "plurality of elements" limitation, which was the Court's sole basis for granting DMF's motion with respect to this Ground;

1    Ground 2  - Anticipation by Imtra 2011 (claims 17 and 26) (as such claims do

2    not include the "plurality of elements" limitation, which was the Court's basis for

3    granting DMF's motion with respect to this Ground)[1]; and

4         Ground 8 - Anticipation by Kim (claims 17 and 22) as this defense was not the

5    subject of DMF's motion for partial summary judgment.  As discussed above, DMF

6    asserts that Ground 8 concerns only unasserted claims, so Ground 8 not at issue in

7    this case.

8         In response to the statement above, DMF asserts that those three Grounds are

9    not in the case because (1) they rely on unasserted claims 17 and 22 (discussed

10   above) and/or (2) they were dismissed in the Court's summary judgment ruling,

11   which dismissal should be maintained upon reconsideration that building mains

12   power is not low-level DC that does not require a junction box (as discussed below).

13

14              **2.    Unclean Hands Remains As A Defense, But Only As To**
                 **Trademark Infringement And Unfair Competition.**

15        The Court granted summary judgment that Defendants' "unclean hands"

16   defense failed as a matter of law with respect to infringement of the '266 Patent, but

17   it did not grant summary judgment on the unclean hands defense with respect to

18   DMF's Trademark and Unfair Competition Claims.  SJ Order at 30-33.  The parties

19   agree that unclean hands is an equitable defense as to which there is no right to a jury

20   trial, but they disagreed in the proposed PTCO regarding whether the defense should

21   be bifurcated and decided by the Court rather than the jury to avoid undue prejudice

22   to DMF and jury confusion.  Dkt. 493-1 at 3-4.

23

24

25   ─────────────────

26   [1] In the SJ Order, the Court found Defendants' anticipation ground based on Imtra
     2011 fails as a matter of law based on DMF's "mixes and matches" argument.  This
     argument was based on DMF's position that Defendants referenced certain pages in
27   the Imtra 2011 catalog to satisfy the "plurality of elements" limitation that differed
     from pages relied upon for other limitations and, as such, is not relevant to claims 17
28   and 26 that lack the "plurality of elements" limitation.

**C.     Bifurcation of Unclean Hands**

**DMF's Statement On Unclean Hands Bifurcation**:  ELCO's equitable
unclean hands defense should be bifurcated as a bench trial because it relies on facts
that do not overlap with the facts required to prove infringement and unfair
competition, and because it would require a trial within a trial to the jury pitting one
UL employee's guidance in 2016 against the commentary of another UL employee
in 2018.  ELCO's unclean hands allegation is that DMF sold large quantities of its
junction boxes in bad faith by describing them as two hour fire rated under a UL
standard while allegedly knowing that was not true. Dkt. 235 (Third Amended
Answer), p. 16.  This allegation of bad faith is not relevant to trademark
infringement and unfair competition.  ELCO's  own portion of the PTCO establishes
that there are no overlapping facts.  *Compare* PTCO (dkt. 493-1) at 32-33 (ELCO's
"Evidence Demonstrating No Trademark Infringement") with PTCO at 35-36
(ELCO's "Evidence In Support of DMF's Unclean Hands").  On the other hand,
there is substantial risk of unfair prejudice to DMF, prolonging trial, and confusing
issues if ELCO is allowed to present unclean hands allegations to the jury when it is
considering other patent and trademark issues.  ELCO's defense is based on hearsay
evidence from an April 2018 email sent by a UL employee who stated that DMF's
marketing had not been approved by UL—unaware that another UL employee *had*
approved the marketing in 2016 (which is an undisputed fact in this case).  *See* SJ
Order at 35;Dkt. 366-2, p. 146, SUF 212, 238.  That out-of-court assertion by the UL
employee in 2018 is likely to "trigger visceral reactions among jurors" about safety
issues and is unfairly prejudicial to DMF.[2]  ELCO's allegation is even more
prejudicial because DMF cannot cross examine the author of this hearsay document
to challenge the basis for his statements.

---

[2] *See* MIL Order at 7 (addressing prejudice from mention of bankruptcy
proceeding).

1    If the hearsay evidence on which ELCO's equitable defense is based is

2    admitted in the jury trial on other issues, it would significantly prolong any jury trial.

3    DMF would have to explain through witnesses that ELCO and other companies also

4    used the same marketing language from 2016 through mid-2018, relying on UL's

5    technical guidance at that time.  The unclean hands defense should be bifurcated

6    because it "places both parties' good or bad faith at issue in ways that are not

7    relevant to a finding of liability for trademark infringement" and [p]resenting these

8    issues would pose a risk of prejudice and confuse the jury."[3]      Tellingly, none of

9    the issues posed below by ELCO in this joint report overlap with the factors the jury

10   will consider in determining whether ELCO's use of "UNO" (meaning "ONE")

11   caused a likelihood of confusion -- in connection with identical LED products sold to

12   the same consumers and channels as DMF's OneLed® and

13   OneFrame®products.  Further, contrary to the suggestion in ELCO's statement

14   below, the Court's denial of summary judgment on "nexus" was not a determination

15   that the factual findings overlap.  Indeed, this is not a false advertising case where

16   DMF is accusing ELCO of falsely promoting its own junction boxes such that the

17   jury must decide overlapping allegations of deceptive advertising.

18       Given the lack of overlap in evidence, the evidentiary issues, the likely

19   confusion and prejudice to DMF, as well as the need to keep the jury trial as short as

20   possible in current circumstances, the Court should conduct a bench trial - if

21   necessary -  after the jury decides infringement.

22       **Defendants' Statement On Unclean Hands Bifurcation:**

23       Defendants oppose bifurcation of their unclean clean hands defense.  That

24   defense should be tried with DMF's unfair competition and trademark infringement

25

26    [3] *JIPC Mgmt. v. Incredible Pizza Co.*, 2009 U.S. Dist. LEXIS 133019, at *70-74 (C.D. Cal. 2009); *see also Clasical Silk, Inc. v. Dolan Grp., Inc.*, 2016 U.S. Dist. LEXIS 193774, at *12 (C.D. Cal. Mar. 21, 2016 ("Defendants' equitable affirmative defenses do not overlap with Plaintiff's claims in a way that overcomes the unfair prejudice that would likely result by allowing Defendants to present its unclean hands and misuse evidence to the jury.").

27

28

1   claims.  That defense is much broader than DMF has repeatedly mischaracterized it.

2   As explained in Defendants' summary judgment opposition, the defense is not

3   limited to merely the single 2-hour fire rated phrase DMF incorrectly claims UL

4   approved in 2016, but also all of the deceptive marketing language and materials

5   DMF used, in conjunction with its trademarks, to market its junction boxes and

6   OneFrame system and develop the alleged good reputation DMF claims Defendants

7   harmed.  Although the Court will ultimately determine whether the unclean hands

8   defense applies, there are disputed factual issues for the jury to decide, to aid the

9   Court's determination.  The issue of unclean hands may be submitted to an advisory

10  jury.  *Hana Fin., Inc. v. Hana Bank*, No. CV 07-1534 PA JWJX, 2011 WL 2581458,

11  at *1 (C.D. Cal. June 29, 2011), *aff'd*, 735 F.3d 1158 (9th Cir. 2013), *aff'd*, 574 U.S.

12  418, 135 S. Ct. 907 (2015); see also *Innovative Ventures, LLC v. NVE, Inc*., No. 08-

13  11867, Dkt. 447 at 6 (S.D. Mich. Jan. 21, 2016) (denying bifurcation and "find[ing]

14  that it would be helpful for the jury deciding this case to hear a full presentation of

15  the real circumstances that surround how these parties acted in competition with one

16  another").

17          Those issues include:

18          • Did DMF mislead the market about its OneFrame system, including that

19              its junction boxes were recessed lights certified for 2-hour fire ratings?

20          • Did UL require DMF to change its marketing language in 2016 to avoid

21              this misconception?

22          • In 2018, did UL receive a complaint from a competitor or customer of

23              DMF, who complained that DMF was deceptively marketing its

24              OneFrame system?

25          • Did UL require DMF to again change its marketing language in 2018

26              the language was misleading and had not been approved by UL?

27          • Did DMF become known as the "fire-rated guys" because of its

28              misleading marketing scheme?

- Did DMF ignore less deceptive language recommended by employee Benjamin Chen regarding fire-ratings?
- Did DMF "retire" its junction box in 2018 because of the deceptive marketing?
- Was the good reputation DMF claims it has regarding the DRD2 obtained by the deceptive marketing of its OneFrame system?

These factual issues are central to the unclean hands defense and clearly relate to DMF's trademark and unfair competition claims.  Indeed, the Court already found such a nexus in ruling on the MPSJ.  MSPJ Order at 35.  Whatever "prejudice" DMF may suffer from Defendants' evidence supporting its unclean hands defense is not undue prejudice warranting bifurcation.  Nor are the "current circumstances" – as referenced by DMF above – proper justification to deny Defendants' right to have a jury decide disputed factual issues pertinent to their unclean hands defense at the same time as the jury decides DMF's claims.  Jury trials will commence again when it is safe to do so.  In the interim, however long that may be, DMF is fully protected by the Court's preliminary injunction order.

### D. Bifurcation of Willfulness Issue

**Defendants' Statement on Bifurcation of Willfulness Issue:** Defendants intend to file a motion to bifurcate the issue of their alleged willful infringement from other issues in the case, on the grounds that such bifurcation will avoid misleading the jury, jury confusion and undue prejudice to Defendants.  The cornerstone of DMF's claim for willful infringement is evidence regarding ELCO's patent counsel Eric Kelly's December 2018 non-infringement opinions, which pertain only to ELL Versions 2 and 3, not Version 1; the timing of those opinions versus when ELCO began selling Version 2 in September 2018 and Version 3 in December 2018; and ELCO's reliance on those opinions.  In its contentions memo and the proposed PTCO, DMF did not identify any evidence of ELCO's purported copying of the DRD2 product as support for its willfulness allegations.  [Proposed]

Pre-Trial Conference Order (Dkt. 493-1) at 13; DMF's Memorandum of Contentions of Law and Fact (Dkt. 461) at 14.[4]   However, in its rebuttal case, DMF will be proffering alleged copying evidence pertaining to ELL Version 1, in response to ELCO's invalidity defenses, to show non-obviousness.  Such rebuttal evidence includes purported emails between ELCO and its suppliers from 2015 and 2016, during which time ELCO was developing the Version 1 design, long before the design was finalized and ELCO first sold Version 1 in late 2017, years before the '266 Patent issued in May 2018, and years before DMF notified ELCO of the '266 Patent in August 2018, right before filing this lawsuit.  The Court has already ruled that these emails are not relevant to infringement, and intends to instruct the jury regarding the distinct concepts of copying and infringement (Order on MILs at 16).  Despite that instruction, if the jury is deliberating willfulness at the same time it is deliberating infringement and invalidity, there is still a real danger that DMF's "copying" evidence will mislead and/or confuse the jury into believing that ELCO willfully infringed the patent.  This would result in undue prejudice to Defendants.  The only way to avoid such misconception, confusion and prejudice is to let the jury first decide whether the ELL modules infringe.  If the jury finds infringement, then the jury can hear evidence relevant to willfulness and decide that issue.

        **DMF's Statement on Bifurcation of Willfulness Issue:**  DMF disagrees with ELCO's rationale for bifurcating trial.  As stated in a willful infringement portion of DMF's Contentions of Fact and Law (Dkt. 461 at 6), which were incorporated into the proposed Pretrial Order (Dkt. 493-1), "[a]dditional factors to be considered by the jury include: whether ELCO intentionally copied DMF's patented technology in developing the accused product."  The issue of copying also is relevant to ELCO's

---

[4]   Below DMF misrepresents Mr. Kelly's deposition testimony.  DMF counsel's deposition questions pertained to DMF's design patent claims and Brandon Cohen's design patent application.

1   invalidity defenses as secondary evidence of nonobvious, so the jury will have heard

2   DMF's evidence of copying before any bifurcated trial on willfulness.

3        Evidence of copying is relevant to DMF's contention of willful infringement

4   in many ways.  For example, DMF also explained in its Contentions of Fact and Law

5   that it would present evidence regarding ELCO's "actions before an opinion was

6   obtained", which includes copying, as well as evidence of "the incomplete basis" for

7   the opinion that ELCO's attorney Eric Kelly gave (Dkt. 461 at 14; Proposed Pretrial

8   Order Dkt at 493-1 at 13:7-9), which includes Mr. Kelly deposition testimony

9   admission that ███████████████████████████████████████████

10  ██████████████████████████.

11  **II.    Plaintiff DMF's Issues for Reconsideration or Clarification**

12       DMF intends to seek reconsideration/clarification of the Court's summary

13  judgement Order (Dkt. 499, "SJ Order") and motion *in limine* Order (Dkt. 500, "MIL

14  Order") on a few discrete issues that are both proper for such a motion and can

15  significantly reduce issues, evidence and ultimately trial time.[5]

16       **A.    SJ Order**

17            **1.    Rule 37(c)**

18       The SJ Order at 5 n.4 did not exclude ELCO's new noninfringement positions

19  based on ELCO's argument at the hearing (which was not in its briefing) that its

20  untimely disclosure was "substantially justified by DMF's conclusory infringement

21  contentions."  ELCO read aloud a snippet from DMF's infringement contentions

22  without providing the entire document to DMF or the Court.  DMF intends to seek

23  reconsideration based on the complete contentions showing they were not

24  conclusory.

25       ELCO's counsel did not disclose that DMF's contentions specifically

26  "incorporate[d] by reference as though stated herein the infringement allegations in

27  DMF's Complaint (Dkt. 1) and in DMF's Preliminary Injunction filings," which

28  ─────────────────
    [5] DMF otherwise preserves its right for review or appeal on other issues.

were very detailed.  For example, the preliminary injunction Benya Decl. (Dkt. 26-2 at ¶60) discussed and showed images of the "grey thermal paste" in the accused ELL products that couple the LED to the casting.  He also discussed and showed images of the ELL driver inside the black driver housing in stating that the driver was coupled to the casting. *Id*. at ¶¶45, 47, 62-63.  Yet, in violation of Rule 37, ELCO's noninfringement contentions (Dkt. 352-9, Ex. 316 at PAGE 1411) did <u>not</u> dispute that the LED was coupled to the casting by thermal paste or that the driver was coupled to the casting as DMF contended.  ELCO failed to raise the new "coupled to" positions until <u>after</u> fact discovery closed and DMF had served its infringement expert report.  ELCO failed to disclose its new "thermal grease" argument until its summary judgment Opposition brief, which relies on a previously unproduced document.

The new "coupled to" infringement position is exemplary.  The same analysis applies to other new non-infringement positions where DMF showed a component met a claim limitation, but ELCO did not raise its new non-infringement position until after fact discovery and DMF expert's infringement report.  These new noninfringement contentions include:

- **"reflector enclosing driver"** – DMF expert's preliminary injunction infringement analysis showed and described the ELL reflector as meeting all of the "reflector" limitation (Dkt. 26.2 at ¶¶68-70), and ELCO's non-infringement contentions did not dispute that the reflector "encloses" the driver (Dkt. 352-9 at PAGE 1401).
- **"angled wall"** – DMF expert's preliminary injunction infringement analysis showed the ELL "angled wall" as part of the "closed rear face" (Dkt. 73-7 at ¶¶105-106), and ELCO's non-infringement contentions did not dispute that (Dkt. 352-9 at PAGE 1399-1400).
- **"thermal grease dissipates heat"** – DMF expert's preliminary injunction infringement analysis showed and described the ELL "grey thermal paste" coupling the LED to the casting and that the casting meets the "dissipates heat" limitation (Dkt. 26.2 at ¶¶ 60, 72), and ELCO's non-infringement contention does not assert that the "thermal paste" or "thermal grease" dissipates heat (ELCO asserted that the casting did not dissipate heat on other grounds later resolved in claim construction) (Dkt. 352-9 at PAGE 1401).

### 2.   Infringement – "coupled to"

DMF intends to seek reconsideration of the SJ Order ruling that the "coupled
to" limitation presents factual issues for the jury, because the dispute should be
resolved as a matter of claim construction.

**LED "coupled to" Casting**.  The SJ Order at 15 determined that the jury
should decide whether the ELL LED is coupled to the closed rear face.  DMF
appreciates the Court's concern about the breadth of an unbounded interpretation of
"coupled to" in the *abstract*; but the dispute here is what "coupled to" means *in the
context of the '266 Patent*.  Under *O2 Micro*,[6] where a claim term's general meaning
does not resolve the disputed scope of a claim term, the court must construe the term
in the context of the patent, rather than send the issue to the jury.

The SJ Order at 14 considered two disputes alleged by ELCO on whether the
LED is "coupled to" the casting: "(i) … the light source module only has an *indirect
thermal connection* to the housing; (ii) the light source module *easily separates from
that thermal connection* because the grease is not an adhesive."[7]  The '266 Patent
specification and claims expressly contemplate (i) an indirect connection of the LED
to the housing (*e.g.*, a "resin" connecting the LED and casting) and that (ii) the LED
can be separated from—*i.e.*, "removably coupled to"—the casting.  *See* Reply (Dkt.
421 at 6-7).  As a matter of claim construction, the LED and casting being coupled
by the intervening layer of thermal grease does not place the LED so remote from
the casting that they are not "coupled" within the context of the '266 Patent; nor does
it matter that the LED also is coupled to other things, such as the driver housing.

---

[6] *O2 Micro Intern. v . Beyond Innovation Tech*., 521 F.3d 1351, 1361 (Fed. Cir.
2008)

[7] ELCO's assertion that the thermal paste is "not an adhesive" should be stricken
for two independent reasons: (1) it was raised for the first time in its Opposition
papers and (2) it is not supported by expert testimony.  Further, inspection of the
ELL products shows that when the LED is adhered to the casting by the thermal
paste alone, the LED is held in place by the thermal paste when held sideways,
upside down or otherwise.  In any event, ELCO concedes its thermal paste *thermally*
couples the LED and casting, which is sufficient to meet this limitation.

There is no dispute that the LED module and casting are *thermally* coupled by the thermal grease, which facilitates the casting dissipating heat from the LED as contemplated by the '266 Patent.  Coupling by the thermal grease is within the scope of "coupled to" *in the context of* the '266 Patent[8]

**Driver "coupled to" Casting**.  Another new ELCO non-infringement position is that the ELL driver enclosure, not the "driver", is coupled to the casting.  This is a claim construction issue.  For example, as discussed in the SJ Order at 13, Claim 6 that depends from Claim 1 includes "an inner enclosure for enclosing the driver within the unified casting."  So the '266 Patent contemplates a "driver" within "an inner enclosure" to be "coupled to" the casting.[9]

### 3.    Infringement – Claim 25

The Court's SJ Order at 3 n.2 questioned whether DMF was asserting Claim 25 in the summary judgment motion, so it is not included in the ruling.  DMF clarifies that Claim 25 was asserted and addressed by both parties in the motion. ELCO stated "Undisputed" as to the first two limitations of Claim 25. *See* SDF 76 and 77.  In SDF 78, ELCO disputes the final limitation "the sidewall has a first dimension between the closed rear face and the open front face of less than 2 inches" based on ELCO's "angled wall" argument for "closed rear face" (which applies only to Version 3) that the Court rejected. *See* SJ Order at 11-13.

### 4.    Validity – Imtra

DMF intends to seek reconsideration of the Court's ruling (SJ Order at 21) that "The question of whether building mains voltage could lead to the low DC input level required by Imtra references, which receive about 10-30VDC input, is factual."

---

[8] In addition to being coupled by the thermal paste, the LED also is physically coupled to the casting by being sandwiched between the reflector and internal mounting post of the close rear face.  This is a nonexclusive, independent ground why the "coupled to" limitation is met, which also may be raised in DMF's motion to reconsider but not discussed here for brevity.

[9] *Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1270-71 (Fed. Cir. 2010)("coupled to" required broad construction where dependent claim clearly stated an indirect attachment).

1   Under *O2 Micro*, this is a claim construction issue concerning the scope of the terms

2   "standard junction box" and "driver".

3        The Court's SJ Order at 21 states that, "although [the Court's] constructions of

4   'driver' and 'standard junction box' require a relationship to building main power,

5   the Court has not held that the claimed driver is limited to supplying [sic: receiving]

6   only AC current." The dispute here, however, is not whether building mains is "only

7   AC current." The dispute here is whether <u>low voltage DC</u> – that <u>does **not require** a

8   junction box</u> under building codes <u>–</u> is "building mains" *in the context of the '266*

9   *Patent.* As discussed in the Court's Claim Construction Order, a junction box is

10  <u>required</u> by building codes to "accommodate[e] wire splices to building main power

11  and separate[e] them from other items inside a ceiling or crawl space." *See* Dkt. 266

12  at 27; *see also* Order Denying Stay, Dkt. 341 at 12-16. When the term "standard

13  junction box" was added to the claims during prosecution, the patentee explained

14  that (1) building codes <u>required</u> a standard junction box to splice to building mains

15  voltage and (2) prior art used a separate "can" to house the lighting device. The

16  compact recessed light of the '266 Patent allowed eliminating the "can" by housing

17  the device within the junction box that building codes <u>required</u> to be present when

18  splicing to building mains voltage.

19       So the claim scope does not encompass anything that theoretically might be

20  "building mains" voltage in the *abstract*. Rather, in the *context of the '266 Patent*,

21  the claim is directed to the type-of building mains voltage that <u>requires</u> a junction

22  box; the '266 Patent gives examples of such building mains voltage: "*e.g.*, 120 VAC

23  or 277 VAC". '266 Patent at 2:34-35, *see also id*. at 4:43 ("120V-240V").

24       As properly construed, there is no genuine factual dispute that all of ELCO's

25  invalidity grounds using Imtra as a primary reference (Grounds 1-6)[10] do not survive

26

27       [10] The SJ Order properly granted summary judgment on Imtra anticipation
    Grounds 1 and 2 for other reasons. Grounds 1 and 2 are included here because that
28  ruling is independently supported on this basis as well.

1  summary judgment.  There is no dispute Imtra concerns low-voltage devices that <u>do</u>

2  **<u>not</u>** <u>require</u> a junction box: both DMF and ELCO's experts agree that low-voltage

3  DC devices do not require a junction box <u>and</u> Imtra witnesses testified that the low-

4  voltage Imtra products <u>do</u> **<u>not</u>** <u>require</u> a junction box.[11]  All of ELCO's asserted

5  obviousness grounds result in some Imtra combination powered by low-voltage DC

6  that <u>does</u> **<u>not</u>** <u>require</u> a junction box.  Accordingly, such combinations would not

7  have the claimed "driver" that receives the type of building mains voltage that

8  building codes <u>require</u> to have a junction box *in the context of* the '266 Patent.  This

9  resolves all Imtra Grounds 1-6.

10       Further, this claim construction dispute must be resolve before trial.  As

11  explained in claim construction and other briefing (Dkt. 256 at 23-24; Dkt. 247 at 6-

12  7; Dkt. 247-2), if the claims cover a lighting device that receives low-voltage DC,

13  then ELCO's Commercial ELL products would infringe all asserted patent claims

14  because they are identical to the accused Residential ELL products in all relevant

15  respects <u>except</u> that the Commercial ELL receives low-voltage DC, but the

16  Residential ELL receives 120 VAC or 277 VAC.  Further, ELCO asserts that the

17  Commercial ELL is a non-infringing alternative, which depends on whether the

18  claims cover a low-voltage DC device. *See* MIL Order at 27-28.

19       **5.**     **Validity – Kim**

20     **Ground 10: Kim/Imtra Obviousness**.  DMF intends to seek reconsideration

21  on ELCO's Ground 10 (Kim/Imtra Obviousness), because ELCO's <u>seven-sentence</u>

22  expert testimony on Ground 10 (Dkt. 370 at ¶¶388-392) is too conclusory to avoid

23  summary judgment [enumeration added; page break omitted]:

24

25

26

27     [11] *See* Benya Dec. (Dkt. 353-4) at ¶43 (quoting ELCO expert testimony that low-voltage DC does not require junction box); *Id*. at ¶¶291, 300 (Imtra low voltage device does not require junction box); *Id*. at ¶292 (quoting Imtra witness testimony

28  that low-voltage Imtra products do not require a junction box).

E.     **Claim Limitations - Imtra and Kim**

388. ❶ A POSITA would be motivated to combine the above-detailed casting of the Imtra references with the remainder of the compact lighting device of Kim as detailed above. ❷ A POSITA would be motivated to make this combination to simplify manufacturing and to incorporate thermal management features for environmental operability. ❸ A POSITA would be motivated to combine the Imtra references and the Kim reference and would expect that housing would work for its intended purpose to house the components of the Kim lighting device.

389. ❹ The growing demand for LED lighting devices in various buildings and structures would motivate a POSITA to modify the Imtra/Kim combination for installation in a junction box for use in a variety of installations and applications.

390. ❺ In my opinion, Imtra 2011 or Imtra Hatteras in view of Kim renders obvious independent claims 1, 17, 22, and 26.

391. ❻ In my opinion, Imtra 2011 or Imtra Hatteras in view of Kim renders obvious dependent claims 2, 4-11, 13, 15-17, 19, 21-22, 25-26, and 28-30.

392. ❼ In my opinion, the combination of Imtra 2011 and/or Imtra Hatteras, Kim and Gifford render all of the challenged claims obvious.

That seven-sentence testimony—most of which are non-substantive summary statements (sentences ❶, ❸, ❺, ❻ and ❼)—does not establish that an alleged Kim/Imtra combination meets all limitations of all 18 asserted patent claims.[12]

The second sentence ❷ concerns two alleged motivations to convert the two-piece Kim housing/heat sink into a single casting like Imtra.  One alleged motivation is "to simplify manufacturing," but with no identification or explanation of any manufacturing problems with Kim, any manufacturing benefits of Imtra that would solve those problems or how that alleged combination would impact other Kim features.  For example, Kim actually touts that having a separate "housing 100" and "heat sink 600" provides a manufacturing benefit in which "the lighting device … can be easily assembled."[13]  ELCO's generic expert *ipse dixit* testimony—that there

---

[12] For illustration, and not exhaustive, there is no discussion of how the combination discloses a "twist-and-lock connector integrated in the unified casting" as in Claim 15, a trim connected by a twist and lock connector as in Claim 16, specific unified casting dimensions as in Claim 1, 8, 21, 25 and 29; complimentary keyed connectors as in Claim 22 and 28.

[13] Kim touts the manufacturing benefits of having a separate (1) "housing 100" with an alignment "key 190", (2) "heat sink 600" with alignment "key recess 190" and (3) "driving part 500" with alignment "key recess 500" make "it possible to easily identify a direction in which the driving part 500 and heat sink 600 are coupled such that "the lighting device … can be easily assembled." (Kim at 3:53 - 4:15)

1    is motivation to make this modification because-I-say-so—is factually detached from

2    the asserted prior art, and fails like other generic expert testimony of motivation to

3    make a system "more efficient, cheaper … more features" that the Federal Circuit

4    squarely rejected in *ActiVideo* as too conclusory.[14]

5         The other motivation identified in the second sentence ❷ for converting Kim's

6    two-piece structure into a single casting—*i.e.*, "to incorporate thermal management

7    features for environmental operability"—has the same conclusory, factually

8    detached problems.  Kim already has an established thermal management system

9    based on the rear "heat sink 600", and converting Kim's two-piece structure to a

10   casting would eliminate Kim's touted manufacturability benefit.  ELCO's expert

11   testimony addresses none of these or other facts about Kim/Imtra supporting this

12   generic motivation.  This is not simply raising some factual disputes about

13   Kim/Imtra, but illustrating some reasons why ELCO expert's testimony is too

14   conclusory with insufficient factual analysis.  Summary judgment on Ground 10

15   should be granted for this reason alone—i.e., failure to establish motivation to

16   modify Kim's two-piece structure into the claimed "unified casting."

17        Further, the fourth sentence ❹ concerns a motivation "to modify the

18   Imtra/Kim combination for installation in a junction box."  It also is generic *ipse*

19   *dixit* testimony of a generic motivation to modify Kim/Imtra: "The growing demand

20   for LED lighting devices in various buildings and structures."  Why does generic

21   "growing demand" lead to the specific modification of putting Kim/Imtra in a

22   junction box?  Further, this conclusory statement makes no mention of how an

23   Kim/Imtra combination is "install[ed] in a junction box" or that it would be a

24   "standard junction box"—*e.g.*, no mention of the claimed "plurality of elements"

25   that align with tabs on a "standard junction box".  The analytical gap here is

26   manifest.  Generic *because-I-say-so* testimony that "The growing demand for LED

27

28
    [14] *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1327-28 (Fed. Cir. 2012).

1   lighting devices in various buildings and structures is motivation to [*insert*

2   *challenged limitation here*]" cannot be legally sufficient to invalidate a patent,

3   otherwise no patent would be valid.  Under *ActiveVideo*, this conclusory testimony

4   fails to establish a motivation to modify Kim/Imtra to have the claimed "plurality of

5   elements" and is an independent reason to grant summary judgment on Ground 10.

6       **Grounds 7 and 9: Kim/Gifford Obviousness**.  DMF will seek

7   reconsideration on ELCO's invalidity Grounds 7 and 9, because the SJ Order

8   overlooked ELCO's waiver concerning conclusory testimony of ELCO's expert.

9   The SJ Order at 27 relies on a couple sentences from ELCO's expert (Bretschneider

10  Decl., Dkt. 370 ¶¶326-327) as raising a factual issue as to motivation to combine

11  Kim and Gifford.  He relies on Gifford's teaching that an LED lighting fixture is

12  attached to an adapter apparatus 100 having holes through which screws are inserted

13  to surface-mount the adapter apparatus 100 to the junction box, asserting that the

14  "adapter apparatus 100 functions as the **unified housing** retaining the LED apparatus

15  102."  But ELCO's Opposition expressly disclaimed using the adapter apparatus 100

16  as the "unified casting" to house components, stating for Imtra/Gifford (Opp., Dkt.

17  367 at 15 (emphasis added):

18          DMF claims that a POSITA would not be motivated to put the internal
            components of Imtra into Gifford's adaptor apparatus. F142.  DMF
19          completely misunderstands the obviousness combination of Imtra and
            Gifford, or it is attempting to obfuscate the issue to confuse the Court.
20
21  ELCO's Statement of Disputed Facts (Dkt. 366-2 at SDF 152) adopts for

22  Kim/Gifford Grounds 7 and 9 the same ELCO disclaimer position from

23  Imtra/Gifford from SDF 129, which states: "Disputed and irrelevant.  DMF

24  completely misunderstands the obvious combination of Imtra and Gifford [emphasis

25  added]."

26      Further, even if ELCO had not disclaimed using Gifford as the "unified

27  casting" to house Kim components, its expert's testimony is too conclusory.  He fails

28  to explain why there would be motivation to use a single-piece Gifford "adapter

apparatus 100" as the housing notwithstanding Kim's teaching (discussed above) that the Kim two-piece "housing 100" plus "heat sink 600" approach has manufacturing benefits.  He also fails to explain how using the Gifford "adapter apparatus 100" as the "unified casting" would impact or satisfy other claim limitations.  For example, he states that the Gifford adapter apparatus 100 in the combination is used to "mount the LED lighting fixture **to** a standard junction box" (emphasis added), which results in a surface mounted light fixture.  But, in the claimed "compact recessed lighting system," the "plurality of elements … facilitate[] holding the unified casting up against the standard junction box when the unified casting is **installed in** the standard junction box."  ELCO's expert does not explain why one would be motivated to mount the alleged Kim/Gifford combination "in" a standard junction box.  This is not to simply raising some factual disputes about Kim/Gifford, but illustrating that the expert's *ipsi dixit* testimony fails to consider and apply relevant facts (disputed or otherwise) and is too conclusory to avoid summary judgment.

### B.   Motions in Limine Order

#### 1.   DMF MIL No. 1 – Kwong Inventorship

DMF intends to seek reconsideration of DMF's MIL No. 1 (Dkt. 415-1) concerning purported prior inventorship by the Kwongs (a baseless allegation) given new information ELCO provided after briefing: ELCO's Contentions of Fact and Law (Dkt.459) and ELCO's portion of the proposed Pretrial Conference Order (Dkt. 493-1) in which:

(1)  ELCO does **not** rely on purported Kwong inventorship to invalidate the '266 Patent (Dkt. 459 at 24-25; Dkt. 493-1 at 30-31) and

(2)  ELCO states for the first time that it _does_ intend to rely on purported Kwong inventorship for its willful infringement defense. (Dkt. 459 at 15; Dkt. 493-1 at 37-38).

Prior to those filings, ELCO never disclosed an intent to rely on Kwong inventorship for its willfulness defense.  Indeed, ELCO's trial counsel gave sworn testimony (Dkt. 299-1 at ¶13) on November 4, 2019 (the last day of fact discovery) that "ELCO

**recently** became aware of potentially significant witnesses located in Hong Kong … Mr. James Kwong and Mr. Alex Kwong" who purportedly showed DMF a Kwong product that ELCO now claims was DMF's DRD2.

Willful infringement, however, concerns ELCO's belief <u>at the time</u> when ELCO sold the infringing products (not afterwards). ELCO was enjoined from selling the infringing products in <u>March 2019</u> (Dkt. 147)—<u>eight months **before**</u> ELCO "became aware" of the purported Kwong inventorship. Thus, Kwong inventorship is not relevant to willfulness as a matter of law.

Consistent with the sworn testimony of ELCO's counsel, ELCO never disclosed reliance on Kwong inventorship in its willfulness defense contentions. *See* ELCO Response to Interrogatory No. 2 at 18-19 (referring only to non-infringement). Indeed, ELCO did not disclose Kwong inventorship in any way before fact discovery closed on November 4, 2019:

- ELCO's January 16, 2019 Initial Disclosures identified the Kwongs only as "knowledgeable about the development, design and manufacture of **Elco's ELL modules**" without mentioning DMF or inventorship.
- ELCO's original and three amended answers filed from October 2018 to July 2019 (Dkts. 15, 18, 160 and 235) did not mention Kwong inventorship.
- ELCO's document production did not mention Kwong inventorship; rather, ELCO produ████████████ Kwongs showing the oppo████████████ ████████████████responded████████ ████████████████████████████████"

Accordingly, DMF intends to seek reconsideration to preclude ELCO from providing any evidence, testimony or attorney argument on the purported Kwong inventorship (1) under Rules 402, 403 because it is not relevant and would be unduly prejudicial to DMF or (2) under Rule 37 as untimely disclosed and prejudicial.

### 1.    **DMF MIL No. 2 – Late Produced Imtra Documents**

DMF's Motion In Limine No. 2 noted that ELCO produced documents from a 2016 trade show relating to Imtra during pretrial preparations (ELCO tried to sneak them in as a trial exhibit when the parties were exchanging exhibits), and requested exclusion of this evidence under Rule 37. The Court's Order did not address this

aspect of DMF's motion.  The late disclosure was not substantially justified or harmless.

## 2.      DMF MIL No. 4 – Don Smith

In opposing DMF's motion in limine No. 4, ELCO's counsel represented that "[i]n May 2019, [he] advised DMF's counsel Ben Davidson that [he] was obtaining 'cross-over files' from Don Smith at ELCO, and that Mr. Smith is a custodian of those files."  Dkt. 490-1 at 3.  This representation is incorrect, and DMF did not have an opportunity to respond to it before the Court took the matter under submission.  The files actually contain hand-written notes of another former ELCO employee, not Mr. Smith.  Rather than guess who to depose about these files, DMF justifiably relied on ELCO's identification of a 30(b)(6) witness, Mr. Cohen, whose deposition was delayed several times by ELCO, and who ultimately failed to provide meaningful answers about these files.  DMF would be prejudiced if Mr. Smith, who has not been deposed, were to give unknown, surprise and untested testimony about these files.

## 3.      DMF MIL No. 15 – DMF's Investment in the Patented DRD2 Technology

In ruling on ELCO's motion *in limine* 15, the Court ordered that "DMF may not refer to either the general concept of development costs or specifically to DMF's own $3,549,746.00 in development costs as a 'check' on the 'conservative' nature of Dr. Goedde's proposed royalty figure."  Order at 22.  Out of an abundance of caution, DMF intends to seek confirmation that the Court's ruling is not intended to preclude fact witnesses from testifying about development costs or other facts relevant to a reasonable royalty analysis.  For example, DMF's inventor should be allowed to testify about development costs for the patented DRD2 technology in order to explain the importance of developing technology to DMF and why DMF cannot afford to allow ELCO to sell copies of that patented technology for a small royalty payment.

1   If, on the other hand, the Court's order is intended to foreclose fact witnesses

2   and evidence on damages if these facts are not also relied on in a damages expert

3   report, then DMF would ask that ELCO also be precluded from introducing **any**

4   damages testimony or evidence because ELCO has proffered **no** damages expert to

5   give any damages report or testimony.

6   In addition, Dr. Goedde should be allowed to reference the development costs

7   to show that his royalty calculation was conservative.  The MIL ruling overlooks that

8   the *Juno Therapeutics* case cited by the Order actually permitted the damages expert

9   to refer to a figure that he did not use in his calculations but that he claimed validated

10   his conclusions where they had a "nexus" to the accused product (e.g., the value

11   assigned to the accused product).[15]  Here, DMF's development costs for the DRD2

12   have a nexus to the accused ELL products because the ELL products were copied

13   from the DRD2 and ELCO derived the benefit of DMF's substantial investment to

14   develop and promote that DRD2 technology which ELCO copied into its ELL.

15   **III.   Defendants' Issues for Reconsideration or Clarification**

16   Defendants intend to file motions for reconsideration of the Court's Orders on

17   DMF's Motion for Partial Summary Judgment and Defendants' Motions in Limine

18   Nos. 1 and 7, on the grounds described below.

19   **A.   Grounds for Reconsideration of the MSJ Order**

20   By way of part of its order on DMF's Motion for Partial Summary Judgment

21   ("MPSJ"), the Court made claim construction rulings for "enclose" and "cover"

22   regarding the reflector; "coupled to" regarding the LED and casting; and "closed rear

23   face."  The Court made these rulings based on arguments raised by DMF for the first

24   time in its reply brief and at oral argument, without allowing Defendants an

25   opportunity to respond to those arguments with briefing or evidence.

26

27

28   [15] *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, No. 2:17-cv-07639-SJO-KS, (C.D. Cal. Dec. 3, 2019), Dkt. 559 at 9.

1. **"reflector" (all asserted claims) (SJ Order at 13-14)**

With regard to the reflector limitation, the Court ruled "in the abstract that the plain and ordinary meaning of the terms "enclose" and "cover" permits multiple materials to "enclose" or "cover" something else, citing to DMF's Russian dolls and 'underneath the covers' claim construction arguments, which DMF raised for the first time in its reply papers. The Court further agreed with DMF's claim construction argument raised for the first time at oral argument, based on claim 6, that the '266 Patent "expressly contemplates circumstances where the driver can be enclosed by both an 'inner enclosure' such as a housing, and additionally by the reflector." The Court ruled that "ELCO has not presented any evidence under this proper interpretation of the terms 'enclose' and 'cover' that would support its noninfringement position," and thus found no genuine dispute of material fact regarding whether all versions of the ELL modules satisfy the reflector limitation. In construing "enclose" and "cover," the Court did not consider or examine any intrinsic or extrinsic evidence regarding these terms, other than to review the language of claim 6.

The Court should reconsider its ruling because it did not consider the following material facts presented to it on the motion:

● Independent claims 1, 17 and 22 of the '266 Patent require the reflector to "enclose[e] the driver from exposure to the area surrounding the compact recessed lighting system." Claim 26 requires the reflector to "cover the driver." The specification does not mention the reflector "enclosing" the driver. Instead, the specification discusses the reflector "shielding" the driver from the outside environment. '266 Patent 5:67 – 6:11. Furthermore, the patent discloses that this shielding occurs as a result of the reflector <u>separating the LED from the driver</u>. *Id.* at 5:64 – 6:3. The patent claims do not use the word "shield."

- DMF failed to address this claim limitation and failed to proffer any evidence that the ELL modules satisfy the reflector claim limitation, thus DMF did not meet its burden on summary judgment on all asserted claims.  DMF's expert, Mr. Benya, addresses the reflector in ¶¶ 125 and 202-208 of his declaration, but he does not address if or how the reflector separates the LED from the driver, or how any such separation shields, encloses or covers the driver from the outside environment.  He only discusses how the reflector is coupled to the LED and directs light away from the LED.

- At oral argument, DMF misled the Court about the language of claim 6.  Contrary to DMF's argument at the hearing, DMF's own admissions and the testimony of its expert shows that the inner enclosure referenced in claim 6 simply refers to a device that <u>holds</u> the driver within the casting.  At most, this limitation refers to enclosing the driver from its underside, not to enclosing the top of the driver, as DMF incorrectly argued at the hearing.  DMF's SUF 41 is the only SUF that pertains to claim 6.  SUF 41 asserts that <u>all</u> three versions of the ELL meet the limitation of claim 6 because each version has "a black enclosure that <u>holds</u> the driver within the unified casting." (emphasis added)  SUF 41 refers to Benya's Declaration ¶ 229 for support.  Benya states in ¶ 229 that claim 6 "is met literally by the DMF DRD2 and the ELCO ELL Modules [referring to each ELL version].  As shown above, the DRD2 and the ELL Modules have a black enclosure that <u>holds</u> the driver within the unified casting." (emphasis added)  Neither the DRD2 nor Version 3 of the ELL has a driver housing with a top so that the driver housing fully encloses the driver, like the driver housing of ELL Versions 1 and 2 does.  The DRD2 driver housing has only a bottom piece.  So does the driver housing for the ELL Version 3.  Thus, claim 6 only refers to "holding" the driver within the casting.  Claim 6 has nothing to do with enclosing the driver to protect it from the outside environment, or otherwise fully enclosing the driver.

- There is no support for claim 6 in the patent specification. *See generally* '266 Patent. The specification does not mention an inner enclosure for the driver as claimed in claim 6.

The Court also did not allow Defendants an opportunity to respond, with briefing or evidence, to DMF's new claim construction arguments, raised in its reply and at oral argument. The Court's ruling ignores triable issues of fact that should be decided by the jury, including the following:

- Whether the ELL reflector separates the LED from the driver when the driver is already enclosed/covered by potting material and/or the driver housing top.
- Whether the ELL reflector or the driver housing or the potting material protects the driver from the outside environment.
- Whether the reflector acts as a shield for the driver when it is already enclosed by the driver housing and/or potting material.
- What is the plain and ordinary meaning of "enclose" and "cover" and the reflector limitation.

### 2. the angled wall of ELL Version 3 ("closed rear face" – Claims 1, 2, 4-8, 13-16,[16] 19, 21, 22) (SJ Order at 11-13)

The Court held in its Claim Construction Order that "closed rear face" does not require construction. Claim Construction Order ("CCO") [Dkt. 266] at 30.

In the SJ Order, the Court rejects Defendants' position that a "face is planar or, at best, smoothly curved." SJ Order at 12. The Court held that ELCO's sole support for this argument was "conclusory, unsupported assertions of Bretschneider," and that ELCO did not discuss the specification, prosecution history or other aspects of the intrinsic record. *Id.* The Court also held that Mr. Cohen's testimony supported DMF's position that there is no reasonable dispute of material fact that the combination of two angled sidewalls and a flat back wall constitutes a "closed rear face." *Id.* The Court also mentions that it asked ELCO's counsel at the

---

[16] As noted above by DMF, it is not asserting Claim 17.

hearing "what evidence" supported its noninfringement position for this claim limitation, assuming the Court rejected ELCO's claim construction, and that in response to that question, ELCO's counsel "failed to identify any specific evidence in the record that would still support a question of fact as to whether this claim limitation was satisfied by its LED Version 3 Module." *Id.* at 12-13.

The Court should reconsider its ruling because it did not consider the following material facts presented to it on the motion:

- In its moving papers, DMF does not proffer any evidence that any of the ELL modules satisfy the claim limitation requiring the sidewall to be joined to the closed rear face.  DMF only addresses that the casting of each has a closed rear face, a sidewall, and an open front face, but only in conclusory terms. SUFs 11-14; Benya Decl. ¶¶ 185-188.  Nowhere does Mr. Benya discuss joining of the closed rear face with the sidewall.  He only mentions that the castings are "single-piece castings."  This evidence does not prove the ELL satisfies this claim limitation.

- The Court incorrectly concluded that Dr. Bretschneider's testimony is purely conclusory and unsupported, and thus ignored that evidence.  The Court's prior ruling that "closed rear face" does not require construction means that the patentee did not proscribe any particular meaning to this term and, therefore, it should be given its plain and ordinary meaning by the jury.  Dr. Bretschneider's testimony is how one of ordinary skill in the art would understand the plain and ordinary meaning of the term "face."  The Court's dismissal of Dr. Bretschneider's testimony because he did not cite to any intrinsic evidence flies in the face of the Court's prior finding that the patentee was not his own lexicographer with respect to this term.  Dr. Bretschneider in fact provided a detailed explanation for why a POSITA would understand the plain and ordinary meaning of "face" to be a plane or smooth curve, including citing to testimony from Benya that supports Dr. Bretschneider's view, and

diagrams of the casting.  Bretschneider Decl. ¶¶ 451-460.  By concluding that Dr. Bretschneider's testimony is purely conclusory and unsupported, the Court failed to construe the evidence in the light most favorable to Defendants.

• The Court ignored and failed to construe Steve Cohen's testimony in the light most favorable to Defendants.  In its reply brief (p. 9), DMF argued that Mr. Cohen admitted, in a declaration filed in opposition to the preliminary injunction motion, that the closed rear face of Elco's ELL modules (all versions) includes the angled wall.  Mr. Cohen stated in that declaration that, in Version 2 of the ELL, "The closed rear face of the <u>casting</u> is a conical shape with a flat vertex."  Without any basis, DMF states on page 9 of its reply brief that Mr. Cohen was specifically referring to the outline of the <u>cap</u> of Version 2, which DMF contends is the same shape as the Version 3 casting.  On page 9 of its brief, DMF even highlighted in red the outline of the <u>cap</u>.  This is not evidence.  Mr. Cohen refers to the casting of Version 2, which DMF contends is the casting of Version 1.  In his declaration, Mr. Cohen did not refer to the "cap."  As the Court noted, Defendants refer to the combination of the casting (of Version 1), with the cap (and additional heat sink) attached, as the Version 2 "housing," not as the "casting" of Version 2.  DMF's attorneys put words in Mr. Cohen's mouth by highlighting in red the cap of Version 2 solely for the purpose of arguing ELCO admitted that the angled wall of Version 3 is part of the closed rear face.  What Mr. Cohen meant by this testimony is a question of fact that should be decided by the jury, not by the Court.

• The Court also ignored evidence of the structural design of the ELL Version 3 casting, which demonstrates the sharp angles between the rear wall and angled wall, and between the angled wall and the sidewall.  This evidence included photographs and diagrams of the Version 3 casting.  Construed in the light most favorable to Defendants, this evidence shows that the angled wall is a separate structural component of the casting from the rear wall and sidewall,

and that the sidewall is not joined to the rear call (or closed rear face).  At a minimum, this evidence raises a triable issue for the jury as to whether the angled wall is a separate structural component.  The jury should be allowed to view the ELL Version 3 casting design and decide the factual question whether it satisfies this claim limitation.

- The Court also ignored Dr. Bretschneider's testimony that the angled wall is a separate structural component of the casting, and thus the Version 3 ELL does not meet this claim limitation.  When construed in the light most favorable to Defendants, his testimony also raises a triable issue.

- At the hearing, the Court asked Defendants' counsel what "<u>other evidence</u>" besides what Defendants had proffered in their opposition papers to support their contention that the rear wall and the angled wall did not meet the "closed rear face" limitation, assuming the Court continued to reject Defendants' argument that a "face" must be planar or, at best, smoothly curved."  Counsel answered that question by stating Defendants did not have any <u>other</u> evidence besides what they had proffered in opposition to the MPSJ.  Defense counsel answered the question that way because evidence of the structural shape of the casting and Dr. Bretschneider's testimony was already in the record.  MPSJ Hearing Transcript at 29:21-30:9.  Thus, the Court's reference in the SJ Order that it asked Defendants' counsel for "what evidence" – as opposed to "what <u>other</u> evidence" – Defendants had is not accurate.  The Court ignored the <u>other</u> evidence, described above.

- The Court also ignored the clear language of the specification cited by DMF, when it argued that Defendants' position on "face" with regard to "closed rear face" is inconsistent with the patent because the specification says that "the casting 5 may be any suitable shape, including an ellipsoid, cone, or polygon that is capable of housing the light source module 3 and driver 4."  This

1   language in the specification refers to the shape of the <u>casting</u>, not the shape of

2   the closed rear face.

3   The Court also did not allow Defendants an opportunity to respond, with

4   briefing or evidence, to DMF's new claim construction arguments, raised in its reply

5   and at oral argument.  The Court also appears to have relied on Mr. Cohen's

6   testimony to construe "closed rear face."  His testimony is not a proper basis for a

7   claim construction ruling because his testimony is not intrinsic evidence.

8   The bottom line is that even if a "face" <u>may</u> include "a conical shape with a

9   flat vertex," it is still a question of fact for the jury to decide whether the angled wall

10   of ELL version 3 is (a) a separate structural component of the casting, (b) part of the

11   closed rear face, or (c) part of the sidewall.  By holding that the rear wall and angled

12   wall satisfy the "closed rear face" limitation, the Court improperly weighed the

13   evidence, ignoring the above evidence, and substituted its judgment for that of the

14   jury, which might have found to the contrary, e.g., that the angled wall is not part of

15   the closed rear face.

16        **3.    "dissipates heat" (Claims 1, 2, 4-8, 13-16, 19, 21, 26, 28-30)**
          **(SJ Order at 15-17)**

17   The Court ruled in its claim construction order that "significantly dissipates

18   heat" means "dissipates enough heat generated by the light source module during

19   operation of the light source module such that an additional heat sink is not

20   required."  CCO at 30.  The Court further stated that a POSITA would understand

21   that "the unified casting must serve as the heat sink and manage the heat released by

22   the light source module."  *Id.*  The Court also stated that a POSITA would further

23   understand that if an additional heat sink were required to manage the heat from the

24   LED, then the "significantly dissipates" limitation would not be met.  *Id.*

25   On the summary judgment motion, the Court ruled that Defendants did not

26   provide <u>any</u> evidence that the casting did not satisfy the "significantly dissipates

27   heat" claim limitation.  SJ Order at 16.  The Court held that "ELCO's position – that

28

the thermal grease and not the unified casting is responsible for managing the amount of heat released in the accused products – is contradicted by its admission that the unified casting acts as the heat sink." *Id.*

The Court should reconsider its ruling because it did not consider the following material facts presented to it on the motion:

- That the thermal grease acts as a heat sink, in addition to the casting, to thermally manage the heat produced by the LED during operation.
- That the thermal grease between the LED and the casting for the ELL dissipates the heat from the LED.  Such evidence includes Dr. Bretschneider's testimony explaining that heat transfer process.  It also includes Mr. Benya's deposition testimony admitting that such heat dissipation occurs in "exactly" that way.
- That the heat absorbed by the thermal grease is then transferred to the casting.
- That while ELCO admitted (in response to SUF 33) that the ELL modules have superior thermal management by using a casting that is an integrated heat sink, ELCO did not admit it is the casting that dissipates the heat from the LED, or that only the casting thermally manages the heat generated by the LED.  The Court improperly construed ELCO's response to SUF 33 more broadly than it should have and failed to construe the above-referenced evidence in the light most favorable to ELCO.  The statement in SUF 33 that, "[The ELL modules] have superior thermal management by utilizing an integrated heat sink, which is the aluminum casting" is a very general statement that makes no reference to the casting dissipating heat from the LED, or how any heat from the LED is transferred to the casting.  Furthermore, Defendants disputed SUF 35, based on the fact that thermal grease dissipates the heat from the LED, which is the crux of the disputed factual issue (not SUF 33).

- That the ELL casting serves as an integrated heat sink (where heat eventually travels and is released into the ambient environment) but is not the component/material that actually dissipates the heat directly from the LED.

- That DMF failed to proffer any evidence that, without the presence of the thermal grease, thus leaving a gap between the ELL casting and the LED, the casting would dissipate enough heat generated by the LED during operation such that an additional heat sink is not required.  Without such evidence, one cannot reasonably conclude, as the Court incorrectly concluded, that the thermal grease is not necessary to dissipate heat from the LED.

- That the '266 Patent does not disclose that the connecting mechanisms which may be used to couple the light source module 3 to the casting 5 serve the function of dissipating heat away from the light source module.

- That the '266 Patent in fact requires direct contact between the light source module 3 and the casting 5.  '266 Patent 5:37.  Here, the specification was not discussing a single embodiment; rather, the specification was discussing that the direct contact between the light source module and the casting is what allows the heat from the light source module to be dissipated to the casting. The underlined language in the following sentence does not refer to an embodiment; the sentence refers to what is generally required by the patent: "As described above, by positioning the light source module 3 in the opening 21, the light source module 3 may avoid the driver 4, thus … allowing the light source module 3 to directly contact the casting 5, such that the casting 5 can dissipate heat generated by the light source module 3." *Id.* at 5:33-39.

At a minimum, there is a question of fact for the jury to decide whether the ELL's thermal grease acts as an additional heat sink by dissipating the heat from the LED.  The Court improperly substituted its own judgment, after weighing the evidence, for that of the jury with regard to this disputed factual question.

4.     **Invalidity Based on Hatteras Product and Imtra 2011 Catalog**

In the SJ Order, the Court granted DMF's motion for summary judgment of no invalidity as to Ground 1 (anticipation based on Imtra Hatteras physical product) and Ground 2 (Imtra 2011 brochure).  SJ Order at 21.  The Court found that the Imtra Hatteras product and the 2011 brochure failed to constitute anticipatory references because they did not disclose the "plurality of elements" limitation.  *Id.* at 20. However, this limitation is not included in claims 17 or 26.  The Court also found Defendants' anticipation ground based on Imtra 2011 fails as a matter of law based on DMF's "mixes and matches" argument.  This argument was based on Defendants' reference to other pages in the product catalog to satisfy the "plurality of elements" limitation and, as such, is also not relevant to claims 17 and 26.  The Court should reconsider its finding and limit the grant of summary judgment on invalidity Grounds 1 and 2 to exclude claims 17 and 26.

**B.     Motions in Limine**

1.     **Grounds for Reconsideration of Defendants' MIL 1**

Defendants intend to file a motion for reconsideration of the Court's ruling on Defendants' MIL No. 1 [Dkt. 428], on the grounds that the Court did not consider the following material facts presented to it on the motion:

- That Chip Israel is not qualified to opine on the specific likelihood of confusion factors required under 9th Circuit law.
- That Mr. Israel admitted that he is does not know how to conduct a survey to determine trademark confusion.
- That DMF does not challenge, and offered no evidence to dispute, Defendants' position that expertise as a lighting designer to testify about reputation in the industry is not the same as expertise regarding trademark confusion.

Although the Court's Order notes that a formal market survey is not required, the Court omits that "a trier of fact may be entitled to presume that one party's

failure to conduct a survey conceded that the survey evidence would be unfavorable to it." *Monster, Inc. v. Dolby Labs. Licensing Corp.*, 920 F. Supp. 2d 1066, 1072 (N.D. Cal. 2013).  Alleged "confusion in the marketplace" is a separate issue from Defendants' alleged "reputation as a commodity importer of lighting fixtures."  DMF does not challenge that these are separate issues.  The Court's finding that Mr. Israel is qualified to opine "on issues regarding lighting design" (Order at p. 4) does not make him qualified to opine on the specific confusion factors required under 9th Circuit law.  Indeed, the Court does not discuss and makes no findings as to whether Mr. Israel is qualified to opine on the specific likelihood of confusion factors required under 9th Circuit law.

## 2.    Grounds for Reconsideration of Defendants' MIL 7

Defendants' Motion in Limine No. 7 ("MIL 7") [Dkt. No. 394] sought to preclude DMF from proffering to the jury any evidence, commentary and/or argument referencing, describing or quoting any portion of the CCO for the claim terms that the Court determined no construction is necessary, and for the claim terms the Court did construe, no portion of the CCO other than the claim constructions themselves.  Defendants cited case law supporting its position that it is proper to exclude reference to the claim construction order, including the Court's reasoning, with the only exception being references to the actual constructions.  Defendants also provided concrete examples from Mr. Benya's report where he appears poised to testify regarding the CCO, including testifying far beyond the actual constructions provided by the Court.

In its Opposition to MIL 7, DMF repeated its meritless argument that it is the Defendants who are seeking to relitigate claim construction arguments.  But then, DMF continued its practice of ignoring the Court's claim construction for driver by insisting that the Court's construction of driver rejected the possibility of the driver receiving DC power.  [Dkt. 455, p. 1]  Similarly, DMF asserted that it was improper for Elco to argue that the driver of Imtra cannot meet the construction of driver.

[Dkt. 455, p. 3]  This argument is completely against the Court's rulings and demonstrates DMF's willingness to ignore the CCO, as recognized by the Court in its recent ruling on the MPSJ ("the Court has not held that the claimed driver is limited to supplying only AC current.")  SJ Order at 21.

In MIL 7, Defendants were essentially asking the Court to direct Plaintiff DMF to abide by the CCO.  However, the Court denied the motion and instructed that *only* Defendants must abide by the CCO.

Defendants intend to file a motion for reconsideration based on the Court's failure to consider material facts and law presented to the Court before such decision.

By:   /s/ Ben M. Davidson
       Ben M. Davidson, Esq.

Ben M. Davidson
DAVIDSON LAW GROUP ALC

David W. Long
ERGONIQ LLC

*Attorneys for Plaintiff*
*DMF Inc.*

Date: April 7, 2020

By:   /s/ Robert Boone (by BMD)
       Robert E. Boone III

Robert E. Boone III
BRYAN CAVE LEIGHTON PAISNER

*Attorneys for Defendants*
*AMP Plus, Inc., d/b/a ELCO Lighting,*
*and Elco Lighting, Inc..*

Date: April 7, 2020

1

## <u>Certification Pursuant To Local Rule 5-4.3.4(a)(2)(i)</u>

2

Pursuant to Central District of California Local Rule 5-4.3(a)(2)(i), I hereby

3

certify that the content of this document is acceptable to

4

Robert Boone III, Esq., counsel for Defendants, and I have obtained his

5

authorization to affix his electronic signature to this document.

6

Dated:  April 7, 2020          By:  _____/s/ Ben M. Davidson_____

7

Ben M. Davidson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28