Ben M. Davidson, Esq., Bar No. 181,464
ben@dlgla.com
DAVIDSON LAW GROUP, ALC
4500 Park Granada Blvd., Suite 202
Calabasas, California 91302
Telephone: (818) 918-4622

David W. Long, Esq. (admitted *pro hac vice*)
longdw@ergoniq.com
ERGONIQ LLC
8200 Greensboro Drive, Suite 900
McLean, Virginia  22102
Telephone: (202) 847-6853

Attorneys for Plaintiff
DMF, Inc.

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DMF, Inc., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>AMP Plus, Inc. d/b/a ELCO Lighting, a California corporation; and<br><br>ELCO Lighting Inc., a California corporation,<br><br>Defendants. | Case No. 2:18-cv-07090 CAS (GJSx)<br><br>**Notice of Judgment By Patent Trial And Appeal Board Regarding United States Patent No. 9,964,266**<br><br>Ctrm:  350 W. First. Street, Room 8D<br><br>Hon. Christina A. Snyder |

On November 19, 2020, the Patent Trial and Appeal Board ("PTAB") issued its Judgment in Case No. IPR2019-01094 regarding United States Patent No. 9,964,266 ("the '266 Patent"). The PTAB determined that Petitioner, Defendant AMP Plus Inc. (ELCO), did "not demonstrate, by a preponderance of the evidence, that claims 1, 2, 4–11, 13–16, 19, 21, 22, 25, 26, and 28–30 are unpatentable. Petitioner has demonstrated, by a preponderance of the evidence, that claim 17 is unpatentable."

The PTAB's Judgment is attached hereto as Exhibit A.

Respectfully submitted,


By:   /s/ David W. Long
      David W. Long, Esq.

David W. Long
ERGONIQ LLC

Ben M. Davidson
DAVIDSON LAW GROUP ALC

*Attorneys for Plaintiff*
*DMF Inc.*

Date: November 19, 2020

# Exhibit A

Trials@uspto.gov                                      Paper 69
571-272-7822                              Date: November 19, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

—————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————

AMP PLUS, INC., dba ELCO LIGHTING,
Petitioner,

v.

DMF, INC.,
Patent Owner.

—————

IPR2019-01094
Patent 9,964,266 B2

—————

Before CHRISTOPHER L. CRUMBLEY, JEFFREY W. ABRAHAM, and
DEBRA L. DENNETT, *Administrative Patent Judges*.

DENNETT, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Claims 1, 2, 4–11, 13–16, 19, 21, 22, 25, 26, 28–30
Not Unpatentable and Claim 17 Unpatentable
*35 U.S.C. § 318(a); 37 C.F.R. § 42.73*

Denying-in-part and Dismissing-in-part as Moot Petitioner's Motion to
Exclude and Denying-in-part and Dismissing-in-part as Moot Patent
Owner's Motion to Exclude
*37 C.F.R. § 42.64(c)*

Granting Patent Owner's Unopposed Second Motion to Seal
*37 C.F.R. § 42.54*

IPR2019-01094
Patent 9,964,266 B2

# I. INTRODUCTION

This is a Final Written Decision in an *inter partes* review challenging the patentability of claims 1, 2, 4–11, 13–17, 19, 21, 22, 25, 26, and 28–30 (collectively, "the challenged claims") of U.S. Patent No. 9,964,266 B2 (Ex. 1001, "the '266 patent"). We have jurisdiction under 35 U.S.C. § 6. For the reasons that follow, we determine that Petitioner does not demonstrate, by a preponderance of the evidence, that claims 1, 2, 4–11, 13–16, 19, 21, 22, 25, 26, and 28–30 are unpatentable. Petitioner has demonstrated, by a preponderance of the evidence, that claim 17 is unpatentable.

## A. Procedural History

ELCO Lighting ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1, 2, 4–11, 13–17, 19, 21, 22, 25, 26, and 28–30 of the '266 patent." Paper 1 ("Pet."). On Nov. 20, 2019, we instituted trial on three grounds of unpatentability asserted in the Petition:

(1)    Whether claims 1, 2, 4–11, 13, 15–17, 19, 21, and 26 of the '266 patent are unpatentable under 35 U.S.C. § 102 as anticipated by Imtra 2011[1];

(2) Whether claims 1, 2, 4–11, 13–17, 19, 21, 22, 25, 26, 28–30 of the '266 patent are unpatentable under 35 U.S.C. § 103 as obvious over Imtra 2011 and Imtra 2007[2]; and

---

[1] Imtra Marine Lighting– Advanced LED Solutions ("Imtra 2011"). Ex. 1005.
[2] Imtra Marine Lighting – Spring 2007 ("Imtra 2007"). Ex. 1006.

2

IPR2019-01094
Patent 9,964,266 B2

(3) Whether claims 1, 2, 4–11, 13–17, 19, 21, 22, 25, 26, 28–30 of the '266 patent are unpatentable under 35 U.S.C. § 103 as obvious over Imtra 2011, Imtra 2007, and Gifford.[3]

Paper 20 ("Institution Decision" or "Inst. Dec.").

Following institution, DMF, Inc. ("Patent Owner") filed a Response (Paper 29, "Resp."), Petitioner filed a Reply (Paper 42, "Reply"), and Patent Owner filed a Surreply (Paper 49, "Surreply").

Petitioner supports its Petition with the declaration testimony of Dr. Eric Bretschneider (Ex. 1002) and Colby Chevalier (Ex. 1008). Patent Owner took cross-examination of the declarants via deposition and filed the transcripts (Dr. Bretschneider at Ex. 2047; Mr. Colby at Ex. 2045).

Patent Owner relies on the declaration testimony of James R. Benya (Ex. 2001). Petitioner took cross-examination of Mr. Benya via deposition and filed the transcript (Ex. 1038). Patent Owner filed a "corrected" version of the transcript (Ex. 2108).[4]

Petitioner filed a Motion to Exclude certain evidence submitted by Patent Owner (Paper 53, "Pet. Mot. Exclude"), after which Patent Owner

---

[3] U.S. Patent No. 9,366,418 B2 to Gifford, published Apr. 4, 2013 ("Gifford"). Ex. 1007.

[4] Mr. Benya's deposition was conducted remotely. Ex. 1038, 5:1. The transcript reveals occasional difficulty hearing or understanding one or more of the speakers. *See, e.g., id.* 5:20–24, 36:18–37:24. Patent Owner requested filing a corrected version of the transcript, and did so as Ex. 2108. The only difference between Ex. 1038 and Ex. 2108 that we have identified is at page 106, line 19, where Ex. 1038 shows the transcription as "wouldn't" and Ex. 2108 shows the transcription as "would." We do not rely on Mr. Benya's testimony at page 106, nor have we identified any difference in the two versions of Mr. Benya's testimony upon which we rely.

3

IPR2019-01094
Patent 9,964,266 B2

filed an Opposition (Paper 56, ("PO Opp. Exclude"), and Petitioner filed a Reply (Paper 60, "Pet. Reply Exclude").  Patent Owner filed a Motion to Exclude (Paper 59,[5] "PO Mot. Exclude"), Petitioner filed an Opposition (Paper 55, ("Pet. Opp. Exclude"), and Patent Owner filed a Reply (Paper 61, "PO Reply Exclude").

Both parties requested oral argument.  Papers 51, 52.  Argument was heard on September 10, 2020, and a transcript (Paper 68) has been entered into the record.

Patent Owner filed an unopposed Motion to Seal Paper 49 and Exhibits 2061–2073, 2075, 2076, 2088, 2090, and 2110.  Paper 67.

B.  *Related Matters*

Patent Owner indicates that the '266 patent is the subject of a concurrent proceeding in the United States District Court for the Central District of California: *DMF, Inc. v. AMP Plus, Inc.*, Case No. 2:18-cv-07090 (the "District Court case").  Paper 29, 5.  In response to the threat posed by COVID-19, the District Court continued the trial, with no new trial date set to our knowledge.  Paper 34.

---

[5] Due to a clerical error, Patent Owner served its Motion to Exclude on Petitioner on Aug. 20, 2020, but did not properly file it with the Board. Petitioner filed an Opposition to Patent Owner's Motion to Exclude on Aug. 27, 2020.  Upon discovery of the faulty filing, Patent Owner requested permission to file its Motion to Exclude after the due date.  Because Patent Owner timely served Petitioner with the motion, and Petitioner did not object to the late filing, we permitted Patent Owner to make the late filing, resulting in Petitioner's Opposition being filed *before* Patent Owner's Motion.

4

IPR2019-01094
Patent 9,964,266 B2

### C. The '266 Patent

The '266 patent, titled "Unified Drive and Light Source Assembly for Recessed Lighting," issued May 8, 2018, and claims priority to provisional application 61/843,278, filed July 5, 2013. Ex. 1001, codes (10), (45), (54), (60). The patent describes a compact recessed lighting system comprising a light source module and a driver separately coupled to a unified casting, and a reflector. *Id.*, Abstract. According to the '266 patent, recessed lighting systems are typically installed or mounted into an opening in a ceiling or a wall, and comprises a trim, a light source module, a "can" housing, and a driver, with the driver insulated from other portions and components of the lighting system through use of a separate insulating container. *Id.* at 1:27–33. The driver may be coupled to the light source module through the use of wires or other conduits such that the driver powers the light source module to emit light. *Id.* at 1:33–36. Separation between the driver and the light source module adds to the size of the recessed lighting system, increasing the size of the system to be placed in constrained spaces and possibly increasing cost. *Id.* at 1:37–46.

The '266 patent purports to provide a lighting system with a more compact and cost-effective design while complying with all building and safety codes/regulations. *Id.* at 2:10–13. The light source module, driver, unified casting, reflector, and lens are used with junction boxes and trims. *Id.* at 2:13–17.

5

IPR2019-01094
Patent 9,964,266 B2

*D. Illustrative Claim*

Claims 1, 17, 22, and 26 are independent claims of the '266 patent.

Claim 1 illustrates the subject matter of the challenged claims and reads as follows:

1.    A compact recessed lighting system, comprising:

a light source module for emitting light;

a driver for powering the light source module to emit light, the driver including an electronic device to at least one of supply and regulate electrical energy to the light source module;

a unified casting with a heat conducting closed rear face, a heat conducting sidewall and an open front face

wherein the heat conducting sidewall is joined to the heat conducting closed rear face at one end and defines the open front face of the unified casting at another end,

wherein the heat conducting sidewall has a first dimension between the heat conducting closed rear face and the open front face of less than 2 inches and extends 360 degrees around a center axis of the unified casting to define a first cavity that extends forward from the heat conducting closed rear face to the open front face of the unified casting and outward to the heat conducting sidewall,

wherein the light source module and the driver are positioned inside the first cavity while being coupled to the heat conducting closed rear face of the unified casting such that the light source module is closer to the closed rear face of the unified casting than the open front face of the unified casting, and

wherein the unified casting includes a plurality of elements positioned proximate to the open front face so as to align with corresponding tabs of a standard junction box and thereby facilitate holding the unified casting up

6

IPR2019-01094
Patent 9,964,266 B2

> against the standard junction box when the unified casting is installed in the standard junction box; and
>
> a reflector positioned inside the first cavity of the unified casting and coupled to and surrounding the light source module such that the reflector directs light produced by the light source module into an area surrounding the compact recessed lighting system while enclosing the driver from exposure to the area surrounding the compact recessed lighting system,
>
> wherein the heat conducting closed rear face and the heat conducting sidewall of the unified casting significantly dissipate heat generated by the light source module during operation of the light source module.

Ex. 1001, 8:2–44 (formatting added).

Independent claims 17, 22, and 26 are similar to claim 1 in that they each require a light source module, a driver, a unified casting, and a reflector. *Id.* at 10:3–34, 11:4–43, and 12:9–31. Significantly, claim 17 does not require a unified casting including a plurality of elements positioned proximate to the open front face so as to align with corresponding tabs of a standard junction box, as claim 1 requires.

## II. DISCUSSION OF UNPATENTABILITY CHALLENGES

Petitioner bears the burden of proving unpatentability of the challenged claims, and that burden never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must establish the facts supporting its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). Below, we discuss whether Petitioner has met its burden with respect to the challenged claims.

IPR2019-01094
Patent 9,964,266 B2

### A. Principles of Law

A claim is unpatentable under 35 U.S.C. § 102(a)(1) if the claimed
invention was patented, described in a printed publication, or in public use,
on sale, or otherwise available to the public before the effective filing date of
the claimed invention.  A claim is unpatentable under 35 U.S.C. § 103 if the
differences between the claimed invention and the prior art are such that the
claimed invention as a whole would have been obvious before the effective
filing date of the claimed invention to a person having ordinary skill in the
art to which the claimed invention pertains.  The question of obviousness is
resolved on the basis of underlying factual determinations including: (1) the
scope and content of the prior art; (2) any differences between the claimed
subject matter and the prior art; (3) the level of ordinary skill in the art; and
(4) objective evidence of nonobviousness, i.e., secondary considerations.
See Graham v. John Deere Co., 383 U.S. 1, 17–18 (1966).  The level of
ordinary skill in the art may be reflected by the prior art of record.  See
Okajima v. Bourdeau, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### B. Level of Ordinary Skill in the Art

We consider each asserted ground of unpatentability in view of the
understanding of a person of ordinary skill in the art ("POSITA").
Sundance, Inc. v. DeMonte Fabricating Ltd., 550 F.3d 1356, 1361 n.3 (Fed.
Cir. 2008) ("What a prior art reference discloses or teaches is determined
from the perspective of one of ordinary skill in the art.") (citing Scripps
Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed.
Cir. 1991)).

Petitioner and Dr. Bretschneider contend that a POSITA at the time of
the invention would have had "at least a B.S. degree or equivalent in

IPR2019-01094
Patent 9,964,266 B2

electrical engineering, mechanical engineering, chemical engineering,
physics, or a related field" and "at least 2–3 years of experience in designing
LED lighting products or fixtures."  Pet. 20; Ex. 1002 ¶¶ 24–25.

Patent Owner and Mr. Benya conclude that a POSITA "would need
experience and working knowledge of the safety and other building codes
and standards governing recessed lighting in residential and commercial
buildings, which impacts recessed lighting design and terminology."  Resp.
7; Ex. 2090 ¶ 31[6].

We find that the art involved in the '266 patent is recessed lighting.
We do not limit the art to recessed lighting in residential and commercial
buildings, as Patent Owner seems to propose.  *See* Resp. 7.  We find that a
POSITA would have the educational background proposed by Petitioner, as
well as knowledge and experience of building and safety codes/regulations
as proposed by Patent Owner.  Other differences between the parties'
proposed definitions are not significant to this Decision.

## C. Claim Construction

We interpret a claim "using the same claim construction standard that
would be used to construe the claim in a civil action under 35 U.S.C.
282(b)."  37 C.F.R. § 42.100(b) (2019).  Under that standard, we construe
the claims in accordance with the ordinary and customary meaning of such
claim, as would have been understood by one of ordinary skill in the art at

---

[6] Exhibit 2090 is Mr. Benya's Feb. 13, 2020 declaration.  Exhibit 2094 is a
version of Mr. Benya's declaration in which confidential business
information has been redacted at paragraphs 129–142, 144–146, 151, and
159.  It is otherwise identical to Exhibit 2090.  In this Decision, we refer to
Exhibit 2090, as this is the exhibit used in the briefing.  We do not rely on
any paragraphs in Exhibit 2094 that contain redactions.

9

IPR2019-01094
Patent 9,964,266 B2

the time of the invention, in light of the specification and prosecution
history.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005)
(en banc).  Only those terms that are in controversy need be construed, and
only to the extent necessary to resolve the controversy.  *See Nidec Motor
Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed.
Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795,
803 (Fed. Cir. 1999)).

　　　Petitioner addresses the construction of "driver" in the Petition (Pet.
22–26) and of "driver" and "standard junction box" in the Reply (Reply 2–
8).  Patent Owner offers a construction of "standard junction box," "driver,"
and "unified casting."  Resp. 36–43; Sur-Reply 1–12.  "Driver" and "unified
casting" are recited in all challenged claims.  *See* Ex. 1001, 8:1–12:61.
"Standard junction box" appears in independent claims 1 and 26, as well as
in claims 19 and 21 (both depending from claim 17) and claim 25
(depending from claim 22).  *See id.*  We analyze "standard junction box" and
"driver" below.  The parties do not make any argument that requires
construction of "unified casting."  We determine that no other terms require
express construction.

　　　　　　1.  *standard junction box*

　　　Although the term "standard junction box" occurs in independent
claims 1 and 26, it is not a structural limitation of either claim.  *See* Ex.
1001, 8:2–12:62.  For example, claim 1 requires "a plurality of elements"
included in the unified casting configured "so as to align with corresponding
tabs of a standard junction box" "when the unified casting is installed in the
standard junction box."  *Id.* at 8:23–33.  Claim 26 requires a unified casting
"having dimensions to fit inside a standard-sized junction box."  *Id.* at

IPR2019-01094
Patent 9,964,266 B2

12:10–13.  Claim 26 imposes dimensions on the unified casting but does not limit the claimed system to one including a standard junction box as part of the claimed system.  *See id.*

Patent Owner urges construction of the term "consistent with the district court's Claim Construction Order at 24–27 (Ex. 2015) as an 'industry-specified size' 'shell or enclosure for accommodating wire splices to building main power and separating them from other items inside a ceiling or crawl space.'"  Resp. 36 (quoting Ex. 2015, 24–27).

Patent Owner emphasizes that "standard junction box" should be limited to accommodating wire splices to *building main power*, supporting this construction with references to the Specification, file history, and Dr. Bretschneider's testimony.  *Id.* at 36–37.  According to Patent Owner, both the Specification and file history "explain[] the importance of *building* codes to the claimed invention."  *Id.* at 7–18, 36–37.  Patent Owner directs us to instances in the Specification indicating the disclosed invention complies with "all building and safety regulations."  *Id.* at 7–10, 36–37.  In similar fashion, Patent Owner directs us to portions of the file history amending claims to add "standard junction box" and conveying the applicant's report of an interview with examiners of the application leading to the '266 patent.  Resp. 10–18, 36–37.  Finally, Patent Owner argues that Dr. Bretschneider conceded that (1) it is important for a POSITA to be familiar with building codes in order to understand the '266 patent invention; (2) junction boxes are used for making a connection to a building main power; and (3) junction boxes are not required for low-voltage devices.  *Id.* at 18–19, 37.

Although Petitioner does not challenge Patent Owner's contention that a "standard junction box" means one having "industry-specified size," it

11

IPR2019-01094
Patent 9,964,266 B2

disputes that a standard junction box is limited to one that connects to building main power.  *See* Reply 2–5.  Petitioner argues that none of the claims require a standard junction box, most of the claims do not require the claimed system be used in a building, and the Specification broadly defines "junction box."  *Id.*  Noting that the claims do not require compliance with codes, Petitioner contends that whether a junction box has a fire rating, meets building and safety codes, or is to be used in a residential or commercial building has no bearing on the proper construction of "standard junction box."  *Id.* at 5.  Petitioner also argues that Patent Owner mischaracterizes Dr. Bretschneider's testimony, asserting that he testified that to understand the invention of the '266 patent it was important to be familiar with UL safety standards for designing lighting products (i.e., not that it was important to be familiar with building and safety codes), and whether junction boxes are required for low voltage DC depends on the installation.  *Id.*

In the Sur-Reply, Patent Owner counters Petitioner's position that the Specification broadly discloses a junction box, pointing out the Specification "refers to the junction box being used for high voltages 'e.g., 120 VAC or 277 VAC' (typically called *building mains*)."  Sur-Reply 1–2.  Patent Owner also points out that Petitioner fails to address the file history in its Reply.  *Id.* at 4.  In addition, Patent Owner argues that extrinsic evidence[7] supports its

---

[7] Patent Owner identifies paragraphs of Mr. Benya's declaration (Ex. 2090), the Gifford patent (Ex. 1007), the file history of the application leading to the Gifford patent (not of record), Mr. Benya's deposition testimony (Ex. 2108), Mr. Benya's testimony in the district court case, and Dr. Bretschneider's testimony (Ex. 2047).  Sur-Reply 2–3, 5–9.

12

IPR2019-01094
Patent 9,964,266 B2

construction. *Id.* at 2–3, 5–9.

The construction of "standard junction box" impacts whether the claimed compact recessed lighting system is limited to "building main power" as a power source. Patent Owner argues that the term is so limited (Response 36–37), thus avoiding prior art that reads on marine lighting systems that arguably do not use building main power as a power source. Petitioner, asserting the marine lighting systems as prior art, argues Patent Owner's proposed construction is too narrow. Reply 2–5.

"[C]laim construction must begin with the words of the claims themselves." *Amgen Inc. v. Hoechest Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006). "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms," however, they "do not stand alone." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314–15 (Fed. Cir. 2005) (en banc). "The words used in the claims are interpreted in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history . . . ." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). The specification, "always highly relevant to the claim construction analysis," "is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. In addition, "the prosecution history provides evidence of how the [PTO] and the inventor understood the patent." *Id.* at 1317. Our reviewing court cautions, however, that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

We may also look to extrinsic evidence in the form of expert

13

IPR2019-01094
Patent 9,964,266 B2

testimony to, among other things "provide background on the technology at issue" or "establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318. Extrinsic evidence is, however, generally viewed as less reliable than intrinsic evidence in determining the proper construction of a claim term. *Id.*

Looking first to the language of independent claims 1 and 26, we find that a standard junction box has tabs, and the unified casting has a plurality of elements that align with those tabs to facilitate holding the unified casting up against the standard junction box when it is installed in the standard junction box. Ex. 1001, 8:28–33; 12:13–16. We find nothing in these claims that expressly states or otherwise implies that a standard junction box is limited to one accommodating wire splices to "building main power."[8] *See* Resp. 36.

The Specification describes a junction box generally as "a shell or enclosure" and an alternative "housing" to a "can" housing structure. Ex. 1001, 3:12 and 7:19–20. The size of the cavity of the junction box "may be pursuant to popular industry specifications for junction boxes." *Id.*, 3:2–5. The Specification indicates a junction box may be part of the recessed lighting system, and describes embodiments of a junction box as separating the inner components of the recessed lighting system (including electrical wires/cables) from the items inside a ceiling or crawl space; being coupled to a stud, beam, or other structural member inside a ceiling or crawl space;

---

[8] In contrast, we note that claims 10, 16, 22, and 25 recite an electrical system *of a building*, indicating that the inventors added the requirement of a building where they chose to limit the claims to that environment.

14

IPR2019-01094
Patent 9,964,266 B2

equipped with one or more bar-hangers to assist installation when the
junction box needs to be located between two studs or joists; a single or
double gang box with a fire rating of up to two hours under specified codes;
receiving electrical wires from an electrical system within a building or
structure; and acting as a heat barrier to block heat emitted by the light and
the driver. *Id.*, 2:19–39; 2:55–57.

Thus, the Specification conveys that the standard junction box is an
industry-specified shell, enclosure, or housing with identified permissive
capabilities. However, the claims and Specification together do not
expressly require that a standard junction box be limited to those that
perform all of the identified functions, as all of the functional language is
permissive and appears in the Specification, but not in the claims. Structural
claims, such as claims directed to an article or apparatus, must be
distinguished from the prior art in terms of structure. *See In re Schreiber*,
128 F.3d 1473, 1478 (Fed. Cir. 1997) and cases cited therein; *see also In re
Danly*, 263 F.2d 844, 848 (CCPA 1959) ("Claims drawn to an apparatus
must distinguish from the prior art in terms of structure rather than
function"); *In re Gardiner*, 171 F.2d 313, 315-16 (CCPA 1948) ("It is trite
to state that the patentability of apparatus claims must be shown in the
structure claimed and not merely upon a use, function, or result thereof.").
At the oral hearing, counsel for Patent Owner confirmed that it is the
structural features of the unified casting that are important for purposes of
infringement, not whether a standard junction box is connected to building
main power:

> That term standard junction box conveys a lot of meaning.
> That's its role, that's why you're having it align with the tabs of
> the standard junction box because this is a device that could be

15

IPR2019-01094
Patent 9,964,266 B2

> put in a standard junction box and we've just got to be careful
> not to confuse that with what you need to prove infringement.
> But if you sell a device that has these features, you infringe
> whether you put it in a junction box or not, we agree with that.

Tr. 44–45; *see also id.* at 46 (counsel agreeing that "you wouldn't have to
have a junction box in your hand" to determine infringement of claim 1 and
agreeing that you don't need to actually connect a device that fits a standard
junction box to building main power to infringe claim 1); *Kimberly-Clark
Corp. v. Johnson and Johnson*, 745 F. 2d 1437, 1448–49 (Fed. Cir. 1984)
("Regardless of how patent claims may be arrived at during the vicissitudes
of prosecution, the invention patented is no more and no less than what the
finally issued claims, as construed by the court, define; and they must be
construed in the identical way for both infringement and validity.").

Patent Owner's argument that the Specification and file history
"explain[] the importance of building codes to the claimed invention" does
not persuade us that a standard junction box is restricted to use only in
association with *building main power*. *Compare* Resp. 7–10 *with* 36–37.
The Specification indicates that the recessed lighting system complies "with
all building and safety codes/regulations." Ex. 1001, Abstract, 2:12–14,
3:5–6, 6:10–11, 7:21–22. The Specification also discloses that the junction
box in certain embodiments of the invention receives electrical wires from
the electrical system of a building or structure. *Id.* 2:33–36, 3:56–58. We
do not agree that these statements should be read in combination to create
the restriction on the junction box urged by Patent Owner. Patent Owner's
arguments ignore the Specification's use of both "building" and "structure,"
which reasonably indicates to a person of ordinary skill in the art that a
"structure" may be something different than a "building." Likewise, the

16

IPR2019-01094
Patent 9,964,266 B2

Specification's use of building *and* safety codes/regulations, leaves open the
possibility that there are safety codes/regulations that apply to structures
other than buildings.

The prosecution history also does not support limiting the standard
junction box to one used only in conjunction with building main power.  *See*
Resp. 10–16, 36–37.  Following a Request for Continued Examination,
Applicant amended some of the pending claims to recite "a unified casting
includes a plurality of elements . . . [that] align with corresponding tabs of a
standard junction box," also adding new claims with the same requirement.
Ex. 2044, 1037, 1042–43, 1045, 1048.  According to the report of a January
24, 2018 interview with examiners, Applicant began with a presentation on
"the technical subject matter underlying the claims, *including* a description
of the state-of-the-art in residential and commercial lighting."  *Id.* at 1053
(emphasis added).  Applicant described "his recognition of various
challenges arising from applicable building codes and fire-related safety
standards for recessed lighting (particularly in multiple dwelling units or
'multifamily construction'), which *in part* provided the basis" for the
invention.  *Id.* at 1053 (emphasis added).  Applicant further stated:

> In the single-housing solution provided by Inventor Danesh's
> innovative assembly, building wiring carrying the AC "mains"
> voltage *may* be coupled to the driver inside the unified casting
> via wire nuts or connectors inside the junction box, as illustrated
> in Fig. 1 of the present application.  In the context of a built
> environment including multiple lighting fixtures, the wiring for
> multiple junction boxes containing respective unified castings
> *may* be daisy-chained together and thereby meet both applicable
> building and electrical codes and fire safety standards without
> requiring the labor-intensive construction of multiple fire-boxes.

*Id.* at 1056 (emphasis added).

17

IPR2019-01094
Patent 9,964,266 B2

Applicant's representations in the interview do not suggest that
Applicant narrowed the scope of the claims as Patent Owner contends.  The
use of the words "may," "including," and "in part" imply that Applicant's
discussion was intended to identify some of the more restricted uses of the
invention (e.g., in multifamily construction), but do not signal an intent to
unreservedly limit the invention to the embodiments described.  *See In re
DiLeone*, 436 F.2d 1404 (CCPA 1971) (interpreting "may" in the
specification's disclosure of "a diamine which may be either an aliphatic
diamine or an aromatic diamine" as illustrative, not as limiting the
description of diamines to only aliphatic and aromatic diamines); *see also
Clark v. Wright Aeronautical Corp.*, 162 F.2d 960, 962 (2nd Cir. 1947)
(Learned Hand, J.) ("It has become a habit of the scriveners of patent
applications to use the permissive form, presumably lest they should too
much limit the invention; but in doing so they risk impaling themselves upon
the other horn of the dilemma, because the specification must contain
adequate instructions for the practice of the invention, and permission may
easily become imprecision.").  Again, as indicated in claims 10, 16, and 22,
to the extent the inventors wished to limit their claimed lighting system to
those connected to the electrical system of a building, they knew how to
expressly do so, and indeed chose to do so only in a small subset of its
claims.

Our reviewing court has made clear that the scope of claim language
is not to be limited by prosecution history that does not clearly and
deliberately call for a narrower definition.  *See N. Telecom Ltd. v. Samsung
Elecs. Co.*, 215 F.3d 1281, 1294 (Fed. Cir. 2000) (holding that prosecution
history statements did not provide a narrowing definition "with reasonable

IPR2019-01094
Patent 9,964,266 B2

clarity and deliberateness"); *see also In re Bigio*, 381 F.3d 1320, 1325 (Fed.
Cir. 2004) ("Absent claim language carrying a narrow meaning, the PTO
should only limit the claim based on the specification or prosecution history
when those sources expressly disclaim the broader definition."); *see also*
*Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir.
2006) (declining to narrow the scope of a claim term by adding a specific
feature to the definition where the applicant had not described the feature as
"necessary" to the claimed invention during prosecution).  Indeed, "because
the prosecution history represents an ongoing negotiation between the PTO
and the applicant, rather than the final product of that negotiation, it often
lacks the clarity of the specification and thus is less useful for claim
construction purposes."  *Phillips*, 415 F.3d at 1317 (citing *Inverness Med.*
*Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–81 (Fed. Cir.
2002) (the ambiguity of the prosecution history made it less relevant to
claim construction) and *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73
F.3d 1573, 1580 (Fed. Cir. 1996) (the ambiguity of the prosecution history
made it "unhelpful as an interpretive resource" for claim construction)).

We find no disavowal of claim scope "with reasonable clarity and
deliberateness" in the prosecution history in this case sufficient to overcome
the heavy presumption that "standard junction box" carries its ordinary
meaning.

The expert testimony before us is also insufficient to persuade us that
a standard junction box implies connection only to building main power.

Patent Owner contends that Petitioner's expert, Dr. Bretschneider,
testified that (1) it is important to be familiar with building and safety codes
in order to understand the invention of the '266 patent; (2) junction boxes

19

IPR2019-01094
Patent 9,964,266 B2

are used for making a connection to building main voltage; and (3) junction boxes are not required for low-voltage devices.  Resp. 37.  We note that Patent Owner takes some liberties in summarizing Dr. Bretschneider's testimony.  Our review of Dr. Bretschneider's deposition reveals he testified that (1) the '266 patent mentions being familiar with building codes; (2) junction boxes for recessed lights under UL standard 1598 are used to make a connection between main power and the lighting fixture and, in some cases junction boxes may simply be used for connections of wires; and (3) depending on the installation, a UL junction box may not be required for low voltage light fixtures.  Ex. 2047, 27:7–12; 25:12–22; 118:5–18.  Contrary to Patent Owner's assertion, Dr. Bretschneider's testimony does not support Patent Owner's construction of standard junction box.  Rather, it indicates that a UL junction box may be used for making a connection to building main power, and that the '266 patent mentions being familiar with building codes.  We are not persuaded that this testimony supports limiting the claims as Patent Owner proposes.

Patent Owner's expert, Mr. Benya, testified that a "junction box used in residential or commercial buildings is understood by a person of ordinary skill in the art to be a basic wiring system element and safety device required by building codes to isolate splicing together of lighting fixture wires to building main voltage."  Ex. 2090 ¶ 55.  Mr. Benya's testimony, however, is premised on a junction box being used in residential or commercial buildings.  *Id.*  Dr. Bretschneider testified that the '266 patent is not restricted to recessed lighting systems for use in residential or commercial buildings.  *See* Ex. 1002 ¶ 27.  As discussed above, the '266 patent Specification addresses use of the lighting system with electrical systems in

20

IPR2019-01094
Patent 9,964,266 B2

a building or structure, not only "residential or commercial buildings" which is not a term included in the Specification. *See* Ex. 1001; 3:56–58. Mr. Benya's testimony does not directly address the question of the construction of "standard junction box" in the claims of the '266 patent.

Based on our review of the intrinsic and extrinsic evidence, we construe "standard junction box" to mean "a shell or enclosure or housing of industry-specified size for containing electrical connections."

We recognize that the District Court adopted a different construction of standard "junction box," namely "a shell or enclosure for accommodating wire splices to building main power and separating them from other items inside a ceiling or crawl space." Ex. 2015, 24–27. We, however, give more weight to the language of the claims themselves and less to the declaration of Mr. Benya. We contrast the absence of "building main power" in independent claims 1 and 26 with the express recitation of a connection to the electrical system of a building in claims 10, 16, and 22. We also assign importance to the use of the phrase "or structure" in addition to "building" in the Specification, which we find to be relevant to the question of whether a standard junction box is limited to the use in commercial or residential buildings. Furthermore, although we do not address the issue of infringement, the Federal Circuit has instructed that claims should be construed the same way for purposes of validity and infringement. In view of Patent Owner's concession that a connection to building main power is not needed to prove infringement, we fail to see why it should be integrated into the meaning of standard junction box for purposes of validity. For these reasons, and those discussed above, we respectfully disagree with the District Court's construction. *See generally* Ex. 2015 and 2095.

Ex. A, p.22

IPR2019-01094
Patent 9,964,266 B2

### 2. *driver*

Independent claims 1, 17, and 22 recite "a driver for powering the
light source module to emit light, the driver including an electronic device to
at least one of supply and regulate electrical energy to the light source
module." Ex. 1001, 8:4–7, 10:5–8, 11:6–9. Claim 26 recites "a driver,
disposed in the casting cavity, to power the light source module." *Id.* at
12:22–23.

Petitioner urges construction of "driver" as "an electronic device to
supply and/or regulate electrical energy to the light source module." Pet. 23.
Petitioner supports its proposed construction with reference to the
Specification of the '266 patent:

> The driver 4 is an electronic device that supplies and/or
> regulates electrical energy to the light source module 3 and thus
> powers the light source module 3 to emit light. The driver 4
> may be **any type** of power supply, including power supplies
> that deliver an alternating current (AC) **or a direct current
> (DC) voltage** to the light source module 3.

*Id.* at 24 (quoting Ex. 1001, 4:21–27 (emphasis added by Petitioner)).
Petitioner also argues that industry standards support its construction of
"driver."[9] Pet. 25. Dr. Bretschneider testifies that Petitioner's proposed

---

[9] Petitioner quotes (1) ANSI/IES (Illuminating Engineering Society) RP-16-
10 Standard (2010), *Nomenclature and Definitions of Illuminating
Engineering*, 25, defining LED driver as "a device comprised of a power
source and LED control circuitry designed to operate a LED package
(component), or an LED array (module) or an LED lamp" (Ex. 1010); and
(2) Underwriters Laboratories Inc. Standard for Safety UL-8750 (2009),
*Light Emitting Diode (LED) Equipment for Use in Lighting*, defining LED
driver as "a power source that adjusts the voltage or current to LEDs,
ranging in complexity from a resistor to a constant voltage or constant
current power supply" (Ex. 1011). Pet. 25.

22

IPR2019-01094
Patent 9,964,266 B2

construction "is entirely consistent with the definitions of driver codified in
industry standards." Ex. 1002 ¶¶ 90–94.  Dr. Bretschneider also testifies that
a POSITA would have been aware that the '266 patent is not restricted to
any particular input electrical power source, and that industry standard
definitions of an LED driver do not limit a driver to 120 VAC or 277 VAC.
*Id.* ¶ 98.

Petitioner contends that the '266 patent "repeatedly states that the
lighting system may be installed in a building or *structure*," thus is not
limited to use in commercial or residential environments.  Pet. Reply 2.
According to Petitioner, the '266 patent covers lighting systems used in any
form of building or structure, including houseboats, yachts, ships, etc.  *Id.* at
3 (citing Ex. 1002 ¶¶ 26–27).  Dr. Bretschneider testifies that the scope of
the '266 patent is not restricted to a particular field of lighting, and a
POSITA would have understood that embodiments of the '266 patent "are
relevant to any form of structure used or occupied by people."  Ex. 1002
¶ 27.

Patent Owner seeks construction of "driver" as "a device that serves
the function of supplying and regulating electrical energy *from building
main power* to the light source module."  Resp. 40 (emphasis added).  Patent
Owner quotes two portions of the Specification:

> driver 4 receives an input current from the electrical system of
> the building or structure in which the recessed lighting system 1
> is installed and drops the voltage to an acceptable level for the
> light source module 3 (e.g., from 120V–240V AC to 36V–48V
> DC).
>
> * * *
>
> The driver 4 may be any type of power supply, including power
> supplies that **deliver** an alternating current (AC) or a direct
> current (DC) voltage to the light source module.

IPR2019-01094
Patent 9,964,266 B2

*Id.* (quoting Ex. 1001, 4:38–43; 4:23–27 (emphasis added by Patent
Owner)).  Patent Owner adds that Dr. Bretschneider testified that the second
quote means that the output of the driver may be AC or DC.  *Id.* (citing Ex.
2047, 127:20–128:10).

Patent Owner also relies on remarks in the report of the examiner
interview discussed above:

> In the single-housing solution provided by Inventor Danesh's
> innovative assembly, **building wiring carrying the AC
> "mains" voltage** may be **coupled to the driver** inside the
> unified casting via wire nuts or connectors inside the junction
> box, as illustrated in Fig. 1 of the present application.

*Id.* at 41 (quoting Ex. 2044, 1056 (emphasis added by Patent Owner).  Patent
Owner characterizes the statement as confirming that the claimed driver is
coupled to "building wire carrying AC 'mains' voltage."  *Id.*

Patent Owner contends that Dr. Bretschneider agreed that the context
in which the term "driver" is used is important to understand its meaning,
and that it may have different meanings in different contexts.  *Id.* (citing Ex.
2047, 85:15–87:1).

In the Reply, Petitioner argues that Dr. Bretschneider's testimony that
the driver *outputs* AC or DC power does not mean that the driver cannot
have AC or DC *input*.  Reply 6 (citing Ex. 2047, 127:20–128:10 and Ex.
1038, 97:21–98:3).  Petitioner also points to Mr. Benya's testimony that the
driver in the Specification can *receive* AC or DC.  *Id.* (citing Ex. 1038,
104:5–21).  Petitioner argues that not all of the claims require the claimed
lighting system to be installed in a building, citing Mr. Benya's agreement
with this position.  *Id.* (citing Ex. 1038, 61:11–16; 82:7–83:9).

In the Sur-Reply, Patent Owner argues that Mr. Benya testified that
(1) building mains would not be low-power DC, and (2) he was unsure

24

IPR2019-01094
Patent 9,964,266 B2

whether the Specification's statement that "[t]he driver 4 is an electronic
device that supplies and/or regulates electrical energy to the light source
module 3 and thus powers the light source module 3 to emit light" is a
complete definition.  Sur-Reply 10–11.  Patent Owner also states that "[t]he
parties agree that the 'electrical system of a building' would be building
mains," but provides no evidentiary support for the assertion of agreement.
*Id.* at 11.

The '266 patent discloses embodiments in which the lighting system
is within "a building or structure" (*see, e.g.*, Ex. 1001, 2:34–36, 4:3–4), but
neither the Specification nor the prosecution history expressly restricts the
lighting system to being *only* within a building—and "structure" is
undefined.  Where desired, the Applicant drafted the claims to limit the
recessed lighting system to one placed or installed in a building.  *See, e.g.*,
Ex. 1001, 11:4–5, 11:35–43 (Claim 22 requires electrical connection
between the driver and "electricity from an electrical system of a building.").
In other claims, however, the plain language supports a recessed lighting
system powered by electricity from, or installed in, a structure that is not
expressly limited to a building.  *Compare id.* at 9:65–67 (claim 16: "a trim
directly coupled to the unified casting, for covering a hole in a ceiling or
wall of a building"), *with id.* at 10:22–23 (claim 17: "the light source module
and the driver are positioned inside and completely contained within the
cavity of the unified casting such that . . . the light source module . . . sits
behind a ceiling or a wall when the unified casting is installed in a hole in
the ceiling or the wall").  Thus, not all claims expressly recite a limitation
that restricts placement of the recessed light system to within a building.
*See, e.g., id.* at 10:3–34 (claim 17).

25

IPR2019-01094
Patent 9,964,266 B2

Our review of the evidence before us supports that the driver is not limited to a device that requires connection to *building main power*, as proposed by Patent Owner. *See* Resp. 40. The driver is broadly described in the Specification as "an electronic device that supplies and/or regulates electrical energy to the light source module . . . and thus powers the light source module . . . to emit light," and "may be any type of power supply." Ex. 1001 4:21–24. The only page of the prosecution history referenced by either party states that "[i]n the single-housing solution provided by Inventor Danesh's innovative assembly, building wiring carrying the AC 'mains' voltage may be coupled to the driver inside the unified casting via wire nuts or connectors inside the junction box, as illustrated in Fig. 1 of the present application." *See* Resp. 41 and Reply 6–7 (both citing Ex. 2044, 1056). Petitioner argues that the sentence describes one embodiment in which the claimed lighting system may be installed in a building having AC mains and does not otherwise limit the broad language of the claims and Specification. Reply 7. Patent Owner argues "the term 'may be' modifies the word 'inside' (not 'coupled to driver')." Sur-Reply 11.

"In the absence of an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning." *Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 857 (Fed. Cir. 2014).

On the record before us, we see no persuasive reason to adopt the narrow construction of "driver" proposed by Patent Owner. "Driver" as used in the '266 patent is not limited to a device that receives electrical power from building main power, but is more broadly construed: an electronic device to supply, regulate, or supply and regulate electrical energy

26

IPR2019-01094
Patent 9,964,266 B2

to a light source module.  Such construction is "in accordance with the
ordinary and customary meaning of such claim as understood by one of
ordinary skill in the art and the prosecution history pertaining to the patent."
*See* 37 C.F.R. § 42.100(b).

On this record, no other claim terms require express construction.  *See
Vivid Techs.*, 200 F.3d at 803.

### D. Asserted References

Before turning to Petitioner's asserted grounds, we provide a brief
summary of the asserted references.

#### 1. Imtra 2011

Imtra 2011 is titled *Imtra Marine Lighting – Advanced LED Solutions*
(Ex. 1005).  The document is a brochure on LED and halogen lighting
fixtures available for use in a variety of marine applications.

Petitioner contends the document is § 102(a)(1) prior art because it
allegedly was published and widely distributed as early as May 26, 2012,
prior to the earliest effective filing date of the '266 patent.  Pet. 4.

Patent Owner does not dispute the prior art status of Imtra 2011, but
questions its applicability to the claims at issue.  Resp. 28–29.

#### 2. Imtra 2007

Imtra 2007 is titled *Imtra Marine Lighting – Spring 2007* (Ex. 1006).
Imtra 2007 is a brochure on marine lighting fixtures, including LED,
halogen, and fluorescent lighting fixtures.  *See generally* Ex. 1006.

Petitioner contends that Imtra 2007 was published and widely
disseminated by Imtra Corporation at least as early as 2007 and, therefore,
qualifies as §102(a)(1) prior art to the '266 patent.  Pet. 4.

Patent Owner does not dispute the prior art status of Imtra 2007.  *See*

IPR2019-01094
Patent 9,964,266 B2

Resp. 30.

### 3. *Gifford*

U.S. Patent No. 9,366,418 B2 to Graham Gifford titled "Method,
Apparatus, and System for Connecting a Light Emitting Diode Light Fixture
to a Mains Power Conductor" issued on June 14, 2016, from an application
published on April 4, 2013, before the effective filing date of the '266
patent.  Ex. 1007, code (54).  Therefore, Gifford qualifies as prior art to the
'266 patent at least under §102(a)(1).

### E. Ground 1:  Anticipation by Imtra 2011

Petitioner, relying on the testimony of Dr. Bretschneider, contends
that Imtra 2011 discloses each element of claims 1, 2, 4–11, 13, 15–17, 19,
21, and 26.  Pet. 26–46.  Petitioner identifies where in Imtra 2011 the
preamble and each limitation is purportedly found for each claim challenged
as anticipated.  *Id.* at 28–46.

Patent Owner responds that Petitioner's anticipation challenge fails as
a matter of law for two reasons: (1) the Petitioner fails to state the grounds
for the challenge with the particularity required by statute; and (2) Petitioner
improperly mixes and matches alleged features of different products in Imtra
2011 as though it is a parts catalog of features to be combined to form the
claimed invention.  Reply 44.

As to the first point, Patent Owner argues that 35 U.S.C. § 312(a)(3)
requires an IPR Petition to identify "in writing and with particularity . . . the
grounds on which the challenge to each claim is based."  Resp. 43–44.
Rather than the typical manner of asserting anticipation, i.e., on a claim-by-
claim basis, Petitioner identifies common limitations in the four independent
claims (1, 17, 22, and 26) and argues that Imtra 2011 teaches the common

28

IPR2019-01094
Patent 9,964,266 B2

limitations.  *See* Pet. 28–37.  Although this method puts additional burden
on the reader to confirm that all elements of the claims are addressed, we
find that Petitioner identifies the grounds for anticipation with sufficient
particularity to meet the requirements of § 312(a)(3).

Patent Owner's second point—that Petitioner improperly mixes and
matches alleged features of different products in Imtra 2011—is based on
the requirement that an anticipatory reference "must not only disclose all
elements of the claim within the four corners of the document, but must also
disclose those elements 'arranged as in the claim.'"  *Net MoneyIN, Inc. v.
VeriSign, Inc.* 545 F.3d 1359, 1369–71 (Fed. Cir. 2008) (quoting *Connell v.
Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983)).  We do not
"treat[] the claims as mere catalogs of separate parts, in disregard of the part-
to-part relationships set forth in the claims and that give the claims their
meaning."  *Id.* at 1370 (quoting *Lindemann Maschinenfabrik GmbH v.
American Hoist & Derrick Co.,* 730 F.2d 1452 (Fed.Cir.1984)).  Nor do we
find anticipation where a reference provides no link between disclosures in
unrelated passages.  *Ecolochem, Inc. v. Southern California Edison Co.,* 227
F.3d 1361 (Fed.Cir.2000) (finding no anticipation of a claim reciting use of
hydrazine with a mixed resin bed to deoxygenate water where the reference
contained a figure and text disclosing use of hydrogen with a mixed bed to
deoxygenate water in conjunction with a separate passage discussing
deoxygenating water with hydrazine).  "[U]nless a reference discloses within
the four corners of the document not only all of the limitations claimed but
also all of the limitations arranged or combined in the same way as recited in
the claim, it cannot be said to prove prior invention of the thing claimed and,

IPR2019-01094
Patent 9,964,266 B2

thus, cannot anticipate under 35 U.S.C. § 102." *Net MoneyIN*, 545 F.3d at
1371.

Petitioner relies on Dr. Bretschneider's citations to pages in Imtra
2011 that contain both information regarding the properties of Imtra LEDs in
general, and information on specific products. *See* Pet. 28–46. Unless the
description of certain properties is expressly limited to the specific products
on a given page, however, we do not view the general disclosures regarding
Imtra LEDs as limited to the specific products on the same page. For
example, based on our review of Imtra 2011, we understand the disclosures
regarding "Anatomy of an Imtra PowerLED" on pages titled "Imtra
Technology" apply to all products in the catalog. *See* Pet. 26–48; *see also*
Ex. 1005, 5–13; Ex. 2045 (Colby transcript) 23:14–24 (stating that
"Anatomy of a PowerLED is used somewhat universally across several
product names."). In addition, although Petitioner identifies specifically the
Portland model as meeting the limitation of "wherein the heat conducting
sidewall has a first dimension between the heat conducting closed rear face
and the open front face of less than 2 inches," review of the reference shows
that all but two of the LED downlights disclosed in the reference meet this
limitation. Thus, while Petitioner identifies specific products as
exemplifying certain claim limitations, it does not follow that *only* those
specific products meet the claim limitations.

In addition to arguing that Petitioner's anticipation challenge fails as a
matter of law, Patent Owner contends that Imtra 2011 discloses neither the
claimed "driver" nor the claimed "plurality of elements" that align with tabs
of a standard junction box. Resp. 46–51.

30

IPR2019-01094
Patent 9,964,266 B2

1. *driver*

Petitioner directs us to the portion of Imtra 2011 indicating Imtra
PowerLED fixtures include "Integrated Driver Electronics featuring," *inter
alia*, constant current control of LEDs, PWM dimming interface, and voltage
spike/transient suppression.  Pet. 29 (citing Ex. 1005, 5); *see also* Ex. 1002,
¶ 123.  Petitioner argues that the integrated driver electronics disclosed in
Imtra 2011 meet the limitation of "a driver for powering the light source
module to emit light."  Pet. 29 (citing Ex. 1005, 5, 10).

Patent Owner argues that Petitioner fails to show the presence of the
claimed driver in Imtra 2011.  Resp. 46–47.  Specifically, Patent Owner
explains that Dr. Bretschneider's declaration relies on text on page 5
(relating to Imtra PowerLED fixtures), but pictures a Ventura product, which
receives low-voltage DC, rather than building mains voltage.  *Id.*  Patent
Owner states that the Portland and Hatteras family of products also receive
low-voltage DC, rather than building mains voltage.  *Id.* at 47.

Thus, Patent Owner's position is based on its proposed construction of
"driver," which we decline to adopt.  Using our construction of "driver," we
are persuaded by Petitioner's argument that the "integrated drive
electronics" of generic Imtra PowerLED fixtures satisfy the "driver"
limitation.  *See, e.g.*, Ex. 1005, 5.

2. *plurality of elements*

Independent claims 1 and 26 (and their challenged dependent claims)
require "the unified casting includes a plurality of elements positioned
proximate to the open front face so as to align with corresponding tabs of a
standard junction box and thereby facilitate holding the unified casting up
against the standard junction box when the unified casting is installed in the

31

IPR2019-01094
Patent 9,964,266 B2

standard junction box."  Ex. 1001, 8:27–33.  Figure 1 of the '266 Patent is
reproduced below:



FIG. 1

Figure 1 of the '266 Patent shows an exploded view of a recessed
lighting system.  *Id.* 2:6–7.  The system may include junction box 2, light
source module 3, driver (power supply) 4, unified casting 5, reflector 6, lens
7, and trim 8.  *Id.* 2:7–10.

The '266 Patent describes the junction box tabs and plurality of
elements for aligning with them as follows:

> In one embodiment, the junction box **2** may include one or more
> tabs **10A**, **10B** for coupling the junction box **2** to the casting **5.**
> The tabs **10A**, **10B** may be any device/component for receiving
> corresponding elements **27A**, **27B** of the casting **5** to firmly hold
> the weight of the unified casting **5,** the light source module **3,** the
> driver **4,** the reflector **6,** the lens **7,** and/or the trim **8** up against
> the junction box **2**.  As shown in FIG. **1,** the tabs **10A**, **10B**
> include holes for receiving screws or bolts **25A**, **25B** through the
> corresponding   elements   **27A**,   **27B**;   however,   in   other

32

IPR2019-01094
Patent 9,964,266 B2

> embodiments the tabs **10A**, **10B** may facilitate a twist-and-lock
> friction connection with corresponding elements **27A, 27B** of the
> casting **5** and without the use of separate tools or other devices.

*Id.*, 2:40–52.

Petitioner argues that Imtra 2011 discloses that the lighting devices
may include mounting holes on the housing that are adapted to receive
mounting screws to fasten the lighting device to a surface, such as a recessed
area in the ceiling.  Pet. 35 (citing Ex. 1005, 6, 10).  Relying on Dr.
Bretschneider's testimony, Petitioner contends that a POSITA would have
understood that the mounting holes are located on or proximate to the open
front face and could be positioned anywhere on the outside surface of the
housing according to the needs of the final installation method.  *Id.* at 35–36
(citing Ex. 1002, ¶ 143).  Dr. Bretschneider testified that "[g]iven the long
history of mounting lighting fixtures to the retaining tabs on the face of a
junction box, a POSITA reading Imtra's implicit teaching of screw mount
fixtures would understand that this indicates a fixture that could be mounted
to the attachment points of a standard junction box."  Ex. 1002, ¶ 143.

Thus, Petitioner asserts that Imtra 2011 discloses the existence of
mechanical elements built into the housing or unified casting in order to
attach the lighting device to a junction box in a ceiling.  Pet. 36.

Patent Owner counters that Imtra 2011 does not teach mounting its
fixtures to the attachment points of a standard junction box.  Resp. 51.
According to Patent Owner, a POSITA reading Imtra 2011 would
understand that it teaches mounting Imtra products directly to the ceiling
using screws that are inserted directly into the ceiling.  *Id.* at 50.  Patent
Owner further argues that products in Imtra 2011 were low-voltage DC
devices that did not require a junction box and were not designed to mate

33

IPR2019-01094
Patent 9,964,266 B2

with a standard junction box.  *Id.* at 49.

Based on our review of the arguments and evidence of record, we
determine that Petitioner has not demonstrated, by a preponderance of the
evidence, that Imtra 2011 teaches the required "plurality of elements
positioned proximate to the open front face so as to align with corresponding
tabs of a standard junction box."  In particular, as explained below, we find
Petitioner has not provided sufficient evidence to demonstrate that the
mounting holes described in Imtra 2011 "comprise a plurality of elements
positioned so as to align with corresponding tabs of a standard junction
box."

Imtra 2011 teaches that, in addition to mounting springs, "screw-
mounted fixtures" or "mounts with screws" are options for installing the
Imtra products.  Ex. 1005, 5, 6, 10, 12.  Petitioner and Dr. Bretschneider rely
on the screw holes or mounting holes as teaching the "plurality of elements"
limitation of the claims.  *See* Pet. 35–36, Ex. 1002 ¶ 143.  The evidence of
record, however, demonstrates only that the products in Imtra 2011 are
installed with mounting springs or are screwed directly into the ceiling, i.e.,
not using a standard junction box.

For example, Eric Braitmayer, CEO and President of Imtra
Corporation, testified at his deposition that he was familiar with Imtra
brochures on lighting products because he created most of the brochures,
and was familiar with Imtra's LED products in the catalogs.  Ex. 2089,
10:10–11; 29:15–30:11 (Braitmayer depo.).  He further testified that Imtra's
LEDs products "could be mounted to any subsurface that's hard enough to
be held in place with a screw," and to mount the LED fixture, one would
"drill small holes in the mounting surface," for mounting the fixture to

34

IPR2019-01094
Patent 9,964,266 B2

whatever material one wants to mount it to, typically plywood in the ceiling
of a boat.  *Id.* at 32:12–19; 42:22–43:6; 75:1–19.  Colby Chevalier, Director
of Product Management at Imtra Corporation, signed a declaration that
stated "Imtra's recessed lights are not mounted in a junction box.  They are
mounted in an overhead cutout in a boat ceiling either using mouse trap
springs or screw holes."  Ex. 2009, 1 (Chevalier decl.).

Petitioner argues that Messrs. Braitmayer and Chevalier are not
persons of ordinary skill in the art, implying that their testimony should be
discounted or ignored.  *See* Reply 12.  However, as both men are shown to
be very familiar with the Imtra products depicted in Imtra 2011, we find
their testimony as fact witnesses to be credible.  *See* FRE 602.

Mr. Benya testifies by declaration that Imtra 2011 has four different
families of LED lights, which he refers to as the Sardinia 120 VAC Family,
the Ventura Low-Voltage DC Family, the Portland Low-Voltage DC
Family, and the Hatteras Low-Voltage DC Family.  Ex. 2090, ¶ 251.  He
notes that the Sardinia 120 VAC Family products are the only Imtra
products that accept 120 VAC.  *Id.* at ¶ 254.  He quotes Imtra 2011 as stating
that the Sardinia 120 VAC Family products are "equipped with an 18-awg
Triplex cable tails for direct hook-up to an AC J-box."  *Id.* at ¶ 252 (quoting
Ex. 1002, 6.  Mr. Benya explains:

> This language means that the wire itself is hooked-up to AC
> power within the J-box.  So when the product is installed through
> a hole cut into a ceiling and *attached directly to the ceiling of the
> boat (by springs or screws)*, the Triplex cable tail provides a
> length of cable that can be extended from the Sardinia/Cyprus
> product at one end to a distance up to the length of that cable to
> be connected at the other end to an AC power line within the
> junction box (such as by twist caps).  Imtra 2011 also explains
> that  an  optional  terminal  block  allows  connection  at  the

35

IPR2019-01094
Patent 9,964,266 B2

> Sardinia/Cyprus product: "If preferred, attach the optional
> terminal block/bracket for convenient wiring right at the fixture
> housing."

*Id.* ¶ 258 (emphasis added).  Mr. Benya conveys that these devices would
not need to use a junction box to mount to the ceiling because trap springs or
screws are used to mount them directly to the ceiling.  *Id.* ¶ 259.

Petitioner argues that Mr. "Benya agrees that because Imtra 2011
discloses screw holes, at least one of those screw holes can be aligned with
any tab of any J-box and that results in the casting being installed in a J-
box."  Reply 11 (citing Ex. 1038, 130:6–131:8).  Petitioner's
characterization is inaccurate.  Although Mr. Benya testified that it is
physically possible to attach an Imtra product to a standard junction box
using one screw hole, he clearly indicated this did not constitute the Imtra
product being "installed" according to the manufacturer's instructions:

> Q.  Well, if we take the Hatteras product depicted in the Imtra
> 2011 catalog as is, we could attach it to a tab of a standard
> junction box by placing a screw through one of the existing screw
> holes; correct?
>
> * * *
>
> [Mr. Benya]:  I'm not sure I understood your hypothetical there.
> If I put one screw through one hole, I could attach it to a standard
> junction box?
>
> Q: Correct.
>
> [Mr. Benya]:  It would stay there, but that's not installed
> according to the manufacturer's instructions.  It's not installed
> according to the UL or code.  So, yeah, you can do it if you want
> to stick one screw in one hole.  That's—that's not realistic.

Ex. 1038, 130:16–131:8.  Mr. Benya's testimony here serves more to
illustrate the weakness of Petitioner's case, as it indicates it is not "realistic"
to attach an Imtra product to a J-box using one of the screw holes designed

36

IPR2019-01094
Patent 9,964,266 B2

for attaching the Imtra product to the ceiling.  Furthermore, the claims require a "plurality of elements"—meaning, more than one element—that "align with corresponding tabs"—again, more than one tab—of a "standard junction box."  Petitioner's thought experiment of connecting a single screw through a single hole to a single tab of a junction box does not address the plain language of the claims.

In his declaration Dr. Bretschneider, Petitioner's expert, testified that a "POSITA could easily select from the large number of commercially available junction boxes, a junction box having tabs that align with the mounting holes shown in Imtra 2011." Ex. 1002, ¶ 144.  Despite this statement, however, Dr. Bretschneider testified at deposition that he did not identify in his declaration any standard junction box whose tabs would align with a plurality of elements of any of the products described in Imtra 2011. Ex. 2047, 185:18–22, 187:6–188:2, 190:13–17.  He also testified that not all junction boxes have mounting tabs or holes to mount a lighting fixture. *Id.* 51:16–19, 53:13–16.  Dr. Bretschneider testified that a low voltage power supply does not require use of a UL junction box, with the exception of a Class 1 environment that includes the presence of flammable of explosive materials in the air. *Id.* at 120:19–121:3, 122:8–15, 124:9–17.

Petitioner argues "J-boxes are well known and provide a convenient mounting surface" and "J-boxes are also known to be used on boats."  Reply 12.  But the assertion does not address the claim limitation that the plurality of elements (alleged to be mounting holes in the Imtra products) are positioned proximate to the open front face (of the fixture) so as to align with corresponding tabs of a standard junction box.  And Petitioner does not direct us to any discussion of attaching a product from Imtra 2011 to a

37

IPR2019-01094
Patent 9,964,266 B2

standard junction box in the catalog itself.

Petitioner has the burden of showing unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e). Claims 1, 2, 4–11, 13, 15, 16, 19, 21, and 26 all require a unified casting having "a plurality of elements" that "align with corresponding tabs of a standard junction box." *See* Ex. 1001, 8:27–30, 12:15–17. For the reasons discussed above, Petitioner fails to demonstrate by a preponderance of the evidence that Imtra 2011 discloses a unified casting having "a plurality of elements" that "align with corresponding tabs of a standard junction box." *See* Ex. 1001, 8:27–30, 12:15–17. As a result, we determine that Petitioner has failed to demonstrate that Imtra 2011 anticipates claims 1, 2, 4–11, 13, 15, 16, 19, 21, or 26.

Claim 17 is the only challenged claim that does not recite a unified casing having a "plurality of elements" aligning with corresponding tabs of a standard junction box. *See id.* 10:3–34. With regard to claim 17, Patent Owner argues that the anticipation challenge fails as a matter of law—an argument that we reject for the reasons discussed above—and Imtra 2011 does not disclose the claimed driver based on a construction of driver that we do not adopt. *See* Resp. 46–51. Patent Owner does not otherwise dispute Petitioner's evidence or arguments that Imtra 2011 discloses each limitation of claim 17. We have reviewed Petitioner's undisputed evidence and arguments regarding the disclosure of Imtra 2011, and agree with and adopt Petitioner's evidence and reasoning presented in the Petition regarding claim 17. As a result, we find that Petitioner has demonstrated by a preponderance of evidence that Imtra 2011 discloses each limitation of claim 17. Therefore, we find Imtra 2011 anticipates claim 17.

IPR2019-01094
Patent 9,964,266 B2

*F. Ground 2:  Obviousness over Imtra 2011 and Imtra 2007*

Petitioner contends that claims 1, 2, 4–11, 13–17, 19, 21, 22, 25, 26, and 28–30 would have been obvious over the combination of Imtra 2011 (Ex. 1005) and Imtra 2007 (Ex. 1006).  Pet. 47–64.  Claims 14, 22, 25, and 28–30 were not challenged as anticipated in Ground 1.  *See id.* at 26. Petitioner relies on Imtra 2007 for its disclosure of certain features of some products in the catalog to meet limitations in claims 14, 22, 25, and 28–30. *See id.* at 50–55.  Petitioner relies on Imtra 2007 as showing additional details about some products that allegedly confirm the products include any limitations missing in the anticipation analysis.  Reply 13.

Petitioner argues that a POSITA would have been motivated to combine the disclosures of Imtra 2011 and Imtra 2007 in order to "understand the technology involved in the products."  Pet. 49.

In Ground 2, Petitioner argues that Imtra 2011 combined with Imtra 2007 disclose the "plurality of elements" limitation.  *Id.* at 49–50.  Petitioner contends:

> [M]ounting holes described in Imtra 2011 are "illustrated in a diagram for the Portland PowerLED in the Imtra 2007 catalog (circled in red below):



Thus, the Imtra references disclose the existence of mechanical

IPR2019-01094
Patent 9,964,266 B2

> elements built into the housing or unified casting in order to
> attach the lighting device to a ceiling, proximate the open front
> face, and that the lighting devices "can be easily installed in
> shallow ceiling depth locations." (Imtra 2011, p. 6) It would be
> an obvious design choice to align these screw holes with tabs of
> a standard junction box. (Bretschneider, ¶118, 144) *See
> Gardner v. Tec Systems, Inc.,* 725 F.2d 1338, 1345, 1346 (Fed.
> Cir. 1984).

Pet. 51–52; *see also* Reply 14–15. Petitioner argues that Mr. Benya
concedes that Imtra 2007 discloses a Portland PowerLED having a flange
with screw holes and a Hatteras PowerLED with a casting with a flange with
screw holes. Reply 14–15 (citing Ex. 1038, 221:–222:1, 223:17–225:1).
Based on the presence of screw holes in the flanges, Petitioner states
"[t]herefore, it is *undisputed* that Imtra 2007 discloses the 'plurality of
elements' limitation." *Id.* at 16 (emphasis added).

We disagree with Petitioner's ultimate conclusion that Imtra 2007
discloses the plurality of elements limitation, at least for the reasons
discussed above in relation to Imtra 2011 and the "plurality of elements"
limitation.

In addition, review of the portions of Mr. Benya's deposition
testimony cited by Petitioner shows that Mr. Benya merely agreed that
drawings in Imtra 2007 of a Portland PowerLED and a Hatteras PowerLED
reasonably indicated that the products include a flange with a screw hole in
them. *See* Ex. 1038, 220:19–225:1. Petitioner tried, but failed, to get Mr.
Benya to agree that "if the Hatteras product had a larger flange such that the
screw holes would align with the tabs of the standard junction box," it would
meet the "plurality of elements" limitation. *Id.* 127:22–130:14. Thus, Mr.
Benya did not agree that Imtra 2007 "discloses the 'plurality of elements'

40

IPR2019-01094
Patent 9,964,266 B2

limitation."

We also disagree with the characterization that Patent Owner did not dispute that Imtra 2007 discloses the 'plurality of elements' limitation.". Patent Owner points to Dr. Bretschneider's single sentence about modifying Imtra 2011 (presumably with Imtra 2007) in the section of his declaration discussing the "plurality of elements" limitation:

> Alternatively, modifying the junction points for screw mount fixtures to match those attachment points of a standard junction box would easily be within the capability of a POSITA and yield predictable results without the need for undue experimentation.

Resp. 55 (quoting Ex. 1002 ¶ 145). Patent Owner argues that a statement about whether one is "capable" of modifying Imtra to have screw holes to align with a standard junction box does not explain adequately why a POSITA would have reason to make such a modification. *Id.* As discussed above in relation to Ground 1, Patent Owner spells out that the products in Imtra 2011 (the same products as in Imtra 2007) do not need a junction box for installation and argues that a POSITA would not indulge in the added time, labor, and expense to add an unnecessary junction box in order to mount a fixture that it already readily mounted directly to the ceiling. *Id.* at 55–56.

Petitioner's reasoning is that the Imtra references (either or both) *would have allowed for* modification of Imtra products such that they could be mounted in a standard junction box. Such reasoning is insufficient, as it merely portrays the possibility of modifying Imtra products, i.e., that they *could be* modified, not that there was a reason to modify the products, i.e., that a POSITA *would have* modified the products. *See PersonalWeb Techs., LLC, v. Apple, Inc.*, 848 F.3d 987, 993 (Fed. Cir. 2017) (holding that two

41

IPR2019-01094
Patent 9,964,266 B2

references could be modified does not imply a motivation to pick out those two references and combine them to arrive at the claimed invention). "[O]bviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015). Petitioner's and Dr. Bretschneider's analysis succumb to hindsight bias in failing to explain *why* a POSITA would modify the Imtra products to arrive at the claimed invention. *See InTouch Techs., Inc. v. VGO Communications, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014) (finding hindsight where expert testified that a POSITA *could* combine references, not that they *would* have been motivated to do so).

Patent Owner also identifies problems with Dr. Bretschneider's conclusory motivations for modifying Imtra in the section of his declaration concerning motivation to combine the Imtra references:

> A POSITA, having the basic knowledge of how light sources, including compact LED-based light sources, can be recessed into a can-like fixture of a convention junction box, would be motivated to seek alternative ways to affix the Imtra lighting devices into such a device.

Resp. 56 (quoting Ex. 1002 ¶ 117). Specifically, Patent Owner accurately establishes that Petitioner fails to show that a POSITA would have basic knowledge of how compact LED-based light sources can be *recessed* into a standard junction box, absent use of the '266 patent. *Id.* (citing Ex. 2090, ¶ 322). For example, Dr. Bretschneider presents a discussion of surface mount lights, in the Background section of his declaration, but surface mount lights in which the LED light source is below the junction box and the ceiling are different from the claimed "recessed lighting system." *Id.*

42

IPR2019-01094
Patent 9,964,266 B2

And neither Imtra brochure discloses mounting an LED light source inside a junction box. *Id.* at 56–57. Moreover, Dr. Bretschneider fails to explain *why* a POSITA would have incurred the additional time and money to mount a compact LED-base light source inside a standard junction box, when the fixture could be mounted directly to the ceiling. Thus, there is insufficient evidence that a POSITA *could have* mounted the recessed fixture in a standard junction box, and no explanation of why a POSITA *would have* done so.

Moreover, that Imtra products could be installed in shallow ceiling depth locations (Ex. 1005, 6), are easily fixed to a mounting surface with fasteners (*id.*, 10), and have screw holes (*id.*, 5) does not support Dr. Bretschneider's conclusion that a POSITA would be led by this information to dimension and position screw holes to allow attachment to the tabs of a standard junction box. *See* Ex. 1002 ¶ 118. Again, that something *could be* done does not provide a reason why a POSITA *would have had a reason* to make that effort. *See Belden*, 805 F.3d at 1073.

Petitioner and Dr. Bretschneider provide no credible reason why a POSITA would make the proposed modifications so that a plurality of elements would align with corresponding tabs of a standard-sized junction box. Therefore, we find that Petitioner fails to show obviousness of claims 1, 2, 4–11, 13–16, 19, 21, 25, 26, and 28–30 over the combination of Imtra 2011 and Imtra 2007 by a preponderance of the evidence. Claim 17 would have been obvious over the combined references for the same reasons it is anticipated by Imtra 2011. *See In re McDaniel,* 293 F.3d 1379, 1385 (Fed. Cir. 2002) ("[A]nticipation is the epitome of obviousness.").

43

IPR2019-01094
Patent 9,964,266 B2

*G. Ground 3:  Obviousness over Imtra 2011, Imtra 2007, and Gifford*

Petitioner challenges claims 1, 2, 4–11, 13–17, 19, 21, 22, 25, 26, and 28–30 as obvious over the combination of Imtra 2011 (Ex. 1005), Imtra 2007 (Ex. 1006), and Gifford (Ex. 1007).  Pet. 64–73.  Petitioner argues that Gifford explicitly discloses mounting elements that align with a standard junction box.  *Id.* at 64.  Petitioner contends that Gifford teaches that compact lighting systems may be recessed within an electrical junction box suitable for installation in a ceiling.  *Id.* at 65 (citing Gifford, Fig. 1; 3:19–27).  Similar to its arguments in Ground 2, Petitioner contends that a POSITA with knowledge of how compact LED-based light sources can be recessed into a conventional junction box would have been motivated to seek alternative ways—such as Gifford—to affix Imtra lighting devices into such a box.  *Id.* at 67.  According to Petitioner, "[a] POSITA would have been motivated to apply the teaching of Gifford that a housing for components of a compact LED lighting device can be asserted [sic] into and attached to a standard junction box" and "[a] POSITA would have been motivated to do so for a number of reasons."  *Id.*

According to Dr. Bretschneider:

Gifford teaches installation of an LED lighting fixture to a standard junction box using an adapter apparatus that includes a hollow recess with a back wall and side walls that are contiguous. Gifford also teaches installation of an electrical converter that converts power mains (e.g.[,] 110 V AC) to low voltage DC in order to supply and regulate electrical energy to the LED module.

Thus[,] a POSITA understands that Imtra and Gifford teach related devices that include many common features.  Combining the elements and features of Imtra and Gifford would be within the capabilities of a POSITA and would yield predictable results.

Ex. 1002, ¶¶ 120–121.

44

IPR2019-01094
Patent 9,964,266 B2

In its Reply, Petitioner states that it relies on Gifford for showing an
LED system having a housing with an integral flange with screw holes that
align with a J-box.  Reply 16.  Petitioner argues "[t]here is no question that
Gifford discloses use of a standard J-box having integral tabs that may be
used to attach a lighting device."  *Id.* at 17.  A POSITA, according to
Petitioner, would have understood that modifying the flange with screw
holes that align with tabs of J-box as taught by Gifford would involve
simply modifying the prior art using well-known methods to yield
predictable results.  *Id.* at17.

Patent Owner raises similar arguments to those made in disputing the
prior grounds, i.e., Ground 3 fails as a matter of law for lack of clarity and
mixing-and-matching product features in Imtra 2011; Imtra 2011 devices do
not require a junction box and were not designed to mount to a junction box
(citing Ex. 2090 ¶ 339); a POSITA would not have been motivated to incur
the time, labor, and expense of using an unnecessary junction box with Imtra
2011 products; and Petitioner provides no motivation other than hindsight to
combine Imtra 2011, Imtra 2007, and Gifford to result in the invention of the
'266 patent.  Resp. 58–63.  More specifically, regarding motivation, Patent
Owner argues that adding Gifford as a reference "does not alter the reasons
explained for Ground 2 (Imtra 2011 and Imtra 2007) why a person skilled in
the art would not be motivated to modify and mount an Imtra 2011 device
directly to a junction box."  *Id.* at 61.

Mr. Benya testifies that Dr. Bretschneider alleges that Gifford's
adapter apparatus is "equivalent" to the unified casting of the '266 patent.
Ex. 2090 ¶ 349 (citing Ex. 1002 ¶¶ 111–112 stating "Gifford's adaptor
apparatus is equivalent to the casting of the '266 patent").  Mr. Benya points

45

IPR2019-01094
Patent 9,964,266 B2

out that Gifford discloses mounting surface mounted lights, not recessed lights. *Id.* Patent Owner argues that what Petitioner describes as a "housing" in Gifford is not a housing, but rather, a safety apparatus. Sur-reply 28; *see also* Reply 16 ("The Petition relies on Gifford for showing an LED system having a housing with an integral flange with screw holes that align with a J-box.").

Patent Owner contends that Petitioner employed hindsight in creating the cropped Fig. 1 of Gifford in the Petition and misidentified its components. Sur-reply 30. Patent Owner provides a side-by-side comparison of Petitioner's "cropped" Fig. 1 of Gifford with the full Fig. 1 of Gifford:

IPR2019-01094
Patent 9,964,266 B2



**ELCO Cropped Gifford Figure 1**
**(Pet. at 65)**

**Full Gifford Figure 1**
**(Response at 32)**

Reply 29.  The left side of the above figure shows Gifford's electrical junction box 112 and adaptor apparatus 100, but not light fixture apparatus 102.  *See* Gifford, 3:19–27.  The right side of the above figure shows the entirety of Gifford's Fig. 1, including electrical junction box 112, adaptor apparatus 100, and light fixture apparatus 102.  *See id.*, 3:11–18.

The left side of the figure above is reproduced from the Petition, and is a partial reproduction of Gifford Fig. 1.  *Compare* Pet. 65 *with* Gifford, Fig. 1.  Petitioner describes its depiction as:

47

IPR2019-01094
Patent 9,964,266 B2

> Gifford teaches that *such compact lighting systems may be
> recessed within an electrical junction box* suitable for installation
> in a ceiling. (Gifford, Fig. 1; 3:19-27) Gifford shows that adapter
> apparatus 100 having a support 110 (highlighted in red) that is
> inserted into and attaches to a junction box 112 (highlighted in
> blue).

Pet. 65 (emphasis added).

The side-by-side comparison figure as explained by Patent Owner

shows:

> The right-side image above shows the *complete* Figure 1 where
> the adapter apparatus 100 is highlighted green. The bottom part
> that ELCO cropped-out is "light emitting diode (LED) light
> fixture apparatus 102" (highlighted yellow) (Gifford, 3:8-10). It
> has a "ceiling canopy 108" to "hide[] the adaptor apparatus 100
> from view" and a "lighting element 104 [that] includes a plurality
> of Light Emitting Diodes (LEDs) 106." (Gifford, 3:11-18). The
> adapter apparatus 100 has a "connector 144 [that] is configured
> to receive a connector 150 of the light fixture apparatus 102 for
> powering the LED lighting element 104" (highlighted purple).
> Accordingly, the adaptor apparatus 100 does not house lighting
> fixture components at all; they are housed in the lighting fixture
> 102 hanging below it.

Sur-reply 29–30.

Upon evaluation, we agree with Patent Owner that the version of

Figure 1 included in the Petition does not fully characterize the teachings of

Gifford.  In particular, we note that Figure 1 shows that Gifford's light

emitting diode is positioned outside its adaptor apparatus, and therefore is

not recessed into the ceiling inside an electrical junction box.  Petitioner's

statements to the contrary (Pet. 65) are unsupported by the evidence of

record."

We find that Petitioner fails to prove by a preponderance of the

evidence that a POSITA would have been motivated to modify the Imtra

IPR2019-01094
Patent 9,964,266 B2

references in view of Gifford's teaching.

Petitioner cites to several paragraphs of Dr. Bretschneider's declaration to support a reason to modify the Imtra products in view of Gifford.  Reply 22 (citing Ex. 1002, ¶¶ 117–121, 134, 143–145, 175, 177–78, 185–86, 199).  As set forth below, review of these paragraphs, however, shows that they are repetitive, conclusory, and suffer from the defect of surmising what a POSITA *could have* done instead of what a POSITA *would have had reason* to do, as discussed in Ground 2.

Paragraphs 117–19 of the Bretschneider Declaration discuss Imtra, but do not mention Gifford.  Ex. 1002, ¶¶ 117–19.

Paragraph 120 of the Bretschneider Declaration states that Gifford teaches installation of an LED lighting fixture to a standard junction box using an adaptor apparatus that includes a hollow recess with a back wall and side walls that are contiguous.  Paragraph 121 of the Bretschneider Declaration concludes that a POSITA understands that Imtra and Gifford teach related devices that include many common features, such that combining the elements and features would be within the *capabilities* of a POSITA and would yield predictable results.

Paragraph 134 of the Bretschneider Declaration discusses the dimensions of a junction box described in the '266 patent.

Paragraphs 143–45 of the Bretschneider Declaration discuss Imtra 2011 and do not mention Gifford.

Paragraph 175 of the Bretschneider Declaration states—incorrectly—that Gifford teaches a lighting system that is able to be installed in a standard junction box.  As shown in the figure above, Gifford discloses components of electrical converter 124 housed in electrical junction box 112 and above

49

IPR2019-01094
Patent 9,964,266 B2

adaptor apparatus 100.  Gifford, Fig. 1, 4:22–30.  Connector 150 sits within
a recess in adaptor apparatus 100.  *Id.*, Fig. 1, 4:41–46.  Gifford's lighting
fixture 102 is located on the exterior of adaptor apparatus 100 and is not
recessed.  Therefore, Gifford does not teach a lighting system able to be
installed in a standard junction box.  Paragraph 175 further states that a
POSITA would be motivated to combine Imtra 2011 with Gifford, but as the
premise on which the conclusion is based is wrong, we disagree with Dr.
Bretschneider's conclusion.

Paragraphs 177–78 of the Bretschneider Declaration state that a
POSITA would be motivated to reposition the mounting holes of Imtra 2011
to match the tab locations of a standard junction box as the tab locations of a
standard junction box form a mounting surface.  This faulty reasoning
assumes a POSITA would seek to incur additional expense in time, labor,
and materials to mount an Imtra fixture in a junction box, rather than simply
screw it into the ceiling.  Petitioner provides no credible reason why a
person of ordinary skill in the art would have made the proposed
modifications.

Paragraph 185 of the Bretschneider Declaration addresses Imtra 2011,
not Gifford.  Paragraph 186, like paragraph 121, states that a POSITA would
be motivated to combine Gifford with Imtra 2011, since such a modification
would be within the *capability* of a POSITA and would give predictable
results.

Paragraph 199 of the Bretschneider Declaration states that a POSITA
would be motivated to modify the position of the screw attachment holes of
Imtra 2011 to correspond to the mounting tabs of a standard junction box in
light of the teachings of Gifford, as both are directed to lighting products

50

IPR2019-01094
Patent 9,964,266 B2

that install in shallow recesses and the combination would result in predictable results.  However, as discussed above, Gifford is not directed to a lighting product that installs in a shallow recess, it is directed to a surface mount light fixture.  Thus, Petitioner provides no adequate reason for making the proposed modification.

And Petitioner provides no evidence that enlarging the flange of the Hatteras product depicted in Imtra 2007 would result in screw holes aligned with the tabs of a standard junction box, or why a POSITA would be motivated to make any modification.  *See, e.g.,* Reply 20–21.  Instead, Petitioner argues that Patent Owner fails to show evidence that a POSITA would have been unable to modify the Imtra products—which improperly attempts to transfer Petitioner's burden of proof to Patent Owner.

Dr. Bretschneider's conclusion that Gifford's adaptor apparatus is "equivalent" to the unified casting of the '266 patent (Ex. 1002, ¶¶ 111–112) is also not credible.  As Dr. Bretschneider acknowledges, the back and exterior of Gifford's adaptor apparatus has no fins or other heat dissipation feature.  *See* Ex. 1002 ¶ 112.  In addition, the adaptor apparatus does not contain a lighting system, nor does Gifford suggest that a lighting system could be contained within the adaptor apparatus.  *See* Gifford, Fig. 1.

Finding insufficient evidence regarding a reason to combine the Imtra references with Gifford, we not are persuaded that Petitioner demonstrates, by a preponderance of the evidence, that the subject matter of any of challenged claims 1, 2, 4–11, 13–17, 19, 21, 22, 25, 26, and 28–30 of the '266 patent would have been obvious over the combination of Imtra 2011, Imtra 2007, and Gifford.

IPR2019-01094
Patent 9,964,266 B2

## III.  MOTIONS TO EXCLUDE

### A.  Petitioner's Motion to Exclude

Petitioner seeks to exclude paragraphs 4–6 of the declaration of Mr. Colby Chevalier dated June 3, 2019 (Ex. 2009), on the basis that he lacks personal knowledge and his deposition testimony exceeds the scope of the direct examination.  Paper 53, 3–5.  In these paragraphs Mr. Chevalier testifies that Imtra's recessed light are not mounted in a junction box, boats do not use junction boxes, and anyone wanting to put Imtra's lights in a junction box would be on the wrong path.  Ex. 2009 ¶¶ 4–6.  At the time of his declaration, Mr. Chevalier was the Director of Product Management for Imtra Corporation and had been with Imtra for more than 13 years.  *Id.* ¶ 1. As such, we consider Mr. Chevalier to be qualified to provide fact testimony regarding Imtra's products.  We deny Petitioner's motion to the extent that it requests exclusion of fact testimony, and dismiss it as moot to the extent that it requests exclusion of opinion testimony, as we did not rely on Mr. Chevalier's opinions in our decision.

Petitioner also seeks to exclude pages of Mr. Chevalier's deposition testimony (Ex. 2045).  Paper 53, 5–6.  We dismiss this portion of the motion as moot as we do not rely on these portions of Mr. Chevalier's testimony in this Decision.

Petitioner seeks to exclude evidence on copying and praise, including Mr. Benya's opinions (Ex. 2090 ¶¶ 120–136, 138–142, 144–147, and 159–160) and Exhibits 2052–2073, 2076, 2077, 2080, and 2081.  Paper 53, 6–14. We dismiss this portion of the motion as moot as we do not rely on this evidence in this Decision.

IPR2019-01094
Patent 9,964,266 B2

We also dismiss Petitioner's motion to exclude paragraphs 35–36 of
Mr. Benya's declaration as moot as we do not rely on them in this Decision.

### B. Patent Owner's Motion to Exclude

Patent Owner seeks to exclude images at pages 20–21 of the Reply, as
well as Exhibits 1010–1028. Paper 59, 1–3 and 6–9. We dismiss this
portion of the motion as moot as we do not rely on this evidence in this
Decision.

Patent Owner also seeks to exclude paragraphs 67, 106, 107, 117, and
147 of Dr. Bretschneider's declaration (Ex. 1002). *Id.* at 3–5. We dismiss
the motion as moot with respect to paragraphs 67, 106, 107, and 147, as we
do not rely on this testimony in this Decision.

We deny the motion with respect to paragraph 117. Patent Owner
argues that paragraph 117 should be excluded under FRE 401–403 as
irrelevant to the analysis of a motivation to combine. Paper 59, 4–5.
Paragraph 117 states:

> The Imtra references teach that its lighting devices are well suited
> for installations with limited space, such as marine applications
> with shallow ceiling depths and limited overhead space [Exh.
> 1005, Imtra 2011, p. 6] The Imtra references teach mounting the
> lighting devices directly to the ceiling by springs or screws but
> does not detail using a standard junction box. The Imtra
> references also teach mounting switches using standard junction
> boxes. A POSITA, having the basic knowledge of how light
> sources, including compact LED-based light sources, can be
> recessed into a can-like fixture of a conventional junction box,
> would be motivated to seek alternative ways to affix the Imtra
> lighting devices into such a device.

Ex. 1002, ¶ 117. Petitioner argues that paragraph 117 provides relevant
evidence and there is no danger of confusion or unfair prejudice. Paper 55,

IPR2019-01094
Patent 9,964,266 B2

3–5.  We deny Patent Owner's motion to exclude paragraph 117, as we find
it to be relevant and probative.

## IV.  PATENT OWNER'S MOTION TO SEAL

Patent Owner moves to seal Paper 49 and Exhibits 2061–2073, 2075,
2076, 2088, 2090, and 2110.  Paper 67.  Patent Owner asserts that the
exhibits sought to be sealed (other than Exhibits 2090 and 2011) were
produced in co-pending district court litigation involving the '266 patent and
contain sensitive business information.  *Id.* at 1–2.  Patent Owner asserts that
Paper 49 (Patent Owner's Sur-reply) and Exhibits 2090 and 2110 were filed
under seal in accordance with 35 U.S.C. § 316(a)(1) and remain under seal
pending the outcome of the motion.  *Id.* at 2.  Petitioner did not oppose
Patent Owner's motion.  *See id.* at 4.

A non-confidential version of Paper 49 was filed as Paper 50.  A non-
confidential version of Exhibit 2090 was filed as Exhibit 2094.  A non-
confidential version of Exhibit 2110 was filed as Exhibit 2111.

"There is a strong public policy for making all information filed in a
quasijudicial administrative proceeding open to the public, especially in an
*inter partes* review which determines the patentability of claims in an issued
patent and therefore affects the rights of the public."  *Garmin Int'l v. Cuozzo
Speed Techs., LLC*, IPR2012–00001, slip op. at 1–2 (PTAB Mar. 14, 2013)
(Paper 34).  For this reason, except as otherwise ordered, the record of an
*inter partes* review trial shall be made available to the public.  *See* 35 U.S.C.
§ 316(a)(1); 37 C.F.R. § 42.14.

The standard for granting a motion to seal is good cause.  37 C.F.R.
§ 42.54.  That standard includes a showing that "(1) the information sought
to be sealed is truly confidential, (2) a concrete harm would result upon

54

IPR2019-01094
Patent 9,964,266 B2

public disclosure, (3) there exists a genuine need to rely in the trial on the
specific information sought to be sealed, and (4) on balance, an interest in
maintaining confidentiality outweighs the strong public interest in having an
open record." *Argentum Pharms. LLC v. Alcon Research, Ltd.*, Case
IPR2017-01053, slip op. at 4 (Paper 27) (PTAB Jan. 19, 2018)
(informative).

After having considered the Motion, we determine that there is good
cause for granting it.  Specifically, Patent Owner demonstrates that the
information it seeks to seal consists of confidential commercial information.
And we see little harm to the public's interest in restricting access to the
information because we do not rely on any confidential information in this
decision.  We further note that the public versions of Petitioner's Sur-reply,
Exhibit 2090, and Exhibit 2111 appear to redact only that information that
Patent Owner seeks to seal in its motion, and the redactions are narrowly
tailored.

V.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has not established, by a preponderance of
the evidence, that claims 1, 2, 4–11, 13, 15, 16, 19, 21, or 26 of the '266
patent are unpatentable;

FURTHER ORDERED that Petitioner has established, by a
preponderance of the evidence, that claim 17 is unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude (Paper
53) is dismissed-in-part as moot and denied-in-part;

FURTHER ORDERED that Patent Owner's Motion to Exclude
(Paper 59) is dismissed-in-part as moot and denied-in-part;

IPR2019-01094
Patent 9,964,266 B2

FURTHER ORDERED that Patent Owner's Unopposed Second

Motion to Seal (Paper 67) is granted.

IPR2019-01094
Patent 9,964,266 B2

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4–11, 13, 15–17, 19, 21, 26. | 102(a) | Intra 2011 | 1, 2, 4–11, 13, 15, 16, 19, 21, 26. | 17 |
| 1, 2, 4–11, 13–17, 19, 21, 22, 25, 26, 28–30 | 103 | Imtra 2011, Imtra 2007 | 1, 2, 4–11, 13–16, 19, 21, 22, 25, 26, 28–30 | 17 |
| 1, 2, 4–11, 13–17, 19, 21, 22, 25, 26, 28–30 | 103 | Imtra 2011, Imtra 2007, Gifford | 1, 2, 4–11, 13–16, 19, 21, 22, 25, 26, 28–30 | 17 |
| **Overall Outcome** | | | **1, 2, 4–11, 13–16, 19, 21, 22, 25, 26, 28–30** | **17** |

57

IPR2019-01094
Patent 9,964,266 B2

For PETITIONER:

Robert E. Boone
Daniel A. Crowe
Erin A. Kelly
BRYAN CAVE LEIGHTON PAISNER LLP
reboone@blcplaw.com
dan.crowe@bclplaw.com
erin.kelly@bclplaw.com


For PATENT OWNER:

David W. Long
ERGONIC, LLC
longdw@ergonic.com

Kevin B. Laurence
LAURENCE & PHILLIPS IP LAW
klaurence@lpiplaw.com

Ben M. Davidson
DAVIDSON LAW GROUP, ALC
ben@dlgla.com

58